No. 22-14219-B

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JOHN HOLLAND, WILLIAM MOORE, EDMUNDO COTA,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NO. 1:17-CR-0234-AT (TOTENBERG, J.)

_____

**REDACTED OPENING BRIEF FOR THE UNITED STATES**

_____

JOHN F. SCANLON
 Assistant Chief

LIGIA MARKMAN
 Trial Attorney
 Criminal Division, Fraud Section

KENNETH A. POLITE, JR.
 Assistant Attorney General

LISA H. MILLER
 Deputy Assistant Attorney General

JOHN-ALEX ROMANO, Attorney
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. (202) 353-0249

*United States v. John Holland, et al.*
No. 22-14219-B

## CERTIFICATE OF INTERESTED PERSONS
## AND DISCLOSURE STATEMENT

In compliance with Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-3, the undersigned hereby certifies that the following have an interest in the outcome of this case:

Adams, Angela

Andrews, Lucas W.

Armstrong, Scott P.

Asbill, Henry W.

Atlanta Medical Center, Inc., a subsidiary of Wellstar Health System

Baverman, Honorable Alan J., United States Magistrate Judge

Bouchard, David Holmes

Bozorgi, Susan Katherine

Centers for Medicare and Medicaid Services

Clinica de la Bebe

Clinica de la Mama

Cota, Edmundo

Deane, Jr., Richard H.

Duffy, Jerrob

Georgia Department of Community Health

*United States v. John Holland, et al.*
No. 22-14219-B

Goodman, Honorable Jonathan, United States Magistrate Judge

Grossman, Andrew

Hall, Jamila Marjani

Hilton Head Health System, L.P. d/b/a Hilton Head Hospital

Holland, John

Markman, Ligia

Martinez, Honorable Jose E., United States District Judge

McEvoy, Brian Fenton

Miller, Lisa H.

Molloy, Sally B.

Moore, William

North Fulton Medical Center, Inc. d/b/a North Fulton Hospital, a subsidiary of Wellstar Health System

Persons, Ellen Harris

Polite, Kenneth A.

Pozos, Antonio M.

Rafferty, Brian T.

Rendon, Carole S.

*United States v. John Holland, et al.*
No. 22-14219-B

Romano, John-Alex

Salinas, Honorable Catherine M., United States Magistrate Judge

Sanders, Jeremy R.

Scanlon, John F.

Sharp, Joseph C.

Sombuntham, Nalina

Soto, Ana Maria Cristina Perez

South Carolina Department of Health and Human Services

Strongwater, Emily

Strongwater, Jay Lester

Surmacz, Nicholas E.

Tenet Healthcare Corporation ("THC")

Tenet Health System Medical, Inc., a subsidiary of Tenet Healthcare Corporation ("THC")

Tenet Health System Spalding, Inc. d/b/a Spalding Regional Medical Center, a subsidiary of Tenet Healthcare Corporation ("THC")

Torres, Honorable Edwin G., United States Magistrate Judge

Totenberg, Honorable Amy T., United States District Judge

Weil, Amy Levin

*United States v. John Holland, et al.*
No. 22-14219-B

White, Honorable Patrick A., United States Magistrate Judge

Zink, Robert A.

In compliance with Fed. R. App. P. 26.1(b), the Centers for Medicare and Medicaid Services, the Georgia Department of Community Health, and the South Carolina Department of Health and Human Services are the organizational victims in this case.

/s/ John-Alex Romano

_____

John-Alex Romano, Attorney
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 353-0249
John-Alex.Romano@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The government requests oral argument and respectfully submits that oral argument may assist the Court in evaluating the facts and law at issue in this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF CONTENTS..............................................................ii

TABLE OF AUTHORITIES ........................................................ v

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION............................................... 1

STATEMENT OF THE ISSUE ................................................... 2

STATEMENT OF THE CASE ................................................... 2

    I.    Procedural History.................................................... 2

    II.    Legal and Factual Background ..................................... 3

        A.    Federal Anti-Kickback Statute ........................... 3

        B.    The Charged Conspiracy ................................... 6

        C.    Government's Motion to Admit Co-Conspirator Statements........................................................ 8

            1.    Factual basis for Tracey Cota's court-approved guilty plea ............................................... 11

            2.    Tracey Cota's interview statements........................ 13

            3.    Documentary Evidence ......................................... 18

                a.    Clinica-Tenet Hospital Contracts................... 18

                b.    North Fulton Business Plan Documents ........ 20

                c.    Internal Reports and Emails ........................... 21

           d.     AKS Training ............................................... 26

    D.    Defendants' Opposition to Admission of Co-Conspirator Statements.................................................... 27

    E.    The District Court's Order ............................... 29

  III.   Standard of Review...................................................... 32

SUMMARY OF ARGUMENT .................................................. 32

ARGUMENT ............................................................................ 35

  I.    The District Court's Exclusion of Co-Conspirator Statements Was an Abuse of Discretion. .................................... 35

    A.    The District Court's Ruling Was Based on Legal Errors. .............................................................. 35

        1.    Legal framework for proving an AKS conspiracy ............................................... 36

        2.    The court erroneously concluded that the one-purpose rule is in tension with the personal-services safe harbor................................. 39

        3.    The court imposed a heightened willfulness requirement........................................... 43

    B.    The District Court's Ruling Was Based on Clearly Erroneous Factual Findings. ............................ 46

        1.    The court clearly erred in finding that Tenet's payments to Clinica were not conditioned on patient referrals. ..................................... 46

        2.    The court clearly erred in finding "scant" evidence of willfulness........................... 54

3.    The court clearly erred in finding that defendants relied in good faith on the advice of counsel.................................................................. 57

II.    Reversal Is Warranted............................................................. 60

CONCLUSION .............................................................................. 61

CERTIFICATE OF COMPLIANCE ........................................... 62

CERTIFICATE OF SERVICE ................................................... 63

# TABLE OF AUTHORITIES

## Cases

*Bingham v. HCA, Inc.*,
   783 F. App'x 868 (11th Cir. 2019) ......................................................29, 40

*Hanlester Network v. Shalala*,
   51 F.3d 1390 (9th Cir. 1998) ................................................................. 38

*Iannelli v. United States*,
   420 U.S. 770 (1975) ................................................................................ 36

*Pfizer, Inc. v. U.S. Dep't of Health and Humans Servs.*,
   42 F.4th 67 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 626 (2023) ...............38, 45

*Purcell v. Gilead Scis., Inc.*,
   439 F. Supp. 3d 388 (E.D. Pa. 2020) ....................................................... 41

*United States ex rel. Armfield v. Gills*,
   No. 8:07-cv-2374, 2012 WL 12918277 (M.D. Fla. Oct. 18, 2012)............. 41

*United States ex rel. Raven v. Georgia Cancer Specialists I, P.C.*,
   No. 1:11-cv-994, 2019 WL 13040801 (N.D. Ga. Mar. 28, 2019) ............. 41

*United States ex rel. Westmoreland v. Amgen, Inc.*,
   812 F. Supp. 2d 39 (D. Mass. 2011) ....................................................41, 42

*United States v. Almedina*,
   686 F.3d 1312 (11th Cir. 2012).............................................................. 32

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*,
   874 F.2d 20 (1st Cir. 1989)...........................................................38, 41, 45

*United States v. Beale*,
   921 F.2d 1412 (11th Cir. 1991).............................................................. 47

*United States v. Borrasi*,
   639 F.3d 774 (7th Cir. 2011) ............................................................. 5, 37

*United States v. Clough*,
   978 F.3d 810 (1st Cir. 2020) ..................................................... 53

*\*United States v. Davis*,
   132 F.3d 1092 (5th Cir. 1998)............................................. 5, 37

*United States v. Dynaelectric Co.*,
   859 F.2d 1559 (11th Cir. 1988)................................................ 49

*\*United States v. Greber*,
   760 F.2d 68 (3d Cir. 1985) ............................................4, 37, 38

*United States v. Hagen*,
   _ F.4th _, No. 21-11273, 2023 WL 2182258 (5th Cir. Feb. 21, 2023)...46, 53

*United States v. Hill*,
   643 F.3d 807 (11th Cir. 2011).................................................. 57

*United States v. Hill*,
   745 F. App'x 806 (11th Cir. 2018) ...............................5, 37, 57

*United States v. Holt*,
   777 F.3d 1234 (11th Cir. 2015)................................................ 36

*United States v. Howard*,
   28 F.4th 180 (11th Cir.), *cert. denied*, 143 S. Ct. 165 (2022) ...................... 36

*United States v. James*,
   590 F.2d 575 (5th Cir. 1979) ..................................................... 8

*United States v. Kats*,
   871 F.2d 105 (9th Cir. 1989) ............................................. 5, 37

*United States v. Lawrence*,
   47 F.3d 1559 (11th Cir. 1995)................................................. 35

*United States v. Lebowitz*,
   676 F.3d 1000 (11th Cir. 2012)............................................... 51

*United States v. Mak*,
   683 F.3d 1126 (9th Cir. 2012)................................................. 54

*United States v. Mallory,*
   988 F.3d 730 (4th Cir.), *cert. denied*, 142 S. Ct. 485 (2021) .................... 4, 37

*United States v. Man,*
   891 F.3d 1253 (11th Cir. 2018) ................................................................. 36

*United States v. Matthews,*
   3 F.4th 1286 (11th Cir. 2021) ................................................................... 32

*United States v. Matthews,*
   431 F.3d 1296 (11th Cir. 2005) ................................................................. 32

*United States v. McClatchey,*
   217 F.3d 823 (10th Cir. 2000) ........................................................ 5, 37, 53

*United States v. Miles,*
   290 F.3d 1341 (11th Cir. 2002) ................................................................. 35

*United States v. Moshiri,*
   858 F.3d 1077 (7th Cir. 2017) ................................................................... 57

*United States v. Nagelvoort,*
   856 F.3d 1117 (7th Cir. 2017) ................................................................... 53

*United States v. Nora,*
   988 F.3d 823 (5th Cir. 2021) ..................................................................... 56

*United States v. Sanjar,*
   876 F.3d 725 (5th Cir. 2017) ..................................................................... 53

*United States v. Shah,*
   981 F.3d 920 (11th Cir. 2020) ........................................................ 5, 30, 39

*United States v. St. Junius,*
   739 F.3d 193 (5th Cir. 2013) ..................................................................... 54

*United States v. Starks,*
   157 F.3d 833 (11th Cir. 1998) .......................................................... 37, 43

*United States v. Van Hemelryck,*
   945 F.2d 1493 (11th Cir. 1991) ................................................................... 9

*United States v. Vernon,*
   723 F.3d 1234 (11th Cir. 2013) ............................................ *passim*

*United States v. Wilk,*
   572 F.3d 1229 (11th Cir. 2009) ................................................ 32

*United States v. Williams,*
   865 F.3d 1328 (11th Cir. 2017) ................................................ 32

**Statutes**

15 U.S.C. § 78ff ........................................................................ 2

15 U.S.C. § 78m ....................................................................... 2

18 U.S.C. § 371 ........................................................................ 2

18 U.S.C. § 1031 ...................................................................... 2

18 U.S.C. § 1343 ...................................................................... 2

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3731 ...................................................................... 2

42 U.S.C. § 1320a-7b ........................................................... *passim*

Pub. L. No. 92-603, 86 Stat. 1329 (1972) .................................... 3

Pub. L. No. 95-142, 91 Stat. 1175 (1977) .................................... 4

**Rules and Regulations**

42 C.F.R. § 1001.952 ........................................................... *passim*

Fed. R. App. P. 4 ...................................................................... 1

Fed. R. Evid. 104 ..................................................................... 49

Fed. R. Evid. 801 ..............................................................1, 2, 35

**Other Authorities**

Black's Law Dictionary .................................................................. 43

Clarification of the Initial OIG Safe Harbor Provisions and
     Establishment of Additional Safe Harbor Provisions Under the
     Anti-Kickback Statute, 64 Fed. Reg. 63518 (Nov. 19, 1999).................... 40

H.R. Rep. No. 92-231 (1971) .......................................................... 3

OIG Supplemental Compliance Program Guidance for Hospitals,
     70 Fed. Reg. 4858 (Jan. 31, 2005)............................................. 45

## INTRODUCTION

John Holland, William Moore, and Edmundo Cota ("defendants") are charged with conspiring to pay and receive healthcare kickbacks, and other crimes, in connection with a 13-year scheme to refer Medicaid patients to hospitals owned by Tenet Healthcare Corporation for childbirth services. The district court denied the government's pretrial motion to admit the statements of ten alleged co-conspirators under Federal Rule of Evidence 801(d)(2)(E), even though the conspirators repeatedly referenced the kickback scheme in their communications and the existence of a conspiracy was corroborated by independent evidence. The court's ruling was based on a flawed understanding of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and clearly erroneous factual findings. This Court should reverse.

## STATEMENT OF JURISDICTION

The government appeals from a pretrial order excluding evidence in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231 and entered its order on November 15, 2022. DE.596 (under seal); DE.610 (redacted order).[1] The government timely filed a notice of appeal on December 14, 2022. DE.619; *see* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18

---

[1] "DE.__" refers to district court docket entries.

U.S.C. § 3731.

## STATEMENT OF THE ISSUE

Whether the district court's denial of the government's motion to admit co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), on the ground that the government failed to prove the existence of a conspiracy by a preponderance of the evidence, was based on legal errors and clearly erroneous findings of fact.

## STATEMENT OF THE CASE

### I.   PROCEDURAL HISTORY

On September 26, 2017, a grand jury in the Northern District of Georgia returned a second superseding indictment charging defendants with conspiring to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371 (Count 1). DE.121:13-25. The indictment also charged defendants, in various combinations, with paying and receiving healthcare kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1), (b)(2) (Counts 2–4: Holland, Cota); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 5–7: Holland, Cota) (Counts 8–9: Holland, Moore); falsifying the books and records of an issuer, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), 78ff(a) (Count 10: Holland) (Count 11: Moore); and major fraud against the United States, in violation of 18 U.S.C. § 1031(a) (Counts 12–13: Holland, Moore). DE.121:26-

34. The district court ordered that Count 10 be dismissed for lack of venue. DE.446:69.

On November 15, 2022, the court denied the government's motion *in limine* to admit the statements of ten alleged co-conspirators under Rule 801(d)(2)(E). DE.610. This interlocutory appeal followed.

## II.    LEGAL AND FACTUAL BACKGROUND

### A.    Federal Anti-Kickback Statute

Congress enacted the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, in 1972 to combat fraud and abuse in the Medicare and Medicaid Programs. Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). The original statute made it a misdemeanor to solicit, offer, or receive a kickback, bribe, or rebate in connection with furnishing covered healthcare services or referring a patient to a provider of those services. *Id.* § 242(b) and (c), 86 Stat. 1419-1420. Through this enactment, Congress intended to strengthen tools for combatting practices that had "long been regarded by professional organizations as unethical, as well as unlawful in some jurisdictions, and which contribute[d] appreciably to the cost of the [M]edicare and [M]edicaid programs." H.R. Rep. No. 92-231 at 1, 107 (1971).

Congress has amended the AKS several times. In 1977, Congress upgraded violation of the statute from a misdemeanor to a felony and broadened

the statute to apply to "any remuneration" (not only kickbacks, bribes, or rebates) solicited, received, offered or paid in connection with, among other things, referring patients for goods or services reimbursable by Medicare or Medicaid. Pub. L. No. 95-142, § 4(a), 91 Stat. 1175, 1181 (1977).

In its current form, the AKS prohibits knowingly and willfully offering or paying "any remuneration" to any person "to induce such person" either (A) to "refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program," or (B) to "purchase, … order, or arrange for or recommend purchasing … or ordering" such items or services. 42 U.S.C. § 1320a-7b(b)(2). The statute also prohibits knowingly and willfully receiving any remuneration "in return for" the same conduct. *Id.* § 1320a-7b(b)(1). These prohibitions were in effect during the charged conspiracy.

Several circuits have adopted—and none has rejected—a "one-purpose rule" for showing unlawful inducement by the payor of kickbacks. Under this rule, conduct violates § 1320a-7b(b)(2)'s prohibition on offering or paying remuneration if one purpose of the payments was to induce an enumerated action, "even if the payments were also intended to compensate for professional services." *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985); *accord United States v. Mallory*, 988 F.3d 730, 741 (4th Cir.), *cert. denied*, 142 S. Ct. 485 (2021);

*United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). Two circuits have also applied the one-purpose rule to the payee offense under § 1320a-7b(b)(1). *See United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989).

In *United States v. Shah*, 981 F.3d 920 (11th Cir. 2020), this Court held that § 1320a-7b(b)(1) does not require any proof of the defendant-payee's motivation for accepting unlawful remuneration. *Id.* at 925. But based on the different language of § 1320a-7b(b)(2), the Court agreed with "[its] sister circuits that the *payor* crime … prohibits payments that are meant *by the payor* to induce one of the enumerated actions." *Id.* at 926. And a panel of this Court previously held in an unpublished decision that the one-purpose rule applies to the payor offense. *See United States v. Hill*, 745 F. App'x 806, 815 & n.9 (11th Cir. 2018).

In certain circumstances, statutory and regulatory safe harbors protect from liability arrangements that otherwise may violate the AKS. 42 U.S.C. § 1320a-7b(b)(3)(A)-(K); 42 C.F.R. § 1001.952. One safe harbor covers payments made under personal-services contracts. 42 C.F.R. § 1001.952(d) (2007). The safe harbor applies only if each criterion is satisfied, including that the contract "covers all of the services the agent provides to the principal for the term of the agreement," *id.* § 1001.952(d)(2), and the "aggregate compensation"

under the contract "is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties" for which a covered healthcare payment may be made, *id.* § 1001.952(d)(5).[2]

### B.    The Charged Conspiracy

The indictment charges that, between 2000 and 2013, defendants conspired to pay and receive illegal kickbacks in exchange for the referral of pregnant patients to hospitals owned by Tenet Healthcare Corporation ("Tenet"), an issuer of publicly traded securities. DE.121:1, 13-16.

Tenet owned and operated several hospitals in its Southern States Region. Four of those hospitals were Atlanta Medical Center, Inc. ("AMC"), North Fulton Medical Center, Inc. ("North Fulton"), and Tenet Health System Spalding, Inc. ("Spalding"), in Georgia, and Hilton Head Health System, L.P. ("Hilton Head"), in South Carolina (collectively, the "Tenet Hospitals"). DE.121:2. Holland was Chief Executive Officer ("CEO") of North Fulton between 2000 and 2006 and Senior Vice President ("SVP") of Operations for the

---

[2] Citations to the personal-services safe harbor are to the version effective December 2007, which was the same version in effect throughout the conspiracy (2000-2013).

Southern States Region between 2006 and 2013. DE.121:2-3. Moore was CEO of AMC from September 2001 through early 2014. DE.121:3.

Cota was CEO of Hispanic Medical Management, Inc., which did business as Clinica de la Mama ("Clinica"). DE.121:3. Clinica provided prenatal care to predominantly undocumented Hispanic women, who were potentially eligible for healthcare coverage under state Medicaid programs and a Medicare program. DE.121:3-5. In September 2010, Clinica was divided into two companies; Cota became CEO of the company that continued doing business as Clinica de la Mama. DE.121:3.

As alleged, defendants conspired with each other and other persons to cause Tenet to pay over $12 million to Clinica to induce Clinica to refer patients to the Tenet Hospitals and to arrange childbirth services at those hospitals for those patients. DE.121:16. As a result of the conspiracy, Tenet Hospitals billed at least $400 million to the Georgia and South Carolina Medicaid programs for childbirth-related services for Clinica patients and their newborns, receiving at least $127 million on those claims. DE.121:22.

Defendants disguised the unlawful kickbacks by having Clinica and Tenet Hospitals enter into pretextual contracts under which Clinica provided various services to the hospital, such as translation services, Medicaid eligibility determination paperwork, and marketing consulting. DE.121:16-17. In many

instances, the services were not needed, substandard, problematic, or not rendered. DE.121:17.

Cota and other co-conspirators allegedly blocked physicians from seeing patients at Clinica unless the physicians were credentialed at Tenet Hospitals and agreed to deliver the babies of Clinica patients there. DE.121:20. Some patients were falsely told that Medicaid would cover their childbirth costs only if the patient delivered at a Tenet Hospital. DE.121:21.

Between September 2006 and June 2012, Tenet Hospitals were covered by a Corporate Integrity Agreement that Tenet entered into with the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG"). DE.121:10. The Agreement's purpose was to ensure that Tenet complied with, *inter alia*, the AKS. Among other things, the Agreement required Tenet to strengthen its policies and procedures for preventing AKS violations and to require senior executives and other personnel to attend annual training that covered the AKS. DE.121:10-11.

### C.    Government's Motion to Admit Co-Conspirator Statements

Defendants moved for a pretrial hearing pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979), to determine the admissibility of co-conspirator statements that the government planned to offer under Rule 801(d)(2)(E). DE.195; DE.218; DE.223. The government opposed their request because the

complexity of the case made a *James* hearing impractical and risked turning it into a mini-trial, and because a court has discretion to make Rule 801(d)(2)(E) determinations at trial. DE.277:36-43; *see, e.g.*, *United States v. Van Hemelryck*, 945 F.2d 1493, 1498 (11th Cir. 1991).[3]

The district court directed the government to provide a list of the offered statements and arguments in support of their admissibility, and directed defendants to file motions to exclude any statements they wished to challenge. DE.610:1-2 (citing DE.446:68-69; DE.497:1-2). The court found the parties' ensuing submissions insufficient and announced that it would "have what amounts to a *James* hearing on paper." DE.497:1-3 & n.2. Because the government bore the burden of establishing admissibility, the court directed it to file a motion *in limine* and to "present its evidence and argument in [a] manner" consistent with the court's intent to hold a "paper" hearing. DE.497:9.

The government moved to admit statements of ten alleged co-conspirators. DE.507. One co-conspirator, Tracey Cota ("Tracey"), is defendant Cota's ex-wife and the former Chief Operating Officer ("COO") of Clinica; Tracey pleaded guilty to conspiring to pay and receive healthcare kickbacks.

---

[3] In 2017, the government identified 55 alleged co-conspirators in response to an order requiring it to disclose the names of all unindicted co-conspirators. D.E.136:10. The government reduced to ten the number of co-conspirators whose statements it seeks to offer at trial.

DE.610:24. The remaining declarants ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮. The ten co-conspirators are:



- **Tracey Cota** (Clinica COO, 2000-2010)

DE.507:1, 28, 32-33, 36, 46, 51, 57, 63, 66.

In total, the government moved to admit 44 written statements by the ten co-conspirators and oral statements by six of them. DE.507:1, 30-72. It submitted voluminous appendices containing evidence of the existence of a conspiracy, membership in the conspiracy, and the statements' nexus to the conspiracy. DE.507-App.A; DE.507-App.B. This evidence primarily consisted of the anticipated testimony of Tracey, consistent with the transcript of her guilty plea proceeding and reports of law enforcement interviews with her, and documentary evidence, including the Clinica-Tenet Hospital contracts and

internal emails.[4]

1. Factual basis for Tracey Cota's court-approved guilty plea

On August 6, 2014, Tracey pleaded guilty before the district judge presiding over this case to conspiring to pay and receive kickbacks in exchange for Medicaid patient referrals. DE.507-App.B:203-37. Tracey is expected to testify at trial in a manner consistent with the following stipulated facts, DE.507:11, which provided the factual basis for her plea, DE.507-App.B:213, 223, 236.

Tracey was the COO of Clinica until September 2010. DE.507-App.B:214. Clinica's CEO (*i.e.*, defendant Cota) had primary responsibility for Clinica's marketing activities, business development, and negotiations. *Id.* Although most Clinica patients were ineligible for traditional Medicaid benefits, many qualified to have the costs of labor and delivery services at a hospital covered by Medicaid emergency assistance programs. *Id.*

Beginning in 2000, Tracey, hospital executives, and others agreed that Clinica would be compensated for referring Clinica patients to the Tenet Hospitals for delivery. DE.507-App.B:216.[5] To effectuate this goal, the Tenet

---

[4] Appendix A contained the written statements offered for admission and a summary index. Appendix B contained the remaining materials.

[5] The hospitals and Tracey's co-conspirators were not identified by name at her public plea hearing, DE.507-App.B:214-16, but the law-enforcement reports

Hospitals contracted with and paid Clinica to provide services at the hospitals, but the "true purpose" of these arrangements was to pay Clinica "for Medicaid patient referrals." *Id.* The conspirators caused Clinica and the Tenet Hospitals to enter into contracts for such services as management of an OB-GYN residency clinic, translation services, and Medicaid eligibility paperwork. DE.507-App.B:217.

Despite the contract provisions, Tracey and her co-conspirators understood that the payments by the Tenet Hospitals to Clinica "were conditioned on and in exchange for Clinica referring its patients to the hospitals." DE.507-App.B:217-18. The Tenet Hospitals would not have contracted with and paid Clinica unless Clinica referred patients to them. DE.507-App.B:218.

To ensure Clinica patients delivered at Tenet Hospitals, Clinica allowed only obstetricians with delivery privileges at Tenet Hospitals to see patients at its clinics. DE.507-App.B:219. Clinica staff was instructed to discourage patients from choosing to deliver at a different hospital, to emphasize the likelihood of getting Medicaid to cover their delivery costs at Tenet Hospitals, and to suggest

---

indicate that she was referring to defendants and co-conspirators ███████ ██████.

that Medicaid coverage for delivery at another hospital might be denied. DE.507-App.B:220.

The district court found a factual basis for Tracey's guilty plea and accepted it. DE.507-App.B:236.[6]

### 2. Tracey Cota's interview statements

Tracey is also expected to testify at trial in a manner consistent with her statements to law enforcement. DE.507:14.

Executed in March 2000, the first Clinica-Tenet Hospital contract called for Clinica to operate a clinic as a training site for AMC's OB/GYN residency program, mostly in exchange for fees based on collections from that clinic. DE.507-App.B:431-63. Tracey, however, reported to AMC the volume of patient referrals from all Clinica clinics, and grew concerned that AMC might reduce the contractual payments because the number of patients referred from the residency clinic was low. DE.507-App.B:16-17. When Tracey expressed this concern to ████████████████████████ told her not to worry; AMC was pleased because overall deliveries from Clinica clinics were higher

---

[6] AMC and North Fulton also pleaded guilty to an AKS conspiracy in connection with the alleged facts in this case. *See United States v. Atlanta Medical Center, Inc., et al.*, No. 1:16-cr-350-AT, DE.19, DE.20 (N.D. Ga. Oct. 21, 2016). The district court referenced that resolution, and a related civil settlement, at a 2019 hearing related to co-conspirator statements. DE.477:44-45.

than AMC had expected from the one clinic. DE.507-App.B:17, 47; *see also* DE.507-App.B:49 (in 2004, ███████ told Tracey that AMC wanted to transition from an affiliation agreement with Clinica to a management services contract and would keep Clinica's monthly remuneration the same). Cota similarly told Tracey that AMC was happy and "getting plenty." DE.507-App.B:17.

In 2000, ████████████████████ introduced Tracey and Cota to Holland, then-CEO of North Fulton; Holland wanted to expand North Fulton's obstetrician program and knew that AMC had success working with Clinica. DE.507-App.B:18, 971. The group discussed Clinica opening a clinic in Roswell, Georgia, and sending patients to North Fulton for delivery services. DE.507-App.B:18, 971-72. Cota told Holland that Clinica could refer 50 patients per month, which pleased Holland because it would double North Fulton's patient load. DE.507-App.B:972. Holland, however, became concerned about the size of the monthly payment to Clinica, wanted assurances that North Fulton would see enough Clinica deliveries to justify the expense, and told Tracey and Cota that he wanted at least 50 per month. DE.507-App.B:21. Under the contract, executed in October 2001 (DE.507-App.B:513-23), North Fulton paid Clinica for translation services and Medicaid eligibility determinations; in fact, North Fulton was buying patient referrals. DE.507-App.B:21.

Cota purposefully did not send Clinica patients to North Fulton until North Fulton had signed the contract. DE.507-App.B:22. At various times, Tracey and Cota told Holland that Clinica controlled the assignment of patients to doctors working at their clinics. DE.507-App.B:117. In the first two weeks of the Roswell clinic's opening, North Fulton did 35 deliveries; Holland told Tracey he was excited and to "keep it up." DE.507-App.B:22. ██████████ later told Tracey, in effect, that Clinica had been assigned a patient quota: North Fulton wanted at least 35 monthly deliveries by Clinica patients. DE.507-App.B:30-31. North Fulton went from a "sleepy" labor and delivery unit to one with "people in the hallway/waiting for a room." DE.507-App.B:170.

Moore became AMC's CEO after the original Clinica-AMC contract was executed. DE.507-App.B:17. In meetings with Tracey, Moore focused on obtaining patient referrals from Clinica; he always asked about delivery volumes and wanted many deliveries by Clinica patients. DE.507-App.B:17, 61. Moore, Cota, and Tracey discussed getting patients to AMC. DE.507-App.B:136. When Tracey explained that a majority of Clinica patients went to AMC through two doctors, Moore asked, "How can I get them all?" *Id.* Moore never asked Tracey about Clinica's qualifications to provide translation services or the quality of their translations, and he did not try to negotiate the rate or hours of Clinica's

translators. DE.507-App.B:139, 176. Clinica ordinarily did not do translating outside its own clinics. DE.507-App.B:139.

In 2004, ████████████████████████████████████ ████████ called a meeting with Moore, Holland, Cota, and Tracey. DE.507-App.B:27-28. ████████ was interested in expanding Clinica operations to other Tenet hospitals and wanted an update from Moore and Holland on how Clinica was affecting admissions at their hospitals. DE.507-App.B:28. Moore and Holland said they were pleased with the Clinica relationship and reported delivery numbers for Clinica patients, including breakdowns by clinic of referrals to AMC and North Fulton. *Id.*

Even before this meeting, ████████████████████ called Tracey to set a meeting to discuss Clinica opening a new clinic and getting those clinic patients admitted to Spalding. DE.507-App.B:29. When Cota and Tracey met with ██████, Cota said that Clinica would easily bring 30 to 40 patients per month to Spalding. *Id.* Cota and Spalding agreed to open a clinic, and at ████████ request, Tracey sent ██████ the Clinica-North Fulton contract. DE.507-App.B:30. The contract with Spalding was signed quickly. *Id.* ██████████ Spalding were more blatant about their desire for patient referrals than other hospitals, which made Tracey uncomfortable. *Id.* But Clinica's arrangement with Spalding lasted only four months: ████████ told Tracey that Spalding was not seeing enough

delivery volume from Clinica to justify the payments and ended the arrangement. *Id.*

In late 2005, ████████████ called Tracey and said that Hilton Head was losing patients to another hospital, that there was a large Hispanic population in the area, and that ██ wanted Hilton Head to set up a clinic with Clinica. DE.507-App.B:31. ████████ wanted the same contractual arrangement North Fulton had with Clinica and wanted 30 Clinica deliveries per month. DE.507-App.B:62-63. Tracey and Cota met with ████████ in South Carolina. DE.507-App.B:31. When taking Cota and Tracey on a hospital tour, ████████ said that 30 patients per month would make the operation profitable; when Cota described the program's potential, ████████ said, "you don't have to tell me, I know and I also told other people at Tenet." DE.507-App.B:160. Hilton Head executed a contract with Clinica effective October 2006. DE.507-App.B:586-93.

After Holland became SVP for Tenet's Southern States Region, Tracey continued to discuss patient referrals with ████████████████████. These discussions focused on the number of Clinica patient referrals, not Clinica's services under the contract. *See* DE.507-App.B:125-26 (meetings with ████ ████); DE.507-App.B:126-27, 403-16 (meeting with ████████████ ████ and conversations with ████████).

17

Tracey and Cota divorced, which resulted in the September 2010 division of Clinica between them: each received three Clinica clinics; Cota assumed Clinica's contracts with North Fulton and Hilton Head; and Tracey assumed Clinica's contract with AMC. DE.507-App.B:33, 174. Cota's new company did business as Clinica de la Mama, and Tracey's new company did business as Clinica del Bebe. DE.507-App.B:963.

### 3. Documentary Evidence

The documentary evidence included (a) the contracts between Clinica and Tenet Hospitals; (b) internal North Fulton business documents; (c) internal reports and emails; and (d) evidence of AKS-related training taken by ███████ ████████████████ Moore and Holland.

### a. Clinica-Tenet Hospital Contracts

The contracts between Clinica (including its successors) and the Tenet Hospitals effectively covered the entire conspiracy. DE.507-App.B:431-629; *see, e.g.*, DE.507-App.B:431-44 (first AMC-Clinica contract effective March 2000); DE.507-App.B:505-11 (AMC-Clinica del Bebe contract effective May 2011); DE.507-App.B:513-21 (first North Fulton-Clinica contract dated October 2001); DE.507-App.B:574-81 (North Fulton-Clinica de la Mama contract effective March 2011).

As CEO of AMC, Moore signed every AMC contract with Clinica and Clinica del Bebe after the original contract. DE.507-App.B:466, 479, 482, 489, 500, 511. As CEO of North Fulton, Holland signed every North Fulton contract with Clinica until mid-2006. DE.507-App.B:523, 538, 546, 659-69. Thereafter, as regional SVP, Holland approved every Tenet Hospital contract with Clinica and the Tenet Hospitals. *See* DE.507-App.B:630-46 (AMC contract approvals); DE.507-App.B:671-701 (North Fulton contract approvals); DE.507-App.B:702-18 (Hilton Head contract approvals).

Clinica's original contracts with AMC and Hilton Head stated that payments to Clinica were not "conditioned on any requirement" that Clinica "make referrals to, be in a position to make or influence referrals to, or otherwise generate business for" the hospital. DE.507-App.B:441, 591; *see id.* at 465-66 (extension of original Clinica-AMC contract signed by Moore). Similarly, in requesting corporate approval for North Fulton's original contract with Clinica, Holland represented that it was "not conditioned, nor the compensation valued, on the basis of the Physician's referrals to [North Fulton]." DE.507-App.B:647-48. After mid-2006, the contracts with Clinica contained provisions requiring the parties to comply with Tenet policies related to the AKS and certifying that they would not violate the AKS. *E.g.*, DE.507-App.B:482, 488, 560, 569-70, 592.

b.  North Fulton Business Plan Documents

The files of North Fulton█ ██████████████ contained a document titled "North Fulton Regional Hospital Business Plan Proforma Worksheet FY 2002," dated August 8, 2001 ("Proforma"). DE.507-App.A:44; DE.507-App.B:277-86[7]; DE.507:73.

The Proforma projected that, in fiscal year 2002, North Fulton would receive $2.5 million in Medicaid revenue and $1.263 million in Medicare revenue from the "Clinica de la Mama" "[i]nitiative." DE.507-App.B:277. Elsewhere, the document described a *quid pro quo*:

> Clinica De La Mama will begin directing admissions [ ] to [North Fulton] upon completion of the contract. They have stated that they will shift 100% of their volume from Northside [Hospital] to [North Fulton] which would bring an estimated 1,000-1,200 deliveries in the first year. … CDLM's fees are $578K per year.

DE.507-App.B:280.

A "Retroactive Analysis" concluded, eight months into the "Clinica LaMama program," that Clinica "is very profitable to North Fulton[.]" DE.507-App.B:292.

---

[7] The Proforma was included in both appendices to the government's motion.

c. Internal Reports and Emails

The minutes of a Clinica shareholder meeting in April 2000, attended by Cota, Tracey, and ███████████, reflect the purpose of the original contract with AMC. DE.507-App.A:1.1. The minutes state that, with one exception, Clinica wanted to "move all the clinics' admissions into 1 facility, Atlanta Medical Center for delivery services," and that, "if certain physicians are opposed to this move, []we will interview other physicians who are willing to admit to Atlanta Medical." *Id.* Later in 2000, Tracey reported to AMC on Clinica's efforts to refer delivery patients to AMC, promising that AMC would "begin to see significant numbers in August and should not experience less than 30 deliveries per month after that time." DE.597-App.A:2.1.

Internal Tenet communications also revealed the purpose of the Tenet Hospitals' arrangements with Clinica. In November 2002, Moore emailed Holland to ask about North Fulton's relationship with Clinica, using patient referrals as the litmus for evaluating the relationship. DE.507-App.B:290 ("How is [ ] Clinica working out for you? Do you know how many deliveries they're averaging?"). In June 2004, Moore emailed ██████ to ask "how much" Spalding was "paying" Clinica, noting that AMC was "about to switch [their] contractual format with Clinica to a Services Agreement." DE.507-App.A:17.1 ██████ agreed to send Moore the Spalding-Clinica contract but noted that ██ was

21

terminating the contract. *Id.* An internal document ▮▮▮▮ subsequently emailed to others reported that the Clinica "initiative" was "discontinued … due to inability of partner to establish clinic volume and market assumptions were found invalid." DE.507-App.A:18.1-2; *see also* DE.507-App.A:14.2 (▮▮▮▮ memo reporting that Spalding's initiative with Clinica "under performed expectations in the first three month by 55 admits"). Moore, however, remained high on Clinica. In August 2006, he emailed ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ about "set[ting] up a meeting with the Clinica folks to discuss expansion sites to possibly feed ▮▮▮▮," adding, "[t]heir business fuels a lot of our NICU volume." DE.507-App.B:302.

In September 2008, then-SVP Holland emailed Moore ▮▮▮▮▮▮ ▮▮▮▮▮▮, asking, "How have total clinica volumes been doing at your two hospitals over the past three months – please take a look at overall deliveries, not %." DE.507-App.A:41.1. Moore reported:

> We have definitely seen a marked decrease at AMC. . . . June also marked the time when Clinica fired [two physicians] so I assumed the volume from the clinics they used to staff was being directed to North Fulton. *If NFMC has not seen an increase then we have a problem.…* The drop off has all come in the last three months.

*Id.* (emphasis added). ▮▮▮▮▮▮▮▮▮▮:

> June-August Clinica volumes for 2007 and 2008 were 349 and 340, respectively. *Based on out flat volume and [AMC's] decline, this would lead us to believe that Clinica is diverting to another program.* Our contract is up for re-

negotiation within the next 60-90 days. ▮▮▮▮▮▮▮ are going to handle this so we will ask some questions during our discussions with Ed [Cota] and Tracey.

*Id.* (emphasis added). Three days later, Holland emailed Cota and Tracey about the "dramatic decrease in volume of Clinica deliveries the past three months," stating: "either volume is going out of the system or Clinica's overall volume of patients has slowed considerably. I am very interested to hear your thoughts and insights on what is happening." DE.507-App.B:318.

▮▮▮▮▮▮▮ also described the Clinica contracts in terms of patient referrals and raised concerns about declining Clinica numbers. In January 2008, ▮▮▮▮▮▮▮ emailed ▮▮▮▮▮▮▮ ▮▮ notes about below-budgeted "OB admissions"; the notes explained that accreditation for AMC's OB/GYN residency program had been withdrawn and that the "long-term volume impact" was uncertain, "because most of the volume is driven by [AMC's] clinica contract where we choose physicians." DE.507.App-A:24.1-2. Three months later, after ▮▮▮▮▮▮▮ emailed ▮▮ the projected 2008 expense for the Clinica contract ($450,000), ▮▮ pledged to "take a hard look at the clinica benefit as compared to cost … . We are paying more than 240K at Hilton Head for 400 deliveries. Those

costs wipe out our OB margin, especially when you include med mal costs."

DE.507-App.A:21.1-2.[8]

In November 2009, █████████████████████████ replied to an inquiry from ██████ about using another provider for translation services. █████ response identified patient referrals as the reason for paying Clinica:

> There are many companies who do [translations].... If we think we can get Clinica to send us the business and we can get the translation services elsewhere, I'm all for it. I agree with your assessment of the way they hold us hostage and don't like it.

DE.507-App.A:29.1; *see also* DE.507-App.A:37.1-2 (email █████████████ ██████ questioning whether to renew Clinica contract in light of projected cuts in Medicaid reimbursements).

In November 2010, when ██████ pushed North Fulton to negotiate a better rate with Clinica given "reductions in Clinica volumes," ██████ explained that they "ha[d] no idea who to work with" because Clinica's principals were going through a "nasty divorce"; ██████ noted that they had contacted "Moore about using both hospitals to negotiate a better rate." DE.507-App.A:23.2. ██████ continued: "[W]e need more time. … The best solution of all is to get our other

---

[8] Another individual who pleaded guilty, Gary Lang, worked at Hilton Head and was involved in discussions with ██████ and Holland that focused on hitting Clinica's delivery numbers; the level of translation services by Clinica was not discussed. DE.507-App.B:83.

OBs … to replace this volume." *Id.* ▮▮▮▮ replied: "[T]his is a very rich contract at \$33K/month. Betting on the come with volumes has not proved successful…." *Id.*

Despite these concerns, Tenet Hospitals ended up paying Clinica's successor companies to protect their patient volumes. DE.507-App.B:505-12, 574-83 (contracts with Clinica successors); *see, e.g.,* DE.507-App.B:333 (May 2011 email from Moore ▮▮▮▮▮: "See significant number of babies coming from Ed Cota's clinic (d la Mama). We need to move on that agreement or risk him pressuring the doctor to deliver at another hospital."); DE.507-App.A:28.3 (AMC volume analysis emailed ▮▮▮▮▮ to ▮▮▮▮▮ Moore in November 2011: "Clinica volume continues to decline due to immigration law enforcement. To mitigate loss within OB, a contract with clinica de la mama is in process, already have a contract with clinica del bebe.").

Finally, emails reflect that Clinica's remuneration by the Tenet Hospitals was not based on the value of the services set forth in the contracts. For example, in a November 2005 email, ▮▮▮▮▮▮ sent Tracey an approved contract ("back from our legal department") and stated, "[w]e had to mess around with some of the numbers relative to each performance item, but the total did not change much (actually went up a little)." DE.507-App.A:43.1. In an earlier communication, ▮▮▮▮ indicated that ▮▮ and Moore were offering

Clinica "another $5,000 per month" so that Clinica would "remain whole" as compared to remuneration under the previous AMC-Clinica contract. DE.507-App.A:42.1; *see also* DE.507-App.A:11.1 (email from Tracey to North Fulton ███████ proposing changes to fee items in the contract and "delet[ing] the marketing piece all together"). And, in November 2008, ██████ advised ██████ that North Fulton should "wait on" competency testing of Clinica interpreters because the testing was not covered by their contract and Tracey was not agreeable to it—after ████████████████████████ had predicted to ██████ that "Clinica interpreters will have difficulties passing our assessments." DE.507-App.A:36.1.

### d. AKS Training

Between 2006 and 2011, Holland, Moore, ████████████████ ████████ received annual compliance training pursuant to Tenet's Corporate Integrity Agreement with HHS-OIG. *See* DE.507-App.B:896-910 (Holland), 940-48 (Moore), ████████████████████████████████ ████████████████████████████

The sessions included training on the AKS. The initial training on arrangements, which both Holland and Moore completed, explained that a permissible arrangement between a "Referral Source[]" and "Hospital[]" must "not take into account volume or value of referrals or other business." DE.507-

App.B:881. Another training slide referenced the "One purpose test" in explaining that the AKS punishes "[k]nowing and willful" violations of its provisions. DE.507-App.B:887 ("Anti-Kickback Basics"). Another slide explained that certain exceptions and safe harbors to the AKS provide "[i]mmunity from prosecution," but cautioned that the "[a]rrangement must meet *all* criteria." DE.507-App.B:888.

### D.    Defendants' Opposition to Admission of Co-Conspirator Statements

Defendants contended that the government did not satisfy any requirement under Rule 801(d)(2)(E), disputing that a conspiracy existed, that defendants and the declarants were members of the conspiracy, and that the noticed statements furthered the conspiracy. DE.521; DE.522; DE.526.

Among other things, defendants maintained that there were legitimate business reasons, related to the fair market value and commercial necessity of Clinica's services, for Tenet executives to discuss patient volumes. DE.521:15-16; DE.522:3-5; DE.526:20. Defendants also alleged that Clinica had provided needed and valuable services to the Tenet Hospitals under the contracts, *e.g.*, DE.522.37-39; DE.526:21-25, and that the co-conspirators had operated with the good-faith belief that counsel for Tenet and Clinica had approved the contracts, *e.g.*, DE.521:16-17; DE.522:17-25.

Defendants challenged the relevance, completeness, and reliability of the government's submitted evidence. *E.g.*, DE.521:2-5, 24-25; DE.526:18. Defendants accused the government of hiding evidence from the court. DE.521:1-5; DE.522:1-2; *see also* DE.477:21-23 (accusing government of arbitrarily designating individuals as co-conspirators to inhibit them from testifying as defense witnesses). Defendants relied on ███████████████ ██████████████████████████████████████████, which, in defendants' view, showed that the individuals "did not believe there was anything improper—certainly nothing criminal—about the Clinica contracts." DE.522:34; ████████████████████████████████████ ████████████████████████████████████ ███████████

The government replied to these arguments. DE.529. As to advice of counsel, the government submitted ████████████████████████ ███████████████████████████ and a memorandum documenting statements to law enforcement by █████████████████████████ which evidenced their lack of knowledge that Tenet Hospitals paid Clinica for patient referrals. DE.529-App.B.

### E.    The District Court's Order

The district court denied the government's motion to admit co-conspirator statements. DE.610. The court found that the evidence failed to establish willfulness and, therefore, the existence of a conspiracy to violate the AKS. On that basis, the court ruled that all of the statements were inadmissible under Rule 801(d)(2)(E). *Id.* at 38-39.

The court concluded, first, that the interplay between the one-purpose rule and the personal-services safe harbor, 42 C.F.R. § 1001.952(d), "is unsettled and unclear in this circuit such that, even if the Government can establish that one purpose of the Tenet-Clinica contracts was to induce referrals, that fact does not establish willfulness under the AKS." DE.610:19. In reaching that conclusion, the court rejected a defense argument that the safe harbor displaces the one-purpose rule whenever the safe harbor's requirements are satisfied. *Id.* at 10-13. But the court determined that the "the one-purpose rule was at odds with a plain reading of the safe harbor." *Id.* at 15.

The court found that two decisions by this Court contribute to confusion in the law. DE.610:15-17. The court read *Bingham v. HCA, Inc.*, 783 F. App'x 868 (11th Cir. 2019), to mean that "in order to demonstrate that Tenet paid remuneration to establish an AKS violation, the Government must establish that Tenet paid in excess of fair market value for the services provided by Clinica."

*Id.* at 16. And it found that *Shah*, 981 F.3d at 925, "confuse[s] matters yet even more," relying on a law firm's commentary about *Shah*'s purportedly uncertain impact on the interplay of the one-purpose rule and the safe harbor. DE.610:17-20. Given the alleged uncertainty in the law, the court required the government to show that the relevant individuals "kn[ew] they were breaking the law beyond knowing that one purpose of the deal was to induce referrals." *Id.* at 21.

The court found "scant evidence of Defendants' willfulness." DE.610:28. It rejected the evidence of AKS training, finding that the evidence "does not establish what was said about the one-purpose rule" and, in any event, that "the one-purpose rule is not clear." *Id.* at 29-30. And it rejected the argument that defendants' discussion of Clinica referrals and patient volumes defeated the safe harbor's application or showed that referring patients was the true purpose of the contracts. *Id.* at 30-31. The court "agree[d]" with defendants that "discussions of patient volume do not demonstrate a willful violation of the AKS," citing a hospital administrator's need "to know how many patients are likely to show up at a hospital on a given day (or over a given period) for numerous reasons that have nothing to do with violating the AKS." *Id.* at 30.

The court found "ample evidence showing that Clinica provided valuable services under the contracts and no evidence that the contracts were a sham." DE.610:33. A hospital selecting a service provider, the court continued, "is not

30

prohibited from choosing to enter into a contract with an entity that also has the capacity to refer patients over one that does not." *Id.* at 34 (quotation omitted).

The court credited "apparent facts" that "attorneys for both Tenet and Clinica vetted the contracts to ensure that they would not violate the law," and found that "when the contracts were executed, Defendants had a reasonable basis to believe that the contractual arrangements … were legal." DE.610:37. The court rejected the government's reliance on ██████████████████ ██████████████ who had expressed concern when shown some of the co-conspirator communications. *Id.* at 37-38. Absent "evidence that the terms of the contracts were not executed faithfully, that Clinica was paid for services that were not rendered, or that some other form of nefarious conduct (other than discussions of volume) occurred," the court declined to "find that any of the involved individuals had reason to believe that they were violating the law." *Id.* at 38.

In so ruling, the court did not make a credibility finding against Tracey or find the evidence of discussions about patient referrals and volume to be untrue. The court acknowledged that "it would be naive to believe that Defendants were not, at least, thinking about referrals when they negotiated and entered the service contracts," and that "the statements of some alleged co-conspirators [ ] indicate a more focused attention on referrals than on the quality of the services

provided by Clinica." DE.610:34-35. But the court found that the government failed to show that defendants "did anything more than create an attractive arrangement for referrals." *Id.* at 35.

## III.  STANDARD OF REVIEW

The Court reviews a ruling on the admissibility of co-conspirator statements for an abuse of discretion. *United States v. Matthews*, 431 F.3d 1296, 1308 (11th Cir. 2005). "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009); *see United States v. Williams*, 865 F.3d 1328, 1337 (11th Cir. 2017) ("Basing an evidentiary ruling on a legal error constitutes an abuse of discretion *per se*."). A finding is clearly erroneous if the Court is "left with a definite and firm conviction that a mistake has been committed." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012) (quotation omitted). A district court may make inferences from the evidence, but those inferences must be "reasonable." *United States v. Matthews*, 3 F.4th 1286, 1289 (11th Cir. 2021).

## SUMMARY OF ARGUMENT

The district court's exclusion of co-conspirator statements under Rule 801(d)(2)(E) was based on legal errors and clearly erroneous findings of fact. The ruling was an abuse of discretion and must be reversed.

A.    The court erred in concluding that the one-purpose rule conflicts with the personal-services safe harbor. There is no tension or uncertainty: the one-purpose rule addresses the inducement element of a payor offense under the AKS, 42 U.S.C. § 1320a-7b(b)(2), while the regulatory safe harbors identify certain types of payments as not included in the statutory definition of "remuneration," 42 C.F.R. § 1001.952. If a defendant establishes a payment practice meets every element of a safe harbor, there is no resulting AKS violation, not because the payment cannot have been intended to induce referrals, but rather because there was no "remuneration."

The district court's misunderstanding caused it to impose a heightened, and erroneous, standard of willfulness: it discounted the probative value of patient-referral evidence in its analysis, contrary to this Court's precedents, and it required proof of nefarious conduct, contrary to the unambiguous prohibitions of the AKS.

B.    The court's factual findings also compel reversal.

First, the court clearly erred in finding insufficient evidence of an arrangement for Tenet Hospitals to pay Clinica for patient referrals. The court essentially ignored Tracey's repeated statements, at her guilty plea and during law-enforcement interviews, that she participated in a scheme in which Tenet Hospitals paid Clinica for patient referrals and used service contracts to cover

up their arrangement. And the court misconstrued the conspirators' discussions of Clinica patient volumes, in which ███████████ candidly discussed paying Clinica for patient referrals, as some benign analysis of whether Clinica's contractual services were priced at fair market value. No reasonable reading of the submitted communications supports that interpretation—███████████ ███████ were treating Clinica as a source of revenue generation.

Second, in finding "scant" evidence of willfulness, the court clearly erred by discounting evidence that ███████████████ received training on the AKS, including on the one-purpose rule. And the court overlooked the contract provisions that (i) required compliance with the AKS and (ii) falsely certified that the contracts were not conditioned on any requirement that Clinica make referrals or otherwise generate business for the Tenet Hospitals.

Third, the court clearly erred in finding that defendants relied in good faith on counsel's alleged vetting of the Clinica-Tenet Hospital contracts. The court did not make a finding that the threshold condition for raising an advice-of-counsel defense was satisfied: full disclosure of all material facts related to the contracts. And the court erroneously rejected the evidence showing a *lack* of full disclosure, which included ██████████████████████████.

These errors cannot stand.

## ARGUMENT

### I.    THE DISTRICT COURT'S EXCLUSION OF CO-CONSPIRATOR STATEMENTS WAS AN ABUSE OF DISCRETION.

The admission of co-conspirator statements under Rule 801(d)(2)(E) requires the government to "prove by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy." *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002); *see United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995) (preponderance standard requires "reliable and specific evidence"). In determining admissibility, a court considers not only the content of the offered co-conspirator statement, but also surrounding circumstances, context, and any corroborating evidence. *See* Fed. R. Evid. 801, adv. comm. notes (1997 amend.).

Because the district court's ruling that the evidence fails to prove a conspiracy was based on a flawed understanding of the AKS and clearly erroneous factual findings, this Court should reverse.

### A.    The District Court's Ruling Was Based on Legal Errors.

The court erroneously concluded that the one-purpose rule is in tension with the personal-services safe harbor. That error caused it to impose a heightened willfulness requirement that is contrary to law.

1.  Legal framework for proving an AKS conspiracy

The "essence" of a conspiracy "is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The existence of such an agreement may be proven through circumstantial evidence and reasonable inferences drawn therefrom. *United States v. Man*, 891 F.3d 1253, 1265, 1272 (11th Cir. 2018). The government "need only prove an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators." *United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) (quotation omitted). An individual's membership in a conspiracy can be proven "even if he did not play a major role in the scheme, did not directly interact with the other co-conspirators, did not participate in every stage of the conspiracy, and did not know all of the details." *United States v. Howard*, 28 F.4th 180, 189 (11th Cir.), *cert. denied*, 143 S. Ct. 165 (2022).

The elements of paying an unlawful healthcare kickback are that the defendant (1) knowingly and willfully, (2) offered or paid "remuneration" to another person, (3) to "induce" that person to refer another individual for the furnishing of any item or service, (4) for which payment may be made in whole or part under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2); *see United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013). The elements of the payee crime similarly prohibit knowingly and willfully accepting

remuneration in return for referring an individual for a covered healthcare item or service. 42 U.S.C. § 1320a-7b(b)(1).

Under the AKS, "willfully … means the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-38 (11th Cir. 1998) (quotation omitted). Willfulness does not require showing that a defendant knew his conduct specifically violated the AKS. *Id.* at 838. Nor, given the statute's application to "overt[] or covert[]" conduct, 42 U.S.C. § 1320a-7b(b), does willfulness require evidence of "furtive activity." *Vernon*, 723 F.3d at 1259.

As discussed, the circuits to have considered the question, including this Court in an unpublished decision, have unanimously held that conduct satisfies the inducement element of the payor offense, § 1320a-7b(b)(2), where one purpose of the payment was to induce an enumerated action, such as patient referrals. *See Mallory*, 988 F.3d at 741; *McClatchey*, 217 F.3d at 835; *Davis*, 132 F.3d at 1094; *Greber*, 760 F.2d at 72; *Hill*, 745 F. App'x at 815 & n.9; *see also Borrasi*, 639 F.3d at 782 (applying one-purpose rule to payee provision); *Kats*, 871 F.2d at 108 (same). That interpretation is based on the plain language of the AKS, which reflects Congress's intent to target "not only sums for which no actual service was performed but also those amounts for which some

professional time was expended." *Greber*, 760 F.2d at 71. "That a particular payment was a remuneration (which implies that a service was rendered) rather than a kickback, does not foreclose the possibility that a violation nevertheless could exist." *Id.*; *see United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29-30 (1st Cir. 1989) ("The gravamen of Medicare Fraud is inducement. Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient.").

The one-purpose rule comports with the purpose and history of the AKS. "Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains." *Greber*, 760 F.2d at 71. By adding the term "any remuneration" to the statute, which before 1977 referred only to kickbacks, bribes, or rebates, *see* pp. 3-4, *supra*, "Congress sought to make it clear that even if the transaction was not considered to be a 'kickback' for which no service had been rendered, payment nevertheless violated the Act." *Greber*, 760 F.2d at 72; *see Pfizer, Inc. v. U.S. Dep't of Health and Humans Servs.*, 42 F.4th 67, 75 & n.7 (2d Cir. 2022) (1977 amendment broadened the statute), *cert. denied*, 143 S. Ct. 626 (2023); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1998) (same).

38

No court of appeals has rejected the one-purpose rule's application to the payor crime. This Court's holding in *Shah* that the *payee* crime does not require proof of the defendant-payee's motivation for accepting payment turned on the absence of the "to induce" language in § 1320a-7b(b)(1), which applies to soliciting or receiving kickbacks "in return for" an enumerated act. 981 F.3d at 925. But the Court agreed with "[its] sister circuits that the *payor* crime … prohibits payments that are meant *by the payor* to induce one of the enumerated actions." *Id.* at 926.

Given the language, history, and purpose of the AKS, the inducement element of the payor offense is satisfied as long as one purpose of the payment was to induce the referral of patients for covered healthcare services.

2. <u>The court erroneously concluded that the one-purpose rule is in tension with the personal-services safe harbor.</u>

Contrary to the district court's conclusion, the one-purpose rule is not "at odds" with a "plain reading" of the AKS safe harbors, and the interplay between the two is neither "unsettled" nor "unclear." DE.610:15.

The one-purpose rule is a method for the government to prove inducement, whereas the regulatory safe harbors are affirmative defenses that, if fully proven by a defendant, exempt certain arrangements from liability by excluding payments made thereunder from the definition of "remuneration." 42 C.F.R. § 1001.952; *see* 42 U.S.C. § 1320a-7b(b)(3)(E) (statutory authority for

HHS to promulgate regulations exempting "payment practice[s]" from AKS liability); *Vernon*, 723 F.3d at 1270-71 (finding that the jury "reasonably rejected" the defendant's "affirmative defense" on AKS safe harbor). Thus, a payment made under an arrangement satisfying every requirement of a regulatory safe harbor does not violate the AKS, not because the payment cannot have been intended to induce referrals, but rather because the payment does not qualify as remuneration.[9] The one-purpose rule and the safe harbors are not in conflict. And as discussed below, the Clinica-Tenet Hospital arrangements did not qualify for safe-harbor protection because they took into account the volume of patient referrals. *See* 42 C.F.R. § 1001.952(d)(5).

The cases discussed by the district court do not render the law uncertain. DE.610:14-17. In *Bingham*, an unpublished decision decided well after the charged conspiracy, this Court affirmed the grant of summary judgment against a relator in a False Claims Act case, holding that, because the doctors paid fair market value to rent office space from a hospital's subsidiary, they did not receive "remuneration." 783 F. App'x at 873. *Bingham* says nothing about the

---

[9] Of course, a "sham" contract, "which on paper looks like it complies with [the safe-harbor] provisions, but where there is no intent to have the space or equipment used or the services provided," does not receive safe-harbor protection. Clarification of the Initial OIG Safe Harbor Provisions and Establishment of Additional Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63518, 63530 (Nov. 19, 1999).

inducement element, and as the district court acknowledged, *Bingham* does not mention the one-purpose rule. DE.610:16.[10]

Similarly, the district court misread four lower court cases that, it believed, applied the one-purpose rule even though the arrangement "arguably fell within a safe harbor." DE.610:14. In three cases, sufficient evidence was presented, or sufficient facts pleaded, indicating that the safe harbor in question was *not* satisfied. *See Purcell v. Gilead Scis., Inc.*, 439 F. Supp. 3d 388, 398-99 (E.D. Pa. 2020); *United States ex rel. Raven v. Georgia Cancer Specialists I, P.C.*, No. 1:11-cv-994, 2019 WL 13040801, *17-*18 (N.D. Ga. Mar. 28, 2019); *United States ex rel. Armfield v. Gills*, No. 8:07-cv-2374, 2012 WL 12918277, *4-*5 (M.D. Fla. Oct. 18, 2012). The fourth case states that "[i]f the requisite intent to willfully or knowingly solicit or offer a kickback is present, formal compliance with a safe harbor is not sufficient to avoid liability under the [AKS]." *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 48 (D. Mass. 2011). But in context, and as evident from the regulatory guidance it cited, that passage was

---

[10] Holland argued below that *Bingham* requires "affirmative proof of a payment in excess of fair market value … in order to establish that the payment is illegal remuneration under the AKS." DE.522:5. Any such rule would be inconsistent with the plain language of the AKS, and with the requirements of the personal-services safe harbor, which are not limited to fair-market-value compensation. *See Bay State*, 874 F.2d at 31 ("Congress did not explicitly change the statute to exclude reasonable payments for actual work done.").

simply noting that a business arrangement must be evaluated in substance, not just form, when determining safe-harbor eligibility. *Id.*; *see* n.9, *supra*.

Nor does this Court's decision in *Shah* "confuse matters." DE.610:17. The district court cited *Shah*—and a law firm's musings on *Shah*—as proof of confusion in the law, even though it recognized that *Shah* did not directly address the one-purpose rule, and even though *Shah* was decided seven years after the charged conspiracy. DE.610:17-20. The district court's analysis also omits any recognition that, unlike *Shah*, this case is substantially a *payor* case: Holland, Moore, ████████████████████████ were agents of Tenet or Tenet Hospitals, and a central object of the conspiracy was for Tenet Hospitals to pay Clinica to induce patient referrals. DE.121:14-16.

During the conspiracy, the AKS unequivocally prohibited knowingly and willfully paying any remuneration, to any person, to induce referrals to federal healthcare programs. And the personal-services safe harbor was clear that it offered protection only if every requirement was satisfied, including that compensation not account for referral volumes. The district court erred in concluding that the one-purpose rule, including its interplay with the safe harbor, was unclear.

42

### 3. The court imposed a heightened willfulness requirement.

The court's confusion about the one-purpose rule caused it to impose a heightened standard of willfulness that discounted the probative value of patient-referral evidence and required proof of nefarious conduct.

First, the court ruled that "even if the Government can establish that one purpose of the Tenet-Clinica contracts was to induce referrals, that fact does not serve to establish willfulness under the AKS." DE.610:19. In setting aside such evidence, *see id.* at 21, the court unduly minimized the probative value of patient-referral evidence in its analysis of willfulness, contrary to circuit precedent.

In *Starks*, this Court rejected a requirement that the defendant knew his conduct specifically violated the AKS, explaining that § 1320a-7b(b) does not "pose[] a danger of ensnaring persons engaged in apparently innocent conduct" because "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." 157 F.3d at 838. The Court compared "such kickbacks" to "*malum in se*, rather than *malum prohibitum*," and concluded that, "[r]egardless of their knowledge of the law, [the defendants] should reasonably have anticipated that their kickback scheme for referrals was 'immoral in its nature and injurious in its consequences.'" *Id.* at 838 & n.7 (quoting Black's Law Dictionary). And in *Vernon*, this Court reasoned that a defendant's status as the CEO of a healthcare company was sufficient for the

jury to infer that he was familiar with the AKS and therefore knew it was illegal to pay commissions to independent contractors. 723 F.3d at 1267.

*Starks* and *Vernon* confirm that the AKS's prohibitions are not ambiguous and that a defendant's knowledge that payments were made to induce patient referrals goes far in proving willfulness. But, here, the district court effectively set this category of evidence aside based on its mistaken belief about the unsettled nature of the law.

Even worse, the court refused to find willfulness "[i]n the absence of evidence that the terms of the contracts were not executed faithfully, that Clinica was paid for services that were not rendered, that the payments under the contract were in excess of fair market value, or that some other nefarious conduct (other than discussions of volume) occurred." DE.610:38. The court repeatedly referenced the purported value of the services it believed Clinica had provided under the contracts and the Tenet Hospitals' alleged need for those services. DE.610:13 n.6, 24, 32-33. In doing so, the court failed to recognize that the conspirators' scheme effectively deprived Clinica patients of their choice of doctor and hospital, or to acknowledge the evidence that Clinica did not, for example, provide quality translation services under the contracts. *E.g.*, DE.507-App.A:36.1; DE.507-App.B:22, 117, 219-20.

More significantly, none of the factors that the court found missing—including a lack of need for the services, substandard services, or payments in excess of fair market value—is necessary to prove an AKS violation. The AKS may be violated by "reasonable payments for actual work done" if the payments were knowingly and willfully made to induce referrals. *Bay State*, 874 F.2d at 31. HHS-OIG long ago warned that "under the [AKS], neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose (i.e., inducing Federal health care program business)." OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005). And the AKS does not require proving "corrupt intent," or a bad purpose beyond knowledge that the conduct is illegal. *Pfizer*, 42 F.4th at 74-77.

The district court emphasized that "a hospital may need a service, and in picking an entity to provide that service, the hospital is not prohibited from choosing to enter into a contract with an entity that also has the capacity to refer patients over one that does not." DE.610:34 (quotation omitted). Fair enough. But if hospital executives knowingly and willfully pay that entity for the purpose of inducing patient referrals, the AKS is violated. Indeed, that is why safe-harbor protection is unavailable where compensation under the contract takes into account the volume or value of referrals. 42 C.F.R. § 1001.952(d)(5); *see, e.g.,*

*United States v. Hagen*, _ F.4th _, No. 21-11273, 2023 WL 2182258, *11 (5th Cir. Feb. 21, 2023) (district court properly denied defense request for jury instruction on safe harbor where compensation took into account volume of referrals).

By requiring "nefarious conduct (other than discussions of volume)," DE.610:38, the court marginalized the value of probative, patient-referral evidence and elevated the bar for proving willfulness.

**B.    The District Court's Ruling Was Based on Clearly Erroneous Factual Findings.**

The government presented specific and reliable evidence of a conspiracy to pay kickbacks for patient referrals, including evidence of willfulness. The district court's contrary findings were clearly erroneous. These errors warrant reversal, standing alone or in combination with the court's legal errors.

1. <u>The court clearly erred in finding that Tenet's payments to Clinica were not conditioned on patient referrals.</u>

The court's finding that the evidence showed only that defendants "create[d] an attractive arrangement" for Clinica to refer patients to Tenet Hospitals, DE.610:35, is contradicted by the overwhelming evidence that Tenet's payments to Clinica were conditioned on patient referrals.

First, Tracey provided direct evidence of the unlawful scheme when she pleaded guilty. Tracey affirmed under oath that she and her co-conspirators had "agreed" that Clinica would be compensated for "referring" Clinica patients to

46

Tenet Hospitals, that the contracts and payments "were conditioned on and in exchange for Clinica referring its patients to the hospitals," and that the Tenet Hospitals would not have contracted with and paid Clinica for services unless Clinica referred patients to them. DE.507-App.B:204, 216-18, 223. Nowhere did the district court reconcile its decision with these sworn admissions, even though the court accepted them as the basis for Tracey's guilty plea. DE.507-App.B:236.

The court dismissed Tracey's admissions because she did not state "that Clinica was paid for services that were not provided, that the payments were above market rates, or that the individuals performing those services were woefully unqualified." DE.610:24. But again, this evidence is not necessary to prove an AKS violation. The absence of such an admission did not nullify Tracey's sworn affirmation of the conspirators' *quid pro quo* arrangement: payments for patient referrals.

Second, in law-enforcement interviews, Tracey provided detailed information about the conspiracy, including specific meetings and conversations she had with co-conspirators. *See* pp.13-17, *supra*. As Clinica's former COO and a cooperating co-conspirator, Tracey was well positioned to provide this information. *See United States v. Beale*, 921 F.2d 1412, 1422-23 (11th Cir. 1991). For example, Tracey described:

- A meeting with Holland in which Cota described Clinica's ability to refer 50 patients per month to North Fulton, Holland's later demand for assurances of patient referrals, and Cota's refusal to begin referring patients to North Fulton until it signed the contract with Clinica. DE.507-App.B:18, 21-22, 971-72.

- ███████████████ statement that North Fulton wanted at least 35 deliveries per month by Clinica patients. DE.507-App.B:30-31.

- Moore's repeated inquiries about Clinica patient referrals and lack of inquiry into the contractual services Clinica was providing AMC. DE.507-App.B:17, 61, 136, 139, 176.

- A meeting with ██████████████████ in which Cota said that Clinica could refer 30-40 patients per month to Spalding, and ██████later cancellation of the Clinica-Spalding contract after only four months based on insufficient Clinica referrals. DE.507-App.B:29-30.

- ████████████████ outreach about a clinic for Hilton Head and statements to Tracey and Cota that ████ wanted 30 deliveries per month from Clinica. DE.507-App.B:31, 62-63, 160.

These conversations and meetings, and others described by Tracey, bear directly on the conspirators' motivation for remunerating Clinica. North Fulton would not have assigned Clinica a patient quota if their relationship simply provided an "attractive arrangement" for referrals. DE.610:35.

If Tracey's statements alone were not enough, they were corroborated by documentary evidence. For example, the Proforma states that "Clinica De La Mama will begin directing admissions to [North Fulton] upon completion of the contract," DE.507-App.B:280, corroborating Tracey's statement that Cota purposefully withheld referrals until the Clinica-North Fulton contract was

signed. Email correspondence indicated that the parties manipulated compensation amounts under the Clinica contracts, *see* pp. 25-26, *supra*, corroborating Tracey's statements that Clinica was paid for patient referrals. And an internal document emailed ███████ corroborated Tracey's account of why ██ canceled the Clinica-Spalding contract: it reported that the Clinica "initiative" was "discontinued … due [in part] to inability of partner to establish clinic volume …." DE.507-App.A:18.1-2. The district court made no credibility finding against Tracey. It failed to give her statements meaningful consideration.

Third, internal Tenet documents confirm that Tenet Hospitals paid Clinica to induce patient referrals. *See generally* pp. 21-26, *supra*. The Proforma projected revenue from the Clinica "initiative" in terms of Medicaid and Medicare payments for the delivery services that resulted from referrals. DE.507-App.B:277, 280.[11] One year into the North Fulton-Clinica contract, Moore emailed Holland, "How is [ ] Clinica working out for you? Do you know how many deliveries they're averaging?" DE.507-App.B:290. Moore's litmus test was patient volumes, not the services Clinica was providing under contract.

---

[11] Defendants challenged the Proforma based on its unknown authorship. But this Court has upheld the admission of an anonymous phone call under Rule 801(d)(2)(E). *See United States v. Dynaelectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988). And nothing precludes considering the Proforma as to the preliminary question of whether a conspiracy existed. *See* Fed. R. Evid. 104(a).

His email confirms what is clear from the Proforma: Tenet Hospitals were valuing and paying Clinica based on patient referrals. *See also* DE.507-App.B:302 (August 2006 email from Moore to ████████████ about "set[ting] up a meeting with the Clinica folks to discuss expansion sites *to possibly feed* ████"; "[t]heir business *fuels* a lot of our NICU volume") (emphasis added).

The September 2008 email chain involving then-SVP Holland, Moore, ████████████ further evidences a *quid pro quo* arrangement. When Holland asked for Clinica patient numbers, Moore reported a "marked decrease" at AMC and believed there would be "a problem" if the decrease was not offset by Clinica patients at North Fulton; ████████ reported only "flat volume" at North Fulton, speculated that Clinica could be "diverting to another program," and pledged to raise the issue with Cota and Tracey during contract-renewal talks. DE.507-App.A:41.1. Holland then complained to Cota and Tracey that "either volume is going out of the system or Clinica's overall volume of patients has slowed considerably." DE.507-App.B:318. On their face, these communications speak to the ████conspirators' agreement to pay Clinica to induce patient referrals— and concern that Clinica was not living up to its end of the bargain.

████████████████ were equally candid about the purpose of paying Clinica. *See* pp. 23-25, *supra*. Among other emails, a message from ████████

50

████████ █████████████, responding to ██████ inquiry about using a different translation provider, linked Clinica payments to patient referrals: "*If we think we can get Clinica to send us the business and we can get the translation services elsewhere, I'm all for it. I agree with your assessment of the way they hold us hostage and don't like it.*" DE.507-App.A:29.1 (emphasis added). ████ was plainly communicating that North Fulton had been paying Clinica to induce patient referrals. *See also, e.g.*, DE.507-App.A:21.1-2 (████████████ ██████████████ "[I] want to take a hard look at the clinica benefit as compared to cost …. We are paying more than 240K at Hilton Head for 400 deliveries. These costs wipe out our OB margins[.]").[12]

Moore's email to ████████████ in May 2011, after Cota and Tracey divorced, captured the kickback scheme in two sentences: "See significant number of babies coming from Ed Cota's clinic (d la Mama). We need to move on that agreement or risk him pressuring the doctor to deliver at another

---

[12] ████████████████████████████████████████████

hospital." DE.507-App.B:333; *see* DE.507-App.A:28.3 (volume report ████ ██████: "Clinica volume continues to decline due to immigration law enforcement. To mitigate loss within OB, a contract with clinica de la mama is in process, already have a contract with clinica de la bebe.").

The district court did not address these communications.  It dismissed patient-volume discussions out of hand because it believed that "a hospital administrator would want to know how many patients are likely to show up at a hospital on a given day (or over a given period) for numerous reasons that have nothing to do with violating the AKS," such as needing to know "how many Spanish-speaking women delivered at a hospital so that they could verify that the payments made to Clinica for translation services were accurate and not above fair market value." DE.610:30; *accord id.* at 35. But that is not a reasonable reading of what the Tenet-based conspirators said.

Contrary to the court's characterization, the internal documents and emails show that the alleged conspirators repeatedly identified patient referrals as the purpose of doing business with Clinica, *e.g.*, DE.507-App.A:18.1-2, 23.2, 28.3, 41.1; described the relationship with Clinica in *quid pro quo* terms, *i.e.*, payments or contracts for patient referrals, *e.g.*, DE.507-App.A:29.1; DE.507-App.B:280, 333; and measured the cost of what a hospital paid Clinica against the Medicaid revenues the hospital projected to generate from the delivery

services Clinica referred to it, *e.g.*, DE.507-App.A:21.1-2, 37.1; DE.507-App.B:277. This evidence shows that the Tenet Hospitals paid Clinica to induce patient referrals—referrals were more than a "collateral hope or expectation." *McClatchey*, 217 F.3d at 834 & n.7; *see United States v. Sanjar*, 876 F.3d 725, 733-34, 747 (5th Cir. 2017) (kickback evidence included that clinic owners and administrator "meticulously monitored patient referrals"). The conspirators' discussion of patient volume concerned revenue generation, not the fair market value of Clinica's services.

Further, because Clinica's compensation took into account patient-referral volumes, and because the contracts did not set forth the parties' agreement concerning patient referrals, the arrangements were not protected by the personal-services safe harbor. 42 C.F.R. § 1001.952(d)(2), (d)(5); *see United States v. Clough*, 978 F.3d 810, 822 (1st Cir. 2020) (evidence showed that defendant and drug company had "an unwritten, 'mutual understanding' of a kickback scheme"; "[n]o matter the written terms" of their agreement, the arrangement fell outside the safe harbor by taking into account defendant's prescription volumes); *United States v. Nagelvoort*, 856 F.3d 1117, 1120-21, 1126 (7th Cir. 2017) (discussions about doctor's "declining referral numbers," and hospital owner's desire to make the doctor happy because "we need his patients over here," was evidence agreements took into account referrals); *see also Hagen*,

2023 WL 2182258, *11 (defendants' own testimony that total monthly remittances derived from a "target" number of raw leads defendants hoped to procure "put[] the contract outside the protection of the safe harbor").

The district court clearly erred in finding that the evidence showed only that defendants "create[d] an attractive arrangement for referrals." DE.610:35.

2. The court clearly erred in finding "scant" evidence of willfulness.

Apart from the evidence of payments made for patient referrals, the government presented evidence of willfulness in two additional forms: (1) AKS-related training taken ███████████████████; and (2) contract provisions prohibiting patient referrals and requiring AKS compliance. Although the government's filings repeatedly discussed this evidence, *e.g.*, DE.507:25, 33, 35, 39-40, 52-54, 63; DE.529:16-17, the district court rejected the training evidence for faulty reasons and failed to address the contract evidence. The court's finding of "scant" willfulness evidence, DE.610:28, was clearly erroneous.

First, that Holland, Moore, ████████████████ took annual training on the AKS beginning in 2006, *see* pp. 26-27, *supra*, is evidence they knew their conduct was illegal. *See United States v. Mak*, 683 F.3d 1126, 1139 (9th Cir. 2012) (citing "export compliance training" as evidence "that [defendant] knew his actions were illegal"); *United States v. St. Junius*, 739 F.3d 193, 211 (5th Cir. 2013) (by signing employment documents explaining that receiving commission

payments was illegal, defendant affirmed she understood conduct violated the law).

The Corporate Integrity Agreement required Tenet's senior leaders, and those involved in negotiating, preparing, reviewing, or approving arrangements with potential referral sources, to receive training on topics that included the AKS. DE.507-App.B:753-55, 788. A training slide titled "Anti-Kickback Basics" shows that ▮▮▮▮▮▮▮▮ were informed of the "One purpose rule" in connection with the AKS's "Knowing and willful" elements; other slides explained that an arrangement with a referral source must "not take into account volume or value of referrals or other business" and cautioned that an arrangement "must meet *all* criteria" to satisfy a safe harbor. DE.507-App.B:881, 887-88.

The district court found that the training slides "provide only a vague idea of the content of the training" and that because "the one-purpose rule is not clear," the person who "led the training could have in good faith" said "that the one-purpose rule did not apply if a transaction fit within a safe harbor." DE.610:29-30. But again, the one-purpose rule is not ambiguous or at odds with the AKS safe harbors. The slides (*e.g.*, DE.507-App.B:879-94) and Agreement implementation report (DE.507-App.B:753-64) provided detailed evidence about the purpose and content of the training—exactly the type of evidence that

the Fifth Circuit found *lacking* in a case holding that a defendant's training on compliance and Medicare was insufficient to establish willfulness under the AKS. *See United States v. Nora*, 988 F.3d 823, 830-31 (5th Cir. 2021).

The court overlooked that Tenet was under a Corporate Integrity Agreement. That the purpose of the training was to comply with the Agreement makes it even less plausible that trainees would have been instructed on anything other than the consensus view of the one-purpose rule. ████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ The court clearly erred by setting aside this evidence of willfulness.

Second, the district court did not address the provisions of the post-Agreement contracts in which Clinica and the Tenet Hospitals certified that they would not violate the AKS and agreed to comply with Tenet's AKS policies. *See* p. 19, *supra*. Holland approved all of those contracts, and Moore signed all of the AMC-Clinica contracts (and all but the original contract). *See id.* Nor did the court address the provisions in the original contracts with AMC and Hilton Head, which disavowed any requirement that Clinica make patient referrals, or address Holland's similar disavowal when seeking corporate approval of the original Clinica-North Fulton contract. *See id.* This was evidence that defendants

56

and their co-conspirators knew patient referrals were illegal. *See Hill*, 745 F.

App'x at 815; *United States v. Moshiri*, 858 F.3d 1077, 1082-83 (7th Cir. 2017).

The court should have considered it.

      3.  <u>The court clearly erred in finding that defendants relied in good faith on the advice of counsel.</u>

The district court clearly erred in finding that "when the contracts were

executed, Defendants had a reasonable basis to believe that the contractual

arrangements under the terms of the contract were legal," because "attorneys for

both Tenet and Clinica vetted the contracts to ensure that they would not violate

the law." DE.610:37-38.

Although good-faith reliance on counsel's advice can negate willfulness,

it is an affirmative defense on which defendants bear the burden of proof. *Vernon*,

723 F.3d at 1269. The fact-bound elements of this defense are that the defendant

(1) "fully disclosed to his attorney all material facts that are relevant to the advice

for which he consulted the attorney," and (2) "thereafter … relied in good faith

on the advice given by his attorney." *Id.* (quotation omitted). Failure to present

evidence on each element is fatal to the defense. *See United States v. Hill*, 643 F.3d

807, 851 (11th Cir. 2011).

The district court did not make any finding that defendants and their co-

conspirators "fully disclosed" all material facts related to the contracts to

attorneys for Clinica or Tenet. The court skipped this step, even though it was defendants' threshold burden to present evidence of disclosure to counsel.

Further, the court misapprehended the scope and facts of the charged conspiracy in evaluating the lack-of-disclosure evidence submitted by the government. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█ ██████████████████████████████████████
████████████████████████████████████████
████████████████████████

█ ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

█ ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

█ ██████████████████████████████████████
████████████████████████████████████████
████████████████

Similarly, the law-enforcement interview ██████████████████

███████████████████████████████████████████████████████

████████████████, reveals that ██ did not know that referrals were the

purpose of the Clinica contracts. DE.529-App.B:1017, 1022-26. When shown

the Proforma, ████████stated that it was suggestive of a *quid pro quo* and would

have ███████████████████████████. DE.529-App.B:1022-23.

The district court did not address ██████████ statements. And the court

dismissed ████████████████ on the ground that it concerned "documents and

communications" that, the court believed, occurred "*after* the contracts had been

approved by counsel and executed." DE.610:37-38 & n.17. The court was

wrong. Not only did the Proforma predate the original North Fulton-Clinica

contract, but defendants and their co-conspirators continually renewed, or

executed new, contracts between Clinica and the Tenet Hospitals throughout

the conspiracy. ██████████████████████ alone predated North Fulton's

December 2009 contract with Clinica (DE.507-App.B:564-70) and March 2011

contract with Clinica de la Mama (DE.507-App.B:574-81), and AMC's May

2011 contract with Clinica del Bebe (DE.507-App.B:505-11).

Even if the communications post-dated the execution of *all* contracts, they

evidence the conspirators' understanding about a purpose (if not the purpose) of

the arrangements. This was an ongoing conspiracy to pay Clinica for patient

referrals pursuant to an unwritten, but necessary, condition of its contractual arrangements with Tenet Hospitals. ██████████████████████ statements reveal that the conspirators did not disclose this purpose to ██████ counsel.

Elsewhere, the court referenced communications between Tracey and ██ ██████ attorney purportedly "show[ing] that the two worked closely and extensively together in vetting the contracts, and [Tracey] sought to avoid violating the AKS." DE.610:28. But Tracey pleaded guilty, admitting that she willfully joined an unlawful plan that was not disclosed in the Clinica-Tenet Hospital contracts. DE.507-App.B:211, 216-18; *see also id.* at 133 (law-enforcement report documenting Tracey's admission that, although she believed the contracts were legal as to the services Clinica provided, "it was not the whole picture"). Tracey could not, and ultimately did not, assert good-faith reliance on advice of counsel.

The legal review of contracts did not negate willfulness. The court's error here compounded its previous ones.

## II.    REVERSAL IS WARRANTED.

Because the government proved a conspiracy by a preponderance of the evidence, the Court should reverse and remand for the district court to determine, as to each statement offered under Rule 801(d)(2)(E), whether the

declarant was a member of the conspiracy with defendants and whether the

statement was made in furtherance of the conspiracy.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted,

KENNETH A. POLITE, JR.
 Assistant Attorney General

JOHN F. SCANLON                      LISA H. MILLER
Assistant Chief                        Deputy Assistant Attorney General

LIGIA MARKMAN                       s/ John-Alex Romano
 Trial Attorney                       _____
 Criminal Division, Fraud Section     JOHN-ALEX ROMANO, Attorney
                                       U.S. Department of Justice
                                       Criminal Division, Appellate Section
                                       950 Pennsylvania Avenue, NW
                                       Washington, DC 20530
                                       Tel. 202-353-0249
                                       John-Alex.Romano@usdoj.gov

61

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,950 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Calisto 14-point font.

**Dated:  March 16, 2023**

s/John-Alex Romano

_____

JOHN-ALEX ROMANO, Attorney
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. 202-353-0249
 John-Alex.Romano@usdoj.gov

## CERTIFICATE OF SERVICE

1.    Counsel for each defendant-appellee has consented to service by electronic mail of the sealed filings in this case. Undersigned counsel of record certifies that, on this day, an electronic copy of the government's sealed opening brief was served on counsel for defendants-appellees by email.

2.    The government has filed a motion to extend the deadline for filing the electronic version of its redacted (public) opening brief until the Court rules on a separately filed motion. Electronic service of the redacted version of the government's opening brief will be effectuated when the brief is electronically filed using the Court's CM/ECF system, which will send notice of the filing to all participants in this case who are registered users of the Court's electronic case filing system.

**DATED:     MARCH 16, 2023**

s/John-Alex Romano

_____

JOHN-ALEX ROMANO, Attorney
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov