No. 22-14219-B

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

**Plaintiff-Appellant,**

v.

JOHN HOLLAND, WILLIAM MOORE, EDMUNDO COTA,

**Defendants-Appellees.**

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA NO. 1:17-CR-0234-AT (TOTENBERG, J.)

_____

## REDACTED OPENING BRIEF FOR DEFENDANT-APPELLEE WILLIAM MOORE

_____

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

BRIAN F. MCEVOY
BRIAN T. RAFFERTY
GRACE W. ZOLLER
Baker & Hostetler LLP
1170 Peachtree Street
Suite 2400
Atlanta, GA 30309
(404) 459-0050
bmcevoy@bakerlaw.com

_Attorneys for Defendant-Appellee William Moore_

*United States v. John Holland, et al.*
No. 22-14219-B

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(3), Defendant-Appellee William Moore certifies that, in addition to the persons and entities listed in the United States' Opening Brief, the following persons and entities have an interest in the outcome of this case:

Shapiro, Kristin A., Counsel for Defendant-Appellee William Moore

Zoller, Grace W., Counsel for Defendant-Appellee William Moore

*/s/ Brian F. McEvoy*
Brian F. McEvoy

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-appellee William Moore respectfully submits that oral argument is unnecessary. The law regarding the district court's holding that the government failed to establish by a preponderance of the evidence that defendants willfully conspired to violate the Anti-Kickback Statute—as is necessary for the government to introduce the hearsay statements of alleged co-conspirators—is well-established and straightforward in its application here. And it is apparent from the briefs and record that the district court's factual findings are not clearly erroneous.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES ........................................................ v

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES................................................................................ 1

INTRODUCTION ...................................................................... 2

STATEMENT OF JURISDICTION............................................... 3

STATEMENT OF THE ISSUES ................................................. 4

STATEMENT OF THE CASE .................................................... 4

   I.   Background........................................................................ 4

   II.  Procedural  History........................................................... 9

       A. Motion for a *James* Hearing........................................ 10

       B. The Government's Motion to Admit .......................... 12

          1.  Tracey Cota's Interview Summaries and Guilty Plea ............ 12

          2.  Clinica Contracts ................................................. 14

          3.  Compliance Trainings ........................................ 14

          4.  Communications Involving Mr. Moore ................ 15

          5.  Communications Not Involving Mr. Moore ......... 18

       C. Defendants' Responses................................................. 19

D. The District Court's Order .......................................................... 22

III.    Standard of Review ........................................................... 25

SUMMARY OF ARGUMENT ................................................. 25

ARGUMENT ...................................................................... 27

I.    The Court Lacks Jurisdiction Over This Interlocutory Appeal .......... 27

II.    The Government Cannot Escape Clear-Error Review by
Manufacturing Bogus "Legal" Issues............................................... 28

III.    The District Court's Willfulness Finding Is Not Clearly Erroneous... 32

A. The District Court's Finding on Willfulness Is Supported by
Substantial Evidence .................................................. 33

B. The Government Fails to Establish Clear Error ........................... 38

1.    The District Court Correctly Found "Scant" Evidence of
Willfulness............................................................ 38

2.    The District Court Correctly Found That the Government Failed
to Establish That Defendants Paid for Referrals ...................... 42

3.    The District Court Correctly Found That Defendants
Endeavored to Comply with the AKS, Including by Working
with Counsel ......................................................... 47

IV.    Defendants' Compliance with the Safe Harbor Provides an Alternate
Basis for Affirmance ......................................................... 49

V.    Given Defendants' Additional Grounds for Denial of the
Government's Motion, Reversal is Inappropriate............................... 52

CONCLUSION ................................................................... 53

CERTIFICATE OF COMPLIANCE ............................................. 54

CERTIFICATE OF SERVICE.................................................... 55

iii

# TABLE OF AUTHORITIES

## Cases

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .................................................................. 25

*Bingham v. HCA, Inc.*,
783 Fed. App'x. 868 (11th Cir. 2019) .......................................................... 51

*Cheek v. United States*,
498 U.S. 192 (1991) .................................................................................. 29, 32

*Smith v. United States*,
568 U.S. 106 (2013) ...................................................................................... 48

*U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*,
752 F. Supp. 2d 602 (W.D. Pa. 2010) .......................................................... 51

*U.S. ex rel. Villafane v. Solinger*,
543 F. Supp. 2d 678 (W.D. Ky. 2008) .......................................................... 51

*United States v. Allison*,
908 F.2d 1531 (11th Cir. 1990) .................................................................. 25

*United States v. Anderson*,
872 F.2d 1508 (11th Cir. 1989) .................................................................. 33

*United States v. Brown*,
983 F.2d 201 (11th Cir. 1993) .................................................................... 47

*United States v. Chi Mak*,
683 F.3d 1126 (9th Cir. 2012) .................................................................... 41

*United States v. Clough*,
978 F.3d 810 (1st Cir. 2020) ...................................................................... 41

*United States v. Drogoul*,
1 F.3d 1546 (11th Cir. 1993) .................................................................. 27, 28

*United States v. Gorski*,
36 F. Supp. 3d 256 (D. Mass. 2014) ............................................................ 47

*United States v. Greber*,
760 F.2d 68 (3d Cir. 1985) ......................................................................... 30

*United States v. Hagen*,
60 F.4th 932 (5th Cir. 2023) ....................................................................... 41

*United States v. Hill*,
745 F. App'x 806 (11th Cir. 2018) .............................................................. 40

*United States v. James*,
590 F.2d 575 (5th Cir. 1979) (en banc) ...................................................... 10

*United States v. Matthews*,
431 F.3d 1296 (11th Cir. 2005) .................................................................. 25

*United States v. McClatchey*,
217 F.3d 823 (10th Cir. 2000) .................................................................... 45

*United States v. Miles*,
290 F.3d 1341 (11th Cir. 2002) .................................................................. 10

*United States v. Moshiri*,
858 F.3d 1077 (7th Cir. 2017) .................................................................... 41

*United States v. Musaibli*,
42 F.4th 603 (6th Cir. 2022) ...................................................................... 28

*United States v. Nagelvoort*,
856 F.3d 1117 (7th Cir. 2017) .................................................................... 42

*United States v. Nora*,
988 F.3d 823 (5th Cir. 2021) ..................................................................... 40

*United States v. Perry*,
624 F.2d 29 (5th Cir. 1980) ....................................................................... 28

*United States v. Posner*,
764 F.2d 1535 (11th Cir. 1985) ................................................................... 28

*United States v. Ross*,
964 F.3d 1034 (11th Cir. 2020) ................................................................... 50

*United States v. Sanjar*,
876 F.3d 725 (5th Cir. 2017) ....................................................................... 42

*United States v. St. Junius*,
739 F.3d 193 (5th Cir. 2013) ....................................................................... 41

*United States v. Starks*,
157 F.3d 833 (11th Cir. 1998) .......................................................... 31, 32, 41

*United States v. Tokars*,
95 F.3d 1520 (11th Cir. 1996) ..................................................................... 25

*United States v. Vernon*,
723 F.3d 1234 (11th Cir. 2013) ........................................................ 29, 31, 41

*United States v. Watkins*,
10 F.4th 1179 (11th Cir. 2021) (en banc) .................................................... 53

*United States v. Wenxia Man*,
891 F.3d 1253 (11th Cir. 2018) ................................................................... 32

**Statutes**

18 U.S.C. § 3231 ........................................................................................... 3

18 U.S.C. § 371 ............................................................................................. 9

18 U.S.C. § 3731 .............................................................................. 4, 25, 27

42 U.S.C. § 1320a-7b ..................................................................................... 9

42 U.S.C. § 1320a–7b(b)(2) ........................................................................ 51

42 U.S.C. § 1320a-7b(b)(2) .................................................................. 29, 32

**Rules**

Federal Rule of Appellate Procedure 28(i) ...................................................... 1

Federal Rule of Appellate Procedure 4(b)(1)(B)(i) ......................................... 4

Federal Rule of Evidence 801(d)(2)(E) ................................................ passim

**Regulations**

42 C.F.R. § 1001.952(d) ...................................................... passim

56 Fed. Reg. 35 ...................................................................... 29, 30

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Mr. Moore respectfully adopts in full his co-defendant/appellee's briefs pursuant to Fed. R. App. P. 28(i). Specifically, Mr. Moore adopts: John Holland's Sealed Opening Brief and Edmundo Cota's Opening Brief. The issues contained in these briefs apply near equally to Mr. Moore as they do to his co-defendants.

## INTRODUCTION

This case is unlike any other Anti-Kickback Statute ("AKS") prosecution. The government challenges fair-market-value payments that were made pursuant to facially lawful contracts, extensively vetted by counsel, and in exchange for necessary services that were actually rendered. It asserts a novel and unsupported "chicken-and-egg" theory of liability, in that some services would not have been needed but for patient referrals, to criminalize routine hospital administration.

Equally novel is the government's approach to proving its case. For over six years, the government has fought to try its case by cherry-picking hearsay statements from an army of purported "co-conspirators," and introducing them, stripped of context, as non-hearsay through a case agent under Federal Rule of Evidence 801(d)(2)(E), not subject to cross-examination on their substance. In order to do so, the government took the unprecedented step of identifying 55 unindicted co-conspirators. Only after the district court required the government to demonstrate admissibility did it narrow the list down to ten unindicted co-conspirators and 44 statements allegedly made in furtherance of a conspiracy with defendants.

The government's attempt to omit context—including fact-witness testimony and completeness of the documents within which the statements are found—is a blatant attempt to smother the truth. Why? Because the truth contradicts the government's version of events. Without this distortion, the government's case falls apart.

Perhaps this is why the government is still fighting to suppress this exculpatory context by taking the unusual step of appealing an order denying its Motion to Admit Co-Conspirator Statements. The government's appeal ignores the findings of the district court and attempts to manifest a legal error where none exists. The district court made a *factual* determination that the government failed to establish Defendant-appellee William Moore's participation in a single conspiracy because "the Government has presented scant evidence of Defendants' willfulness"—an essential element of the charged conspiracy—and thus failed to carry its burden of proof under Rule 801(d)(2)(E). The government's evidence of the alleged conspiracy largely consists of required compliance training, boilerplate contractual provisions that were drafted and approved by in-house and outside counsel, and benign hospital business operation documents, including ones tracking patient volume—which are ubiquitous in hospital management. This showing is woefully inadequate, especially when considered along with the substantial exculpatory evidence submitted by defendants. The district court's factual finding is not clearly erroneous and should be affirmed, if this appeal is not dismissed for lack of jurisdiction.

## STATEMENT OF JURISDICTION

The government appeals from a pretrial order holding that certain statements are not admissible under Federal Rule of Evidence 801(d)(2)(E). The district court had jurisdiction under 18 U.S.C. § 3231 and entered its order on

November 15, 2022. DE.596.[1] The government timely filed a notice of appeal on December 14, 2022. DE.619; *see* Fed. R. App. P. 4(b)(1)(B)(i). The government asserts that this Court has jurisdiction under 18 U.S.C. § 3731. For the reasons provided in Argument § I, *infra*, section 3731 does not provide jurisdiction over this interlocutory appeal.

## STATEMENT OF THE ISSUES

1.      Whether an order rejecting a single ground for admission of evidence but not other potential grounds is an order "suppressing or excluding evidence" under 18 U.S.C. § 3731, as necessary for jurisdiction over this interlocutory appeal.

2.      Whether the district court's finding that the government failed to establish that defendants conspired to willfully violate the AKS was clearly erroneous.

3.      Whether defendants' compliance with the personal-services safe harbor to the AKS, 42 C.F.R. § 1001.952(d), which the government did not dispute below, provides an alternate basis for affirmance.

## STATEMENT OF THE CASE

### I.    Background

William Moore became the CEO of Atlanta Medical Center ("AMC") in September 2001—nearly two years after the initial contracts at issue were negotiated, reviewed, approved, and executed—a position which he held until

---

[1] "DE._____" refers to district court docket entries.

2014. DE.121:3. During this period, AMC was owned and operated by Tenet Healthcare Corporation ("Tenet"), a Fortune 500 company with hospitals across the nation. DE.521-Ex.4:21. Defendant-appellee John Holland was the CEO of North Fulton Hospital ("NFH"), a Tenet hospital in Roswell, Georgia, from 2000 to 2006, and from 2006 to 2013 he was Senior Vice President of Operations for Tenet's Southern States Region. DE.121:2.

Defendant-appellee Edmundo Cota was the President and CEO of Hispanic Medical Management, Inc., which did business as Clinica de la Mama ("Clinica"). DE.121:3.[2] Since its founding in 1988, Clinica had operated numerous health clinics that provided Ob-Gyn and pediatric healthcare services to uninsured and undocumented Hispanic women and children in a bilingual environment sensitive to the needs of this population. DE.521-Ex.4:2-3. Patients generally paid Clinica in cash for services at the clinics but were eligible to have their labor and delivery at a hospital covered by Medicaid's Emergency Medical Assistance programs. DE.507-AppxB:213-14.

Before, during, and after Mr. Moore and Mr. Holland's tenures at AMC and NFH, the two hospitals separately contracted with Clinica for the provision of services necessary to support their work with the region's fast-growing Hispanic population. DE.521-Ex.4:7. The contractual relationship between Clinica, AMC, and the other Tenet hospitals proceeded as follows.

---

[2] In 2010, Mr. Cota and his wife and business partner, Tracey Cota, divorced and divided the business between them. DE.121:3. This brief refers to their various entities as "Clinica."

1.    AMC began negotiating with Clinica in 1999 and entered into its first contract with Clinica on March 15, 2000, eighteen months prior to Mr. Moore's tenure. DE.507-App.B:431-65; DE.521-Ex.16. Pursuant to the contract, Clinica would open and manage an Ob-Gyn clinic near AMC staffed by hospital residents. DE.507-App.B:431-65. The time residents spent staffing the clinic would count for purposes of AMC's graduate medical education program, and the contract specified that "none of the benefits to [Clinica] is conditioned on any requirement that [Clinica] make referrals to" the hospital. DE.507-App.B:441-43. AMC and Clinica also entered into a marketing-consulting agreement under which Clinica would assist the hospital in the "development and implementation of a marketing plan to promote the Practice to the Hispanic community." DE.507-App.B:449. Mr. Moore became the CEO of AMC in September 2001, after the initial contract's execution and first renewal. DE.507-App.B:465.

Between 2000 and 2011, AMC and Clinica regularly renewed their contractual relationship and added to Clinica's responsibilities. DE.507-App.B:431-65. In June 2001, prior to Mr. Moore's arrival at AMC, the parties amended the contract to provide that Clinica would supply and manage sufficient bilingual staff for 24/7 interpretation services for all Spanish-speaking patients at AMC, regardless of the hospital department. DE.507-App.B:465. In 2006, the parties added that Clinica would provide bilingual Medicaid eligibility determination services for all Hispanic patients at AMC. DE.507-App.B:480. In 2008, AMC's accreditation as a teaching hospital was revoked and the residency

program ended. DE.507-App.B:307. But AMC continued to engage Clinica for interpretation and Medicaid eligibility services. DE.507-App.B:484-504.

AMC undisputedly received needed and valuable services from Clinica under these contracts. Clinica opened and managed a clinic near the hospital where AMC residents could gain educational experience treating a diverse population, which was important for AMC's residency program during its years of operation. DE.507-App.B:443; DE.521-Ex.54:173, 219-21. AMC also received needed in-person interpretation services for the hospital's Spanish-speaking patients. DE.521-Ex.2:514. While hospitals sometimes satisfy their federal-law obligation to provide interpretation through telephonic services, in-person translation is superior, particularly in high-risk situations such as deliveries, and was preferable given AMC's significant number of Spanish-speaking patients throughout the hospital. DE.521-Ex.2:748.

Regarding the Medicaid eligibility services, Clinica staff prescreened and qualified Hispanic patients for Medicaid assistance, and Clinica patients would arrive at AMC for labor and delivery with their Medicaid applications in order. DE.521-Ex.2:140. While AMC had previously used a Tenet subsidiary for Medicaid eligibility services for other patients, Clinica was better at working with the undocumented Hispanic population and less expensive. DE.521-Ex.2:152-53 ██████████████████████████████████

████████████████████████████████████

Counsel for AMC and for Clinica drafted and negotiated the initial agreement and approved the extensions and amendments throughout the course

of the parties' contractual relationship, including verifying that AMC was paying fair market value for Clinica's services. *See, e.g.*, DE.521-Exs.-4, 16, 20-23, 55, 63-64. For example, in 2005, AMC polled providers of interpretation services in the Atlanta area to establish fair market value and determined that Clinica's compensation was at the low end of the range. DE.521-Ex.63:34.

2.      Three other Tenet hospitals also contracted with Clinica, although Mr. Moore never worked at or had meaningful involvement with these hospitals. NFH entered into its first contract with Clinica in for 24/7 interpretation services and Medicaid eligibility services in October 2001. DE.507-App.B:513-27. The contract was regularly extended and renewed through 2011, long after Mr. Holland had left the hospital. DE.507-App.B:528-85. As with the AMC contracts, NFH undisputedly received needed and valuable services from Clinica. *See, e.g.*, DE.521-Ex.12:51 ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ The NFH contract was also extensively vetted by counsel for Tenet and Clinica. *See, e.g.*, DE.507-App.B:651; DE.521-Ex.12:73 ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

Spalding Regional Medical Center ("Spalding") in Griffin, Georgia, and Hilton Head Hospital ("HHH") in South Carolina also contracted with Clinica

in 2004 and 2006, respectively, for interpretation and Medicaid eligibility services. DE.507-App.B:586-629. Spalding's and HHH's contracts with Clinica were likewise reviewed and approved by counsel. DE.507-App.B:702-718; DE.521-Exs.26, 35.

## II.    Procedural History

On September 16, 2017, the United States filed a second superseding indictment against defendants.[3] DE.121. As relevant here, Count 1 charges defendants with a conspiracy to defraud the United States and pay and receive bribes in connection with a federal health care program, in violation of 18 U.S.C. § 371. Specifically, Count 1 alleges that defendants conspired to violate the AKS, 42 U.S.C. § 1320a-7b, "by knowingly and willfully offering and paying remuneration" to induce the referral of an individual for the furnishing "of any item and service for which payment may be made in whole and in part by a federal health care program." DE.121:¶ 41. Notably, Mr. Moore is *not* charged with an underlying substantive count of violating the AKS. DE.121:¶ 66. The indictment acknowledges that all of the payments at issue were made pursuant to facially lawful contracts. *See* DE.121:¶ 46-47. But it alleges that the contracts were "pretextual" and many "purported" services provided under the contracts were known to defendants to be unnecessary, duplicative, problematic, not rendered, or rendered by persons who were not qualified. DE.121:¶ 48.

---

[3] Mr. Moore is on bond. DE.131

### A. Motion for a *James* Hearing

The government notified counsel of the names of 55 alleged "unindicted co-conspirators" whose hearsay statements the government might introduce at trial pursuant to Federal Rule of Evidence 801(d)(2)(E), as required by the district court's Standing Order. DE.195-Ex.A. ███████████████████ ████████████████████████████ *Id.*

In January 2018, all defendants moved for a hearing pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc). *See* DE.195:1, 218:1. A *James* hearing is held to determine the admissibility of hearsay statements by alleged co-conspirators under Rule 801(d)(2)(E) *prior to trial* to prevent exposing jurors to evidence that would be "so highly prejudicial as to color other evidence." *James*, 590 F.2d at 579. For the statements to be admissible under Rule 801(d)(2)(E), the government must prove *by a preponderance of the evidence* that a conspiracy existed, the conspiracy included the declarant and the defendant, and the statement was made during the course and in furtherance of the conspiracy. *See United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). The government opposed, arguing that a *James* hearing would be an impractical mini-trial and urged the district court to defer the question of Rule 801(d)(2)(E) admissibility until the close of the government's case-in-chief. DE.277:38, 43.

In June 2019, the district court proposed a "compromise" requiring the government to provide a notice of co-conspirator statements that it intends to introduce at trial along with its arguments in support of its burden to satisfy the Rule 801(d)(2)(E) standard. DE.446:68. The district court expressed its concern

that if the issue were delayed until trial, it would cause substantial delay given the identification of 55 unindicted co-conspirators. *Id.*

The government then notified defendants of 83 statements it "may" introduce under Rule 801(d)(2)(E) made by 11 alleged co-conspirator declarants, while also maintaining that the identified 55 individuals and entities previously identified were still considered unindicted co-conspirators. DE.472:Ex.A. The only independent evidence provided to establish that a conspiracy existed was the "anticipated testimony of Tracey Cota, Gary Lang, and other trial witnesses"—a statement the government simply copied and pasted nine times throughout its notice. *Id.* Notably, the government's notice did not mention willfulness.

Defendants moved to exclude all 83 statements because the government failed to establish that a conspiracy to violate the AKS existed, let alone that each of the 11 declarants were knowing and intentional members of that conspiracy. DE.472:1, 473:1. In the alternative, defendants renewed their request for a *James* hearing. *Id.*

The district court held a hearing on October 3, 2019, to discuss outstanding pre-trial issues, including the *James* hearing issue, and subsequently denied defendants' Motions to Exclude. DE.497:10. However, the district court found the government's notice to be insufficient for myriad reasons, including failure to establish a single conspiracy existed. DE.497:4-5. The district court stated that the government failed to present "sufficient argument to explain why the evidence shows by a preponderance of the evidence that the … contract[s

were] pretextual." DE.497:6-7. The district court also raised the issue of the government's unsupported criminalization of volume discussions. "It is not a crime, for example, for a Tenet official to ask Tracey Cota how many patients Clinica will refer to a Tenet hospital in the coming month, and that information is clearly relevant to the hospital for reasons beyond violating the AKS." *Id.* The district court *again* compromised by ordering a *James* hearing "on paper." DE.497:9. It ordered the government, as the party bearing the burden, to file "a motion or motions" specifically identifying the hearsay statements it intended to introduce and to justify their admission. *Id.*

## B.   The Government's Motion to Admit

The government filed its Motion to Admit Co-Conspirator Statements in April 2020, seeking to introduce 44 statements from 10 declarants, ████████ ████████████████████████████ DE.507. Although proving a conspiracy required the government to establish that defendants conspired to *willfully* violate the AKS, its Motion to Admit was completely silent on willfulness. *See* DE.596:28, n.14. It provided the following evidence to establish the existence of a conspiracy:

### 1.    *Tracey Cota's Interview Summaries and Guilty Plea*

The government submitted summaries of Tracey Cota's interviews with law enforcement and the transcript at her change-of-plea hearing. Ms. Cota was Mr. Cota's wife and business partner until around 2008, when they went through a contentious divorce and divided the Clinica business. DE.507-App.B:33. The summaries of her initial interviews state that, ██████████████████

███████████████████████████████████████

████████████████████████████ DE.507-App.B:968. They also state

that, during the parties' contractual relationship, Ms. Cota ██████

███████████████████████████████████████

███████████████████████ DE.507-App.B:972; *see also* DE.507-

App.B:9████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████. *See, e.g.*, DE.507-App.B:77, 180, 183-84.

According to the summaries, years into her interviews with the
government, Ms. Cota abruptly ██████████████████████

███████████████████████████████████████

██████████ DE.507-App.B:972, 21. The summaries also indicate that ██

███████████████████████████████████████

███████████████████████████████████████

██████████ *See, e.g.*, DE.507-App.B:17, 61.

Ms. Cota pled guilty to conspiring to violate the AKS in 2014. DE.507-
App.B:203-37. At the plea hearing, the government argued as a factual predicate
for her plea that the "true purpose" for the Clinica contracts was "to pay for
Medicaid referrals." DE.507-App.B:216. The government explained that "it was
sort of a chicken and egg thing…. [O]nce Clinica agreed to refer those patients,
then a need existed, so they created a need for the contracts." DE.507-
App.B:219. The plea agreement contained "extensive cooperation provisions"

13

that will be considered at Ms. Cota's sentencing hearing, which has been continued for eight years at the government's request. DE.507-App.B:230, 236.

### 2.    *Clinica Contracts*

The government also submitted copies of Clinica's contracts with the Tenant hospitals as evidence of the conspiracy, despite the contracts being facially lawful. The government notes that Mr. Moore signed some of the contracts for AMC, that some of the contracts stated that payments to Clinica were "not conditioned on any requirement" that Clinica make referrals, and that some contracts contained provisions requiring the parties to comply with the AKS. *See, e.g.*, DE.507-App.B:441, 482. The Government's evidence also establishes that each contract was substantially negotiated, reviewed, and amended by counsel for Tenet and Clinica. *See e.g.,* DE.507-App.B:973-76.

### 3.    *Compliance Trainings*

The government submitted evidence that, from 2006 to 2011, Mr. Moore, Mr. Holland, and hundreds of other Tenet employees received required compliance training that included reference to the AKS. DE.507-App.B:765-894. Specifically, slide 24 in a 2006 PowerPoint presentation paraphrased the basic elements of a "safe harbor" to the AKS for personal-service contracts with referral sources:

- Fair Market Value
- Commercially reasonable
- Reasonable and necessary for legitimate business purposes
- Does not take into account volume or value of referrals or other business

DE.507-App.B:881. Slide 30 referenced the "one-purpose" rule, stating: "Knowing & willful – One purpose test." DE.507-App.B:887. And slide 31 referenced "Exceptions and Safe Harbors," including the safe harbor for services contracts, and stated "[i]mmunity from prosecution available," "[a]rrangement must meet *all* criteria," and "[v]oluntary – not illegal if fall outside of the safe harbor but subject to scrutiny." DE.507-App.B:888. The government presented no evidence of what was said in these presentations.

### 4.    *Communications Involving Mr. Moore*

The government submitted a handful of communications that included or referenced Mr. Moore. Most are statements that the government also seeks to introduce as co-conspirator statements.

The government submitted three emails from ███████████ ████████ including people who are not alleged unindicted co-conspirators, that simply cc'd Mr. Moore, and attached ████████████ on actual versus budgeted admissions for the hospital as a whole, including line items breaking down admissions by payor and department and detailed notes about the reasons for any variance. *See, e.g.*, DE.507-App.B:319-20 (███████████



████████████████████████ The government emphasized a few

comments regarding variances in OB admissions. For example, ███████ ███████



DE.507-App.B:320; *see also* DE.507-App.B:328 ███████████

████████████████████████████████████████████████████

███████████████████████████ DE.507-App.B:340 ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████[4]

The government submitted a ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ DE.507-Ex.17.[5] It

submitted a ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[4] The government seeks to admit the latter two documents as co-conspirator statements. DE.507-Exs.27, 28.

[5] The government seeks to admit this as a co-conspirator statement. DE.507-Ex.17.

██████████████████████████████████████ DE.507-Ex.42.[6] It submitted

a███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ DE.507-App.B:302. It submitted a███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

DE.507- App.B:318. And it submitted ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ DE.507-App.B:333.

The government also submitted a████████████████████████

████████████████████████████████████████████████████████

██████████████████████ DE.507-App.B:290.  And  the  government

submitted ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████. *See* DE.507-App.B:317.[7]

---

[6] The government seeks to admit this as a co-conspirator statement. DE.507-Ex.42.

[7] The government seeks to admit this as a co-conspirator statement. DE.507-

The government submitted a ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ DE.507-
App.B:324.[8] The email chain indicates that ██████████████
████████████████████████████████████████████████
██████████████████████████████. *Id.*

5.    *Communications Not Involving Defendants*

The government also submitted a few documents that did not include any defendant, all of which are statements that the government seeks to introduce under Rule 801(d)(2)(E).[9] With respect to AMC, it submitted a



████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ DE.507-Ex.24. And it submitted a ████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

Ex.41.

[8] The government seeks to admit this as a co-conspirator statement. DE.507-Exs.23, 30.

[9] DE.507-Exs.11, 21, 24, 36, 37, 43.

███████████████████████████████████████████████████

████████████████████████████████████ DE.507-Ex.43.

Regarding other hospitals, the government similarly submitted business communications that it misconstrued to be nefarious. *See* DE.507-Exs.29, 37, 44. For example, it submitted an email between ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ DE.507-Ex.21.

### C.  Defendants' Responses

In opposition to the motion, defendants submitted the evidence discussed above showing that the Tenant hospitals received much-needed services from Clinica at fair market value, and that the contracts were extensively vetted by counsel. In addition, defendants submitted reams of evidence putting the government's hearsay statements in context. It is this contextual evidence that the government hopes to avoid at trial by introducing its version of the hearsay statements through a case agent, while blocking admission of the alleged co-conspirators' exculpatory statements on the ground that they are not in furtherance of a conspiracy and therefore could not be admitted to cross-examine the agent. *See, e.g.*, DE.477-Tr.:96.

To start with, defendants submitted transcripts of the grand jury testimony of most of the alleged co-conspirators, along with notes from their interviews with law enforcement. These individuals would be credible witnesses at trial—███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ These

individuals consistently testified that ████████████████████████

████████████████████████ *See, e.g.*, DE.521-Ex.12:10 ████████████

█████████████████████████████████████ DE.521-Ex.14:251

███████████████████████████████████████████████

████████████████████████████ DE.521-Ex.14:262 ████████████

█████████████████████████████████████████████ DE.521-

Ex.15:42 ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ *See, e.g.*, DE.507-

App.B:162; DE.521-Ex.12:42, Ex.48:268; *see also* DE.521-Ex.43 █████████

███████████████████████████████████

     Defendants also submitted evidence explaining that, by offering translation and Medicaid eligibility services, the hospitals hoped to attract Hispanic patients. *See, e.g.*, DE.521-Ex.14:197 ███████████████████

███████████████████████████████████████████████

██████████████████████████████ [10] Because ████████████████████████

███████████████████████████████████████████████

---

[10] *See also* DE.521-Ex.15:93, 48:66-67.



Additionally, defendants submitted evidence showing that there were valid business reasons for their discussions of Clinica volume. Understanding and predicting volume was important for the hospitals' staffing and budgeting plans. *See, e.g.*, DE.521-Ex.8 ███████████████████ DE.521-Ex.12:28 ██████████████████████ ████████████████████████████████████████ It was also important to predict the number of Clinica patients who would deliver at the hospital in preparing the Clinica contracts, as the volume of Clinica patients was relevant to the business need for and fair market value of the services provided under the contracts. *See, e.g.*, DE.521-Ex.2:80, Ex.7.

As for the volume analyses, the witnesses explained that ████████

███████████████████████████████████████████████

████████████████████████ DE.521-Ex.2:364-65, ████████

███████████████████████████████████████████████



*See, e.g.*, DE.521-Ex.2:373-74. Defendants also presented evidence explaining the government's supposedly nefarious statements. For example, with respect to the ▮▮▮▮▮▮▮▮ DE.521-Ex.14:250-53.

### D. The District Court's Order

The district court denied the government's motion on the basis that the government failed to establish that a conspiracy existed because it did not establish a willful violation of the AKS by a preponderance of the evidence. DE.596:38-39. Indeed, the court stated that the government had presented "scant" evidence of defendants' willfulness and did not even discuss willfulness in its motion: "a search of the document indicates that no form of the word 'willful' appears in the motion." DE.596:28, n.14. The court then explained why the government failed to carry its evidentiary burden on this element.

The court found "ample evidence showing that Clinica provided valuable services under the contracts and no evidence that the contracts were a sham." DE.596:33. To the contrary, "it is…apparent that the services provided by Clinica were valuable to Tenet and to the patients." DE.596:32. For example,

the court found that "Clinica was uniquely situated to provide [Medicaid eligibility] services to benefit both the Tenet hospitals and the undocumented patients." DE.596:33. "Because of Clinica's work, Tenet was able to secure millions in EMA payments, and the patients left the hospitals with babies and without significant medical debt." *Id.*

The court further noted that "[t]he Government has…failed to dispute, or even respond to, Defendants' contention that the contracts qualified under the [42 C.F.R.] § 1001.952(d)42 C.f safe harbor" to the AKS, which permits providers to enter into services contracts with referral sources so long as, *inter alia*, the contract is for services that are reasonably necessary and the referral source is paid a fair market value. *Id.* The court explained that "the Government has not yet produced *any* evidence that Clinica was paid for services that were not provided, that the amount paid exceeded the fair market value of the services that were provided, [or] that the services were not needed by the hospitals." DE.596:13, n.6. "In the absence [such] evidence…this Court cannot find that any of the involved individuals had reason to believe they were violating the law." DE.596:38.

The government did argue that "the Tenet hospitals did not need the services provided for under the contracts *unless* Clinica referred its patients to the hospitals." DE.596:24. But the court recognized that, "as more Medicaid-covered, Hispanic women show up at a hospital to deliver babies, more translation services, services related to EMA eligibility determination paperwork, educational services, and birth certificate services are needed, and

the provider of those services has a legitimate expectation of higher pay for more service." DE.596:34. It does not "violate the AKS to create an attractive place to refer patients," including by hiring Clinica to perform services that "made the Tenet hospitals an attractive place for Clinica to send its patients because Clinica knew that its employees would be there to help with translation and Medicare eligibility." *Id.*

The government also argued that, notwithstanding the safe harbor, defendants still violated the AKS because one purpose of the contracts was to induce referrals, in contravention of the "one-purpose rule." DE.596:9-21. The court was unpersuaded by the government's evidence that a purpose of the contracts was to induce referrals, as "hospital administrators have ample, legal reasons to monitor patient volume, and as a result the discussions, standing alone, do not establish that payments under the agreements were for something more than the value of the services provided." DE.596:31. In any event, the court found that, even accepting government's legal argument on the "one-purpose" rule's primacy, the lack of clarity on the interaction between the safe harbor and rule undercut its showing of willfulness because defendants reasonably could have believed that conduct satisfying the safe harbor was lawful. DE.596:19, 21, 30.

Moreover, "attorneys for both Tenet and Clinica vetted the contracts to ensure that they would not violate the law." DE.596:37. Thus, the court found that "when the contracts were executed, defendants had a reasonable basis to believe that the contractual arrangements…were legal." *Id.* The court noted the

24

government's evidence that counsel for Tenet was unaware of a handful of emails discussing the Clinica contract and volume, but it found that the evidence "falls significantly short of establishing that the employees failed to make a full and complete good faith effort of all material facts to an attorney." *Id.*

## III.  Standard of Review

The district court's determination that the government did not prove by a preponderance of the evidence that a conspiracy existed is a "factual finding[]" that this Court reviews "under the clearly erroneous standard." *United States v. Matthews*, 431 F.3d 1296, 1308 (11th Cir. 2005); *see also United States v. Tokars*, 95 F.3d 1520, 1538 (11th Cir. 1996); *United States v. Allison*, 908 F.2d 1531, 1534 (11th Cir. 1990). "Clear error is a highly deferential standard of review." *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019) (quotation marks omitted). A finding is clearly erroneous only if the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted).

## SUMMARY OF ARGUMENT

The district court denied the government's motion to admit alleged co-conspirator statements because it found that the government failed to establish a conspiracy to willfully violate the AKS. The government's challenge to that finding fails for several reasons.

**I.**    The Court lacks jurisdiction over this interlocutory appeal because the district court's order rejecting only a single ground for admission is not an order "suppressing or excluding evidence." 18 U.S.C. § 3731.

**II.**      The government's claim of legal error misapprehends the district court's reasoning respecting the personal-services safe harbor. The court accepted the government's legal argument, which it repudiates on appeal, that the "one-purpose" rule overrides application of the safe harbor. It found that, even under the government's legal position, the law was sufficiently unclear that a party could rely in good faith on attempted compliance with the safe harbor and that, in fact, defendants did so rely, which undercut the government's meagre showing on willfulness. The government's concession on appeal that the safe harbor is an absolute defense to liability only reinforces the district court's factual finding on willfulness.

**III.**      The government fails to establish that the district court's finding on willfulness is clearly erroneous. That finding was supported by extensive and unrebutted evidence that the hospitals received needed and valuable services from Clinica at a fair market value pursuant to contracts extensively vetted by counsel. This is not the typical AKS case involving obviously culpable conduct like no-work contracts. Indeed, the government identifies *no* case finding a willful AKS violation in circumstances anything like those here.

None of the three purported "errors" asserted by the government withstand scrutiny. First, the district court correctly found "scant" evidence of willfulness given that the government's evidence consisted of boilerplate contractual provisions and one bullet on a PowerPoint slide from a compliance training stating "Knowing & willful – One purpose." Second, the district court correctly found that the government did not establish that payments to Clinica

were conditioned on patient referrals based on the weakness of the government's showing—a handful of emails taken out of context and misconstrued—and extensive contrary evidence. Finally, the district court correctly considered evidence of counsel's involvement in making its willfulness finding and rejected the government's unsupportable claim that defendants concealed material facts from counsel. As the court found, counsel's extensive involvement supports defendants' good-faith attempted compliance with the AKS.

**IV.**    Defendants' compliance with the personal-services safe harbor provides an alternative ground for affirmance. The government argues on appeal that the Clinica contracts fall outside the safe harbor because compensation was "determined in a manner that takes into account the volume or value of any referrals." 42 C.F.R. § 1001.952(d)(5). That argument is waived because the government did not make it below. It is also wrong because compensation was based on the fair market value of Clinica's services and the hospitals' projected need for those services, and the government introduced no evidence that the compensation was based on the volume or value of Clinica referrals.

ARGUMENT

**I.    The Court Lacks Jurisdiction Over This Interlocutory Appeal**

This Court lacks jurisdiction because the order appealed by the government is not one "suppressing or excluding evidence," as 18 U.S.C. § 3731 requires. While that provision provides jurisdiction over orders with the "practical effect" of excluding evidence, *United States v. Drogoul*, 1 F.3d 1546, 1551 n.13 (11th Cir. 1993), the order here only rejects a single ground for

admission without addressing other hearsay exceptions the government has indicated it might assert, *compare United States v. Musaibli*, 42 F.4th 603, 612 (6th Cir. 2022) (permitting appeal because admissibility was "thoroughly ventilated below"). Moreover, the district court's order does not foreclose the government from admitting the statements at trial by calling the *readily available* witnesses who made them. *Compare Drogoul*, 1 F.3d at 1551 n.13 (permitting appeal because denial of motion to depose foreign nationals had "practical effect" of exclusion where those witnesses "refuse[d] to testify" and were "beyond the subpoena power"). For the same reasons, cases approving jurisdiction over orders expressly *excluding* co-conspirator statements, *United States v. Perry*, 624 F.2d 29, 30 (5th Cir. 1980); *United States v. Posner*, 764 F.2d 1535, 1537 (11th Cir. 1985), do not support jurisdiction here. This appeal should be dismissed.

## II.    The Government Cannot Escape Clear-Error Review by Manufacturing Bogus "Legal" Issues

The district court denied the government's motion for admission of alleged co-conspirator statements because it found that the government had failed to establish that defendants acted willfully. In a blatant attempt to avoid clear-error review of that finding, the government asserts that the decision below was marked by "legal errors" concerning the import of the personal-services safe harbor. But the district court refrained from ruling on the safe harbor, instead only finding that legal uncertainty regarding its application was relevant to whether defendants acted willfully—"'that is, with a bad purpose, either to disobey or disregard the law.'" DE.596:7 (quoting *United States v. Vernon*, 723

F.3d 1234, 1256 (11th Cir. 2013)). In arguing otherwise, the government misstates the district court's reasoning and omits mention of its own reversal of position on the safe harbor's force that further supports the district court's determination.

A.    Although the district court's decision did not rest on application of the safe harbor, it is relevant here as a factual matter and as an alternative ground of affirmance, which is addressed below. *See infra* § IV. Factually, an individual's good-faith effort to comply with the law speaks to a lack of willfulness. *See Vernon*, 723 at 1269; *see generally Cheek v. United States*, 498 U.S. 192, 203 (1991). The AKS makes it a crime to "knowingly and willfully offer[] or pay[] any remuneration…to induce" referrals. 42 U.S.C. § 1320a-7b(b)(2). Because the statute technically reaches many "innocuous, or even beneficial, commercial arrangements," Congress directed the Inspector General of the U.S. Department of Health and Human Services to promulgate regulatory safe harbors. 56 Fed. Reg. 35,952, 35,952 (July 29, 1991). The "personal services" safe harbor excludes payments compensating services from being "remuneration" under the AKS when (1) they are made pursuant to a written agreement, (2) the agreement specifies and covers all the services provided to the payor by the payee, (3) the term of the agreement is at least one year, (4) the compensation formula is set in advance, consistent with "fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals," and (5) the aggregate services provided do not exceed those reasonably necessary to achieve the agreement's purpose. 42 C.F.R.

§ 1001.952(d). A person who complies with the safe harbor "will be assured of not being prosecuted criminally or civilly." 56 Fed. Reg. at 35,954.

The government acknowledged below that safe-harbor compliance is an affirmative defense to an alleged AKS violation but argued that this "affirmative defense will fail—and the AKS conspiracy proved—where the United States demonstrates that any purpose of a payment for services was to induce…patient referrals." DE.507:6-7; *see also* DE.507:26-27 (similar). In other words, it contended that the judicially-created "one-purpose rule"—which holds that the AKS's inducement element is satisfied if one purpose of a payment is to induce referrals, even if the payment was also intended to compensate for services, *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)—overrides the personal-services safe harbor.

Ultimately, the district court rested its decision not on the AKS's inducement element (one-purpose theory) or the remuneration element (safe harbor), but on the government's failure to establish willfulness. DE.596:37-38. It found that, even accepting the government's legal position, someone in "good faith" could believe that "the one purpose rule did not apply if a transaction fit within a safe harbor." DE.596:30. On that basis, it determined that "Defendants had a reasonable basis to believe that the contractual arrangements under the terms of the contracts were legal" under the safe harbor and that no evidence showed "any of the involved individuals had reason to believe that they were violating the law." DE.596:38.

**B.**    The government now faults the district court for taking its safe-harbor argument seriously, but its concession that the safe harbor is not vitiated by the one-purpose rule only supports the district court's reasoning.

After insisting below that the one-purpose rule overrides the safe harbor, the government acknowledges on appeal that the two address different elements (inducement and remuneration, respectively) and that "a payment made under an arrangement satisfying every requirement of a regulatory safe harbor does not violate the AKS." Gov't.Br.39-40, *compare* DE.507:6-7. The government's criticism of the district court for accepting the force of its now-repudiated legal argument is baffling. If the safe harbor shields conduct from liability, as the government now concedes, then that means it was indisputably reasonable for the parties to the Clinica agreements to rely on their understanding and advice of counsel that the agreements satisfied the safe harbor and therefore were lawful. The district court's factual finding of reliance on the safe harbor is certainly not undermined by the government's belated concession that compliance with the safe harbor provides a complete defense to liability.

Nor was there legal error. Far from applying a "heightened standard for willfulness," Gov't.Br.43, the district court drew the standard verbatim from the government's principal authorities, *Vernon* and *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998), which define willfulness as "'specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law,'" DE.596:7. Those decisions contradict the government's claim (at 43) that a different standard, the one-purpose rule, applies—which

31

would collapse the statute's inducement and willfulness elements into a single inquiry, one that improperly excludes good-faith attempted compliance with the law. *See Cheek*, *supra*. Finally, the government is wrong to contend (at 44) that the district court held that a showing of "nefarious conduct" is needed to make out an AKS violation. It simply found that no such evidence contradicted defendants' showing of good-faith. DE.596:38.

In sum, the district court applied the governing legal standard to find that the government's "scant evidence of Defendants' willfulness" fell short, given defendants' reasonable belief they acted lawfully under the safe harbor and absent any of the types of evidence typically found in an AKS case, such as that "the terms of the contract were not faithfully executed, that Clinca was paid for services that were not rendered, [or] that the payments under the contract were in excess of fair market value…." DE.596:28, 32-33, 38. The government's appeal challenges that factual determination, not any legal holding.

## III.   The District Court's Willfulness Finding Is Not Clearly Erroneous

The district court's finding that the government "failed to establish by a preponderance of the evidence that Defendants conspired to violate the AKS" because the court "could not find that any of the involved individuals had reason to believe they were violating the law" is not clearly erroneous. DE.596:38. "The term 'willfully' in the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), requires the government to prove" that a defendant "knew that his conduct was generally unlawful." *United States v. Wenxia Man*, 891 F.3d 1253, 1268 (11th Cir. 2018) (citing *Starks*, 157 F.3d at 837-39)). Willfulness is refuted by evidence that one

acted in good faith. *See United States v. Anderson*, 872 F.2d 1508, 1517-18 (11th Cir. 1989). The district court meticulously considered the totality of the government's evidence (DE.596:23-27) and defendants' evidence (DE.596:27-28), and then thoughtfully explained why the preponderance of the evidence does not establish that defendants knew their conduct was unlawful (DE.596:28-38), assuming their conduct even was unlawful (*see* Argument § IV, *infra*). That finding is correct—and certainly not clearly erroneous.

## A. The District Court's Finding on Willfulness Is Supported by Substantial Evidence

The government largely ignores the evidence submitted by defendants and relied on by the district court in determining that the evidence does not establish willfulness. That evidence shows the contracts were run-of-the-mill service agreements that paid fair market compensation for needed services that were actually performed, not a pay-for-play scheme. It also shows that Tenet's attorneys were involved at every step of the contracting process, providing all involved with reasonable assurance that the agreements were legal and satisfied the AKS and its personal-services safe harbor. For all its bluster, the government refuses to seriously engage the district court's findings on either point.

Most glaringly, the government fails to address the extensive evidence that the hospitals received needed and valuable services from Clinica at a fair market value. *See, e.g.*, DE.521-Ex.2:515, 752 (interpretation services), DE.521-Ex.12:51 (same); DE.521-Ex.15:79-80 (same); DE.521-Ex.48:76 (same); DE.521-Ex.63:34 (same); DE.521-Ex.2:153-54, 165 (Medicaid eligibility

services); DE.521-Ex.12:20 (same). ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ *See, e.g.*, DE.507-App.B:162; DE.521-Ex.12:42, Ex.48:268.

Consistent with this evidence, the district court found it "apparent that the services provided by Clinica were valuable to Tenet and to the patients," and that "Clinica was uniquely situated to provide these services." DE.596:32. The government does not dispute the district court's finding that it failed to adduce "any evidence that Clinica was paid for services that were not provided, that the amount paid exceeded the fair market value of the services that were provided, [or] that the services were not needed by the hospitals." DE.596:13, n.6.

Attempting to nevertheless characterize the contracts as pretextual, the government argues that the district court failed "to acknowledge the evidence that Clinica did not, for example, provide quality translation services." Gov't.Br.44. The government cites to an alleged co-conspirator statement to prove its point—████████████████████████████████████████████████ ████████████████████████—that neither includes nor references defendants. DE.507-Ex.36. The government ignores the district court's finding that the recipient of this email "complained about the translators" to Mr. Cota and "sought to compel Clinica to perform under the terms of the contract"—a far cry from furthering the alleged conspiracy. DE.596:13, n.6. ████████████

██████████████████████████████████████████████████

████████████████████████ DE.521-Ex.49 ████████████████



Moreover, other evidence showed that the interpreters were qualified and doing a good job. *See, e.g.*, DE.521-Ex.12:57 ███████████

█████████████████████ Even the government's own evidence contradicts its allegation. *See e.g.*, DE.507-App.B:136 ████████

        The evidence that the hospitals received needed and valuable services at a fair market value—and the complete lack of evidence that the services were unnecessary or not rendered—negates willfulness in two distinct ways. First, it undermines the government's theory that the "true purpose" of the contracts was to pay for referrals. Witness after witness before the grand jury testified that

services. *See, e.g.*, DE.521, Ex.12:10 ██████

█████████████; DE.521-Ex.14:251 ██████

██████████; DE.521-Ex.14:262 ██████

DE.521-Ex.15:42 ████████████████████████

██████.[11] The undisputed evidence that the hospitals received these

---

[11] The government dismisses the testimony of these witnesses as "post-hoc justifications." Gov't.Br.51, n.12. But their grand jury testimony is detailed and

necessary services at fair market value—and docked Clinica's pay when they didn't—confirms this testimony. As the district court explained, "[t]he existence of those services made the Tenet hospitals an attractive place for Clinica to send its patients because Clinica knew that its employees would be there to help with translation and Medicare eligibility," but there is nothing illegal about "creat[ing] an attractive place to refer patients." DE.596:34. In short, the evidence supports the district court's finding that "the government d[id] not show by a preponderance of the evidence that Defendants did anything more than create an attractive arrangement for referrals." DE.596:35.

Second, this evidence supports the district court's separate finding that, even if the government had proven that the purpose of the contracts was to induce referrals, "[d]efendants had a reasonable basis to believe that the contractual arrangements under the terms of the contracts were legal." DE.596:37. As discussed above, the safe harbor, 42 C.F.R. § 1001.952(d), exempts from the AKS payments made under contracts where the services are reasonably necessary and compensation reflects a fair market value. The district court correctly explained that there was "significant evidence regarding the fact that the lawyers on both sides were heavily involved in drafting and monitoring the services contracts," DE.596:28, including ensuring that the requirements of the safe harbor were satisfied, *see, e.g.*, DE.507-App.B:651; DE.521-Exs.4, 12:73, 16, 20-23, 44, 48:88, 55, 63-64. █████████████████████

---

credible, which is likely why the government would prefer to introduce their emails through a case agent rather than calling the witnesses.

███████

██████ *See, e.g.*, DE.521-Ex.64:22, Ex.35.

As the district court noted, the government "failed to dispute, or even respond to, Defendants' contention that the contracts qualified under the § 1001.952(d) safe harbor." DE.596:33. On appeal, the government argues that the safe harbor is inapplicable because "compensation under the contract takes into account the volume or value of referrals." Gov't.Br.45; *see also* Gov't.Br.53. The government's argument—which relies on a novel "chicken and egg" theory of criminal liability, DE.596:34 (quoting government attorney)—is both waived and incorrect as a matter of law, as explained in Argument § IV, *infra*.

The government's argument also fails to seriously engage the district court's *factual* finding of defendants' reasonable reliance on the safe harbor. The relevant question is not, as the government assumes (at 53-54), whether the contracts actually satisfied the safe harbor, but whether the evidence shows that defendants endeavored to comply or believed they complied with the safe harbor, thereby negating willfulness. On that question, the government identifies *no* evidence that defendants either were aware of the government's newly contrived chicken-and-egg theory or that they were violating it.

Quite the opposite. *Tenet legal counsel* was involved at every step of the contracting process and was included on emails discussing Clinica volume—the same emails the government relies on to argue that the safe harbor is inapplicable. *See, e.g.*, DE.507-App.B:323-25 ████████

████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ *See* DE.507- Ex.3 (designating the report as a co-conspirator statement); DE.521-Ex.3 (counsel's review of the report). The government's argument that defendants somehow must have known that these discussions with their legal counsel placed the contracts outside of the safe harbor is nonsensical.

In short, the totality of the evidence shows that the payments at issue were made pursuant to facially lawful and non-pretextual contracts that were extensively vetted by counsel. The district court did not clearly err in finding that the government failed to prove that defendants knew those payments were unlawful, as necessary to establish *willful* violation of the AKS.

### B. The Government Fails to Establish Clear Error

The government argues that the district court made three errors in finding that the preponderance of the evidence does not establish willfulness: (1) the court erred in finding "scant" evidence of willfulness, Gov't.Br.54-57; (2) the court erred in finding that payments under the contracts were not conditioned on referrals, Gov't.Br.46-54; and (3) the court erred in finding that defendants in good faith relied on counsel, Gov't.Br.57-60. None withstand scrutiny.

1.    <u>*The District Court Correctly Found "Scant" Evidence of Willfulness*</u>

The record confirms that the government presented "scant" evidence of willfulness. DE.596:28. Indeed, as the district court observed, "no form of the

word 'willful'" even appeared in the government's motion. DE.596:28, n.14. The government belatedly argues on appeal that two forms of evidence establish willfulness: AKS-related trainings attended by defendants and contract provisions certifying compliance with the AKS. Gov't.Br.54-57. That beggars belief.

Regarding the AKS trainings, the district court correctly explained that the PowerPoint slides submitted by the government "provide only a vague idea of the content of the training by merely listing the topics to be discussed," such as by stating "Knowing & willful – One purpose test." DE.596:29. "[T]he Government's evidence does not establish what was said about the one purpose rule" at the training, and "whoever led the training could have in good faith read the plain language of the safe harbor (which was also discussed in the training) and determined that the one-purpose rule does not apply if a transaction fit within the safe harbor." DE.596:29-30. And the boilerplate contractual provisions the government cites contain even less detail about the AKS—the provisions do not even mention the one-purpose rule or the safe harbor. DE.507-App.B:441 (stating that payments under the contract are not "conditioned on any requirement" to make referrals). This "evidence" does not establish that defendants knew the intricacies and interplay of the safe harbor and the one-purpose rule, such that their reliance on counsel was somehow illegitimate. DE.507:14, 25.

The government speculates that "the consensus view of the one-purpose rule" was presented at the AKS trainings. Gov't.Br.56. What, precisely, the

government means by the "consensus view" of the one-purpose rule is unclear. As noted above, the government now concedes that the safe harbor is a complete defense to liability. The government's suggestion that defendants must have known their conduct was unlawful because of the one-purpose rule (at 56) is at odds with that concession. The district court thoroughly explained why, as a factual matter, defendants could reasonably believe that contracts satisfying the safe harbor were lawful even if one purpose of engaging Clinica was to obtain referrals. DE.596:9-21, 28-30. Further confusing things, the government also concedes that a medical provider may lawfully choose to hire a service provider that "has the capacity to refer patients over one that does not." Gov't.Br.45. In any event, the government points to nothing even suggesting that these legal nuances, nor the government's novel chicken-and-egg theory of liability, were discussed at the AKS trainings. *Cf. United States v. Nora*, 988 F.3d 823, 831 (5th Cir. 2021) ("A juror would have to make a speculative leap about the content of these trainings and meetings—that they somehow alerted Nora to the unlawfulness of Abide's practices and the actions he took to support them.").

The government cites three cases where evidence indicating the defendants' general awareness of the AKS supported a finding of willfulness. Gov't.Br.54, 57. Apart from the markedly different procedural posture of those cases—sufficiency of the evidence challenges to jury verdicts—the cases all involved obvious AKS violations. *See, e.g.*, *United States v. Hill*, 745 F. App'x 806, 815 (11th Cir. 2018) (pharmacy shared fifty percent of its profits from prescriptions with defendants, who paid patients to obtain prescriptions); *United*

*States v. Moshiri*, 858 F.3d 1077, 1079 (7th Cir. 2017) (referring physician received payments under purported teaching contract with hospital where he did not perform vast majority of contractual duties); *United States v. St. Junius*, 739 F.3d 193, 199 (5th Cir. 2013) (home care service provider received ten-percent kickback on the price of medical equipment purchased by her referrals).[12]

As the district court explained, in such "typical" AKS cases "willfulness is evident because, for example, a doctor who is paid for a job that she does not perform obviously knows that she is doing something wrong." DE.596:38. These facts do not exist here because this is not a typical AKS case. The government seeks to push the boundaries of AKS criminal liability to reach payments made pursuant to facially lawful and non-pretextual contracts extensively vetted by counsel simply because, according to the government, some of the services would not have been necessary without the referrals. Yet the government identifies no case finding criminal liability under the AKS supporting its novel theory.[13] Even if the government's theory of liability were

---

[12] The other case cited by the government involved a challenge to a jury verdict under the Arms Export Control Act and obviously culpable conduct. *United States v. Chi Mak*, 683 F.3d 1126, 1131 (9th Cir. 2012) (defendant attempted to smuggle secret naval technology to China).

[13] Every single case cited by the government in support of willfulness involved the obviously culpable conduct of typical AKS cases. *See, e.g.*, *Vernon*, 723 F.3d at 1257 (defendants paid referral sources forty-five percent of profits from each referral); *United States v. Starks*, 157 F.3d 833, 836 (11th Cir. 1998) (defendants paid health aides $250 per referral); *United States v. Hagen*, 60 F.4th 932, 938 (5th Cir. 2023) (defendants paid Philippines operation to target senior citizens, have a teledoc sign an equipment order, and arrange for them to order the equipment from defendants); *United States v. Clough*, 978 F.3d 810, 815 (1st Cir. 2020)

41

correct, which it is not, there is no evidence that defendants knew of that theory, much less that they willfully violated it.

   2. *The District Court Correctly Found That the Government Failed to Establish That Defendants Paid for Referrals*

The government faults the district court for finding that it did not "show by a preponderance of the evidence that Defendants did anything more than create an attractive arrangement for referrals." DE.596:35. The government attempts to characterize this case as a "*quid pro quo* arrangement: payments for patient referrals." Gov't.Br.47. This argument is particularly weak with respect to Mr. Moore, as he began his tenure at AMC nearly two years after the Clinica relationship was formed. The government's accusation requires one to actively ignore the substantial evidence that services *were being provided* throughout the entire tenure of the Clinica arrangement. *See* pp. 7-8, supra. But even accepting the government's utter speculation about the "true purpose" of the contracts, the government would still fail to establish willfulness because defendants could in good faith believe that their conduct was lawful under the safe harbor. *See* pp. 38-41, *supra*.

   Regardless, ample evidence supports the district court's finding that at most defendants created an attractive arrangement for referrals. As discussed,

---

(defendant paid $1,000 for "sham speaking engagements" no one attended); *United States v. Nagelvoort*, 856 F.3d 1117, 1125-26 (7th Cir. 2017) (doctor paid $2,000 per month to do nothing); *United States v. Sanjar*, 876 F.3d 725, 747 (5th Cir. 2017) (defendants paid group-home operators to refer residents to sham mental health facility).

*see* pp. 7, 19-21, *supra*, defendants presented extensive evidence that the purpose of the contracts was to obtain services that were incredibly important to serve the region's fast-growing Hispanic population. The government's contrary argument rests on the conclusory, inconsistent, and unreliable statements of Ms. Cota and a handful of documents taken out of context and misrepresented as sinister. Notably, Ms. Cota's expected testimony and most of those documents are among the statements that the government seeks to admit pursuant to Rule 801(d)(2)(E), which provides that courts "may consider" such statements in deciding a motion to admit under the rule, but that "[t]he statement…does not by itself establish…the existence of a conspiracy or participation in it." In light of this rule, the government is fortunate that the district court considered its evidence at all; the district court certainly did not err in declining to give the evidence—and the speculative inferences the government draws from it—dispositive weight.

Regarding Ms. Cota, the government argues that she "affirmed under oath that she and her co-conspirators 'agreed' that Clinica would be compensated for 'referring' Clinica patients to Tenet Hospitals, that the contracts and payments 'were conditioned on and in exchange for Clinica referring its patients to the hospitals,' and that the Tenet Hospitals would not have contracted with and paid Clinica for services unless Clinica referred patients to them." Gov't.Br.46-47. And law enforcement's notes from Ms. Cota's interviews reflect that ████████ ████████████████████████████████████████████████████ Gov't.Br.48. The government's reliance on this evidence does not withstand scrutiny.

Ms. Cota's interview notes indicate that it was ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ DE.507-App.B:19. In light of the ████

████████████████████████████████████████

████████████████████████████████████████

████████████ *Id.* At the time, Ms. Cota also ████████████████████

████████████████████████████████████████

████████████ DE.507-App.B:972. This is why Ms. Cota routinely relied

upon her own counsel and altered her conduct according to his legal advice. *See*

*e.g.*, DE.521-Ex.3 ████████████████████████████████

████████████████████████████ As the district court correctly

recognized, Ms. Cota's statements and admissions do not prove that the

contracts were a sham, DE.596:24, nor could they in light of the undisputed

evidence that they weren't, *see* pp. 7, 19-22, *supra*. Ms. Cota's guilty plea simply

establishes that she "now sees it differently," *id.*, and accepted the government's

"chicken and egg thing" theory, DE.507-App.B:219. The plea sheds no light on

defendants' *mens rea*.

Ms. Cota's statements that ████████████████████████████

████████████████████ are similarly underwhelming. The district court

explained that "hospital administrators have ample, legal reasons to monitor

patient volume," and that "'mere oral encouragement to refer patients…does

not violate the law.'" DE.596:31 (quoting *United States v. McClatchey*, 217 F.3d

44

823, 824 (10th Cir. 2000)). Indeed, defendants submitted uncontested evidence that 

Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, DE.521-Ex.2:373-74. Any good business losing customers or community standing would want to know the reason and address it. *See, e.g.*, DE.521-Ex.15:93 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DE.521-Ex.48:66-67 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The "documentary evidence" cited by the government fares no better. Gov't.Br.48-52. Defendants are not included on or referenced in about half of the documents. DE.507-Exs.18, 21, 29, 43; DE.507-App.B:277. Regarding the documents that relate to defendants, the government cites innocuous emails such as one asking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DE.507-App.B:290, or another noting that Clinica ▮▮▮▮▮▮▮▮▮▮▮

DE.507-App.B:302. The government also places great emphasis on one email

chain between ███████████████████████████████████████

██████████████████████ DE.507:Ex.41. As explained, there is nothing

unusual or illegal about hospital executives monitoring patient volume and

referrals. The government also argues that a ██████████████████████

"captured the kickback scheme in two sentences." Gov't.Br.51 (citing DE.507-

App.B:333). If that were true, it seems unlikely that ██████████████████

████████████████████████████████████████████████████████

████████████████████ *See e.g.*, DE.521-Ex.2:477,719.

The documents that defendants are not included on or referenced in are

likewise unexceptional, even if they had any relevance to defendants' state of

mind, which they clearly do not. For example, the government suggests that a

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ "speak[s] to the Tenet conspirators' agreement to

pay Clinica to induce patient referrals," Gov't.Br.50. But the preceding sentence

of that email makes clear that ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ DE.507-Ex.21. As the ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ DE.521-Ex.14:250. The fact that the government

must resort to drawing wild inferences from benign business communications

underscores the weakness of its evidence. The district court did not err in finding that the government failed to establish a *quid pro quo* arrangement by a preponderance of the evidence.

### 3. *The District Court Correctly Found That Defendants Endeavored to Comply with the AKS, Including by Working with Counsel*

Finally, the district court did not err in relying on evidence that "attorneys for both Tenet and Clinica vetted the contracts to ensure that they would not violate the law" to support its conclusion that defendants had a "reasonable basis" to believe that their conduct was lawful. DE.596:37. Contrary to the government's suggestion (at 57), the district court did not hold that this evidence conclusively established the affirmative defense of advice of counsel. The district court instead considered the evidence of counsels' involvement in finding that the preponderance of the evidence does not establish willfulness. DE.596:37-38.

The district court's consideration of this evidence in connection with its willfulness finding is plainly appropriate. *See United States v. Brown*, 983 F.2d 201, 203 (11th Cir. 1993) (noting that evidence relating to advice of counsel was "one of three types of evidence [defendant] relied upon to negate the willfulness element"). Either considered alone or in conjunction with all of the other evidence, it illustrates that defendants endeavored to comply and reasonably believed that they complied with the AKS. Nor was the district court required to make a finding that all of the elements of an advice-of-counsel defense were satisfied prior to considering this evidence. *See United States v. Gorski*, 36 F. Supp. 3d 256, 268 (D. Mass. 2014) ("The second, and broader, sense of the term

[advice of counsel] arises when a criminal defendant seeks to introduce evidence, or argue to the jury, that the advice or involvement of a lawyer tended to negate his *mens rea*, even if the defendant could not establish all the elements of the formal defense.").[14]

In any event, the government is wrong that defendants did not "fully disclose[] all material facts" to counsel. Gov't.Br.57 (quotation marks omitted). As to Mr. Moore, the government cites exactly one ██████████████ ██████—again one of the documents the government seeks to admit as a co-conspirator statement—██████████████████████ DE.507-Ex.41. But, as noted, it is standard practice to monitor patient volume across services lines and inquire about significant drops. The district court correctly explained that the mere fact that defendants did not, for example, forward this email to counsel "falls significantly short of establishing that [defendants] failed to make a full and complete good faith report of all material facts to an attorney." DE.596:37. Moreover, as discussed, defendants *did* include counsel on other emails discussing volume in connection with Clinica contracts.[15]

---

[14] The government incorrectly states that defendants would bear the ultimate burden of proof on an advice of counsel defense. Where the defense would negate an element of the crime, such as the requisite *mens rea* here, the government is "foreclosed from shifting the burden of proof to the defendant." *Smith v. United States*, 568 U.S. 106, 110 (2013).

[15] The government cites two additional ████████████████ ██████████████████████████ in support of its contention that defendants failed to disclose material facts. Gov't.Br.58. These documents are similarly unremarkable, *see* pp. 18-19, *supra,* and of course defendants could not

As to Clinica, the government does not dispute the district court's finding that Ms. Cota "worked closely" with counsel for Clinica and "sought to avoid violating the AKS." DE.596:28. It also does not even try to argue that the Cotas failed to disclose material facts to their counsel. Nor could it. Ms. Cota, for example, ███████████████████████████████████████████████ ████████████████████████ *See* p. 44, *supra*. The government argues only that "Tracey pleaded guilty, admitting that she willfully joined an unlawful plan that was not disclosed in the Clinica-Tenet contracts," and that, in light of her guilty plea, "Tracey could not, and ultimately did not, assert good-faith reliance on advice of counsel." Gov't.Br.60. This point is irrelevant. The district court was well-aware of Ms. Cota's guilty plea, as it presided at her hearing. The fact that Ms. Cota pled guilty does not relieve the government of its burden in this case to establish *Mr. Moore's willfulness*—a burden that the district court did not clearly err in finding that the government failed to meet.

## IV. Defendants' Compliance with the Safe Harbor Provides an Alternate Basis for Affirmance

Defendants' compliance with the personal-services safe harbor provides an alternative ground for affirmance. The district court correctly observed that the government "failed to dispute…Defendants' contention that the contracts qualified under the [] safe harbor," DE.596:33, but credited the government's legal position that the one-purpose rule overrides the safe harbor. DE.596:18. As noted, the government repudiates that position on appeal, conceding that "a

---

forward to counsel documents that they did not receive.

payment made under an arrangement satisfying every requirement of a regulatory safe harbor does not violate the AKS." Gov't.Br.40. Because the government did not raise below its new argument (at 53) that the Clinica agreements fall outside the safe harbor, that argument is forfeited. *See United States v. Ross*, 964 F.3d 1034, 1040 (11th Cir. 2020) (refusing to address "new" argument that government "fail[ed] to raise…in the district court").

It is also meritless. The government contends that the agreements do not satisfy the safe harbor's requirement that compensation is "not determined in a manner that takes into account the volume or value of any referrals," 42 C.F.R. § 1001.952(d)(5), because they account for services that Clinica would provide to patients it refers. Gov't.Br.53-54. But this reading of the "takes into account" language to forbid fair-market-value payment for services provided to referred patients conflicts with both the safe harbor as a whole and the statute. The regulation *requires* projecting service volume—whether or not that involves services provided to referred patients—through its requirements that agreements be for at least a year's duration, set out total compensation *in advance*, be for "fair market value," and be only for services "reasonably necessary to accomplish the commercially reasonable business purpose of the services." 42 C.F.R. § 1001.952(d)(iii), (iv), (vi). As a result, the government's reading would essentially nullify the safe harbor, because it would exclude personal-services agreements with practically any person or entity in a position to make referrals, from ambulance services to surgeons. *Contra* Gov't.Br.45 (conceding a hospital may lawfully contract with service-provider that "also has the capacity to refer

patients"). As for the statute, its "remuneration" element (to which the safe harbor provides an exception) is limited to payment *for* referrals and so does not encompass fair-market-value payment for providing services to patients. 42 U.S.C. § 1320a–7b(b)(2); *cf. Bingham v. HCA, Inc.*, 783 Fed. App'x. 868, 873 (11th Cir. 2019) (holding there was no remuneration because physician tenants did not receive anything "in excess of the fair market value of their lease payments"). The only interpretation of the "takes into account" language that fits the overall safe harbor and the statute is one limited to payment for referrals, not for the provision of reasonably necessary services at fair market value.[16]

Furthermore, the government's conclusory statement that the "compensation under the contract takes into account the volume or value of referrals" is wholly unsupported. Gov't.Br.45. The government cites to no evidence—because there is none—that contractual compensation varied based upon the number of referrals. *See U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 629 (W.D. Pa. 2010) (requiring that or above-fair-market value compensation); *U.S. ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 692-3 (W.D. Ky. 2008) (same).[17] AMC paid Clinica regardless of whether Clinica referred zero patients or fifty patients in a month because the payments were for the fixed

---

[16] The government's authorities involving sham contracts, Gov't.Br.53-54, have no bearing here, where it is undisputed that Clinica performed the contracted services and was paid at fair market value. DE.569:33, 38.

[17] "The requirements for qualifying for an exception under the Stark Act and for fitting within the corresponding safe harbor provision under the Anti–Kickback Act are substantially similar and thus the same analysis would apply to both." *U.S. ex rel. Singh*, 752 F. Supp. at 634.

fair market value of services, not patients. *See* 507-App.B:472, 480, 485, 490 (AMC's compensation for Clinica's services set at an hourly and monthly rate for a two-year term). The government's repeated reliance on "volume tracking" evidence fails to refute this reality. The "volume tracking" was done for typical hospital administration purposes *after* the contracts with Clinica were in place and fair market value was determined by counsel. *See* DE.521-Exs.63:48-49, 64:4, 22 (Tenet legal counsel analyzing and setting fair market value for Clinica/AMC contracts). "Volume tracking" was not done to establish the "compensation" as the safe harbor addresses because it was already set. Thus, the compensation did not "take into account the value or volume of referrals" and the contract remained within the safe harbor provision. Just because the government states something does not make it so.

## V.    Given Defendants' Additional Grounds for Denial of the Government's Motion, Reversal is Inappropriate

Even if the Court accepts the government's challenge to the district court's willfulness finding, that would support only vacating denial of the government's motion, not reversal. Although asserting otherwise, the government acknowledges that further determinations would be necessary to admit any statement. Gov't.Br.60-61. The district court similarly acknowledged that its willfulness finding relieved it from having to resolve "numerous other complex issues." DE.617:18.

Before admitting any statements under Rule 801(d)(2)(E), the district court would need to resolve a plethora of issues. Indeed, defendants challenged

all elements of the government's showing as to each alleged co-conspirator and statement, most of which the district court did not reach. Accordingly, the most the government could obtain on appeal is vacatur and remand for the district court to proceed consistent with this Court's disposition. *See, e.g.*, *United States v. Watkins*, 10 F.4th 1179, 1185 (11th Cir. 2021) (en banc).

## CONCLUSION

The Court should dismiss this appeal or affirm the decision below.

Dated: April 17, 2023

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*/s/ Brian F. McEvoy*

BRIAN F. MCEVOY
BRIAN T. RAFFERTY
GRACE W. ZOLLER
Baker & Hostetler LLP
1170 Peachtree Street
Suite 2400
Atlanta, GA 30309
(404) 459-0050
bmcevoy@bakerlaw.com
*Attorneys for Defendant-Appellee William Moore*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the length limitations of Fed. R. App. P. ("Rule") 32(a)(7)(B) because it is 12,902 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Calisto MT font, a proportionally spaced typeface with serifs.

Dated: April 17, 2023

*/s/ Brian F. McEvoy*

Brian F. McEvoy
*Counsel for Defendant-Appellee William Moore*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, a true and correct copy of the foregoing Redacted Opening Brief for Defendant-Appellee William Moore was electronically filed via the Court's CM/ECF system and served upon all counsel of record in this case.

I also certify that on April 17, 2023, a true and correct copy of the Sealed Opening Brief for Defendant-Appellee William Moore was served via electronic mail to counsel for the government-appellant and each defendant-appellee, who all previously consented to service by email. A courtesy paper copy is forthcoming to the Clerk's Office pursuant to the Local Rules.

Dated: April 17, 2023

/s/ Brian F. McEvoy
_____
Brian F. McEvoy
*Counsel for Defendant-Appellee William Moore*