NO. 22-14219-B

————————

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JOHN HOLLAND,

Defendant-Appellee.

————————

On Appeal from the United States District Court
for the Northern District of Georgia

————————

CORRECTED REDACTED BRIEF FOR APPELLEE

————————

Richard H. Deane, Jr.
JONES DAY
1221 Peachtree St. NE
Ste. 400
Atlanta, Georgia 30361
404-581-8502

Amy Levin Weil
THE WEIL FIRM
511 East Paces Ferry
Road, NE
Atlanta, Georgia 30305
404-581-0000

Henry W. Asbill
ORRICK
HERRINGTON &
SUTCLIFFE, LLP
2001 M St., NW, Ste. 500
Washington, D.C.  20036
202-349-8007

Counsel for Appellee John Holland

IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA, :
 :
   Appellant, :
 :
   v. : APPEAL NO. 22-14219-B
 :
JOHN HOLLAND, :
 :
   Appellee. :

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(3), appellee John Holland submits that the

United States' Certificate of Interested Persons and Disclosure Statement is correct

and complete.

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellee John Holland submits that oral argument is not necessary in this case. The district court's order is thorough and well-reasoned, and the appellant's brief does not raise either an issue of exceptional importance or one of first impression in this circuit. The appellant's Statement Regarding Oral Argument points to no reason why oral argument is warranted. Additionally, setting this interlocutory appeal for oral argument would only serve to further delay the trial of Mr. Holland, who was indicted over six years ago. Mr. Holland already has filed two speedy trial motions in the district court. (Docs. 180, 579).

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1 of 1

STATEMENT REGARDING ORAL ARGUMENT .................................................... i

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ........ ix

STATEMENT OF THE ISSUES ................................................................................. 1

STATEMENT OF THE CASE ..................................................................................... 2

      1.    Course of Proceedings and Disposition Below ................................ 2

      2.    Statement of the Facts .......................................................................... 3

      3.    Standard of Review ............................................................................. 11

SUMMARY OF THE ARGUMENT ........................................................................ 12

ARGUMENT AND CITATIONS OF AUTHORITY ............................................... 14

    I.    THE DISTRICT COURT DID NOT ERR AS A MATTER OF LAW IN CONSIDERING THE ELEMENT OF "WILLFULNESS" UNDER THE AKS. ................................................. 14

        A.    The District Court's Understanding of the One-Purpose Rule and the Standard for Proving "Willfulness" Were Correct. .......... 16

        1.    The One-Purpose Rule .................................................................. 18

        2.    Safe Harbor of § 1001.952(d) ....................................................... 19

        3.    The District Court Did Not Impose a Heightened Standard for Establishing "Willfulness." ....................................................... 24

    II.    THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT THE GOVERNMENT FAILED TO ESTABLISH "WILLFULNESS." ........................................................ 30

        A.    The District Court Did Not Clearly Err in Finding that Payments to Clinica Were Not Conditioned on Referrals. ........... 31

B.    The District Court Did Not Clearly Err in Finding Scant Evidence of Willfulness. ...............................................................42

C.    The District Court Did Not Clearly Err in Finding that Mr. Holland Relied in Good Faith on Advice of Counsel. ....................44

CONCLUSION ........................................................................................49

CERTIFICATE OF COMPLIANCE ...........................................................50

CERTIFICATE OF SERVICE ....................................................................51

## TABLE OF AUTHORITIES

Page

### CASES

*Bryan v. United States*,
524 U.S. 184 (1998)............................................................................27

*Lamonica v. Safe Hurricane Shutters, Inc.*,
711 F.3d 1299 (11th Cir. 2013) .........................................................11

*Thomas v. Cooper Lighting, Inc.*,
506 F.3d 1361 (11th Cir. 2007) .........................................................24

*United States v. Aids Healthcare Found., Inc.*,
262 F. Supp. 3d 1353 (S.D. Fla. 2017), *aff'd sub nom. Carrel v. AIDS
Healthcare Found., Inc*., 898 F.3d 1267 (11th Cir. 2018) ................19

*United States v. Bay St. Ambulance & Hosp. Rental Serv., Inc.*,
874 F.2d 20 (1989) .............................................................................30

*United States v. Borrasi*,
639 F.3d 774 (7th Cir. 2011) .............................................................30

*United States v. Clough*,
978 F.3d 810 (1st Cir. 2020)..............................................................41

*United States v. Davis*,
132 F.3d 1092 (5th Cir. 1998) ...........................................................29

*United States v. Greber*,
760 F.2d 68 (3d Cir. 1985) .....................................................25, 26, 29

*United States v. Hagen*,
60 F.4th 932 (5th Cir. 2023) ..............................................................41

*United States v. James*,
590 F.2d 575 (5th Cir. 1979) .................................................3, 5, 6, 36

iv

*United States v. Jones*,
    565 U.S. 400 (2012) ........................................................................... 17

*United States v. Kats*,
    871 F.2d 105 (9th Cir. 1989) ..................................................... 26, 30

*United States v. Lebowitz*,
    676 F.3d 1000 (11th Cir. 2012) .......................................................... 11

*United States v. Mallory*,
    988 F.3d 730 (4th Cir. 2021) ............................................................ 29

*United States v. McClatchey*,
    217 F.3d 823 (10th Cir. 2000) ..........................................18, 25, 29, 33

*United States v. Nagelvoort*,
    856 F.3d 1117 (7th Cir. 2017) .......................................................... 41

*United States v. Nerey*,
    877 F.3d 956 (11th Cir. 2017) .......................................................... 28

*United States v. Nora*,
    988 F.3d 823 (5th Cir. 2021) ..................................................... 42, 43

*United States v. Petrie*,
    302 F.3d 1280 (11th Cir. 2002) ........................................................ 44

*United States v. Reeves*,
    742 F.3d 487 (11th Cir. 2004) .......................................................... 15

*United States v. Shah*,
    981 F.3d 920 (11th Cir. 2020) ..................................................... 26, 30

*\*United States v. Starks*,
    157 F.3d 833 (11th Cir. 1998) .....................................................passim

*United States v. Turner*,
    871 F.2d 1574 (11th Cir. 1989) ........................................................ 15

*United States v. Vernon,
   723 F.3d 1234 (11th Cir. 2013) ...........................................29, 39, 44

United States v. Westry,
   524 F.3d 1198 (11th Cir. 2008) .......................................................11

U.S. ex rel. Villafane v. Solinger,
   543 F. Supp. 2d 678 (W.D. Ky. 2008).............................................21

U.S. ex rel. Hockaday v. Athens Orthopedic Clinic, P.A.,
   No. 3:15-CV-122 (CDL), 2022 WL 2820103 (M.D. Ga. July 19, 2022) ..........48

## FEDERAL STATUTES

15 U.S.C. § 78m(b)(2)(A)..................................................................2

15 U.S.C. § 78m(b)(5) ......................................................................2

15 U.S.C. § 78ff(a)............................................................................2

18 U.S.C. § 2 ....................................................................................2

18 U.S.C. § 371 .................................................................... viii, 2, 8

18 U.S.C. § 1031 ...................................................................... viii, 8

18 U.S.C. § 1031(a)(1).....................................................................2

18 U.S.C. § 1031(a)(2).....................................................................2

18 U.S.C. § 1031(b)(1).....................................................................2

18 U.S.C. § 1031(b)(2).....................................................................2

18 U.S.C. § 1343 .................................................................. viii, 2, 8

18 U.S.C. § 3731 ...................................................................... viii, 8

42 U.S.C. § 1320a-7b.............................................................. viii, 8

42 U.S.C. §§ 1320a-7b(b) ............................................................. 12

42 U.S.C. § 1320a-7b(b)(1) .......................................................2, 26

42 U.S.C. § 1320a-7b(b)(2) .....................................................passim

42 U.S.C. § 1320a-7b(b)(2)(A) ................................................... 15

42 U.S.C. § 1395nn(a)(1) ............................................................ 21

## FEDERAL REGULATIONS

42 C.F.R. § 411.354(d)(5)(i) ....................................................... 22

42 C.F.R. § 1001.952(d) .........................................................passim

42 C.F.R. § 1001.952(d)(1) .....................................................19, 20

42 C.F.R. § 1001.952(d)(1)(iv) ................................................... 21

42 C.F.R. § 1001.952(d)(5) ........................................................8, 23

42 C.F.R. § 1001.952(d)(7) ......................................................... 46

## FEDERAL RULES

Fed. R. App. P. 32(a)(5) .............................................................. 50

Fed. R. App. P. 32(a)(6) .............................................................. 50

Fed. R. App. P. 32(a)(7)(B) ........................................................ 50

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................. 50

Fed. R. Evid. 801(d)(2)(E) .....................................................passim

## LOCAL RULES

11th Cir. R. 26.1-1(a)(3) ...................................................... C-1 of 1

## Other Authorities

Dep't of Justice, Criminal Justice Manual, § 9-11.151 ............................................8

https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151 ...............................8

https://www.tbtlaw.com/attorneys/william-c-tinsley-ii/..........................................37

Merriam-Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/nefarious.......................................................................27

*Physicians' Referrals to Health Care Entities With Which They Have
    Financial Relationships*,
    66 FR 856...........................................................................................................22

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

A.    The United States District Court for the Northern District of Georgia has jurisdiction over this criminal case, in which John Holland was charged with offenses against the laws of the United States, including 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b; 18 U.S.C. § 1343; and 18 U.S.C. § 1031.

B.    This Court lacks jurisdiction over this interlocutory appeal filed by the United States pursuant to 18 U.S.C. § 3731.  Mr. Holland filed a motion to dismiss the appeal simultaneously with the filing of this brief.

C.    The district court's order on the Government's pretrial motion *in limine* was entered on November 15, 2022.  The Government's notice of appeal was filed on December 14, 2022.

D.    This is an interlocutory appeal of a pretrial order of the district court.

STATEMENT OF THE ISSUES

I.    WHETHER THE DISTRICT COURT ERRED AS A MATTER OF
      LAW IN ITS ANALYSIS OF THE ELEMENT OF
      "WILLFULNESS" UNDER THE AKS.

II.   WHETHER THE DISTRICT COURT CLEARLY ERRED IN
      FINDING THAT THE GOVERNMENT FAILED TO ESTABLISH
      "WILLFULNESS."

STATEMENT OF THE CASE

1.    Course of Proceedings and Disposition Below

In September 2017, a federal grand jury sitting in the Northern District of Georgia issued a second superseding indictment charging John Holland and two co-defendants, William Moore and Edmundo Cota, with conspiracy, in violation of 18 U.S.C. § 371 (Count 1); and charging Mr. Holland with substantive counts of payment and receipt of bribes, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. §§1320a-7b(b)(1), (b)(2) and 18 U.S.C. § 2 (Counts 2–4); wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2 (Counts 5–9); falsification of books and records, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a) and 18 U.S.C. § 2 (Count 10)[1]; and major fraud against the United States, in violation of 18 U.S.C. § 1031(a)(1)-(a)(2), (b)(1)-(b)(2) & 18 U.S.C. § 2 (Count 12).  (Doc. 121).[2]  Mr. Holland pleaded not guilty.  (Doc. 129).

After the Government disclosed a list of 55 alleged unindicted co-conspirators whose statements it intended to introduce into evidence under Fed. R. Evid.

---

[1] Count Ten was dismissed.  (Doc. 446-69).

[2] Curiously, the Government first indicted Mr. Holland in Miami, (Doc. 1), even though a grand jury empaneled in the Northern District of Georgia had for three years been hearing testimony and receiving evidence about the facts underlying this case, and Judge Totenberg had accepted two guilty pleas, (Doc. 20).  Mr. Holland ultimately succeeded in having the indictment transferred back to Atlanta.  (Doc. 56).

801(d)(2)(E), Mr. Holland filed a motion for a *James*[3] hearing. (Doc. 195 & Ex. A), Doc. 195). When the Government objected to the district court conducting a *James* hearing, (Doc. 277-36–43), the court directed the Government to disclose the statements it intended to introduce under Rule 801(d)(2)(E), and Mr. Holland to respond. (Doc. 446-68–69). After the Government disclosed its list, Mr. Holland filed a motion to exclude the statements or for a *James* hearing, to which the Government responded and Mr. Holland replied. (Doc. 472 & Exhibit A; Docs. 485, 489). After holding a status conference on the issue, (Doc. 477), the court found the Government's submissions to be insufficient and ordered it to file a motion to admit the statements, (Doc. 497).

Following briefing, (Docs. 507, 520, 530), the district court denied the Government's Rule 801(d)(2)(E) motion. (Doc. 596). The Government filed an interlocutory appeal of this order. (Doc. 619).

Mr. Holland is out on bond.

2.     Statement of the Facts

The allegations in the second superseding indictment relate to service agreements entered into from the late 1990s to mid-2000s between hospitals operated by Tenet Healthcare Corporation ("Tenet") and Hispanic Medical Management d/b/a Clinica de la Mama ("Clinica"), a corporate entity that ran medical clinics providing prenatal care

---

[3] *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc).

3

primarily to undocumented Spanish-speaking expectant mothers.  (Doc. 121-2–3).

During the relevant period, Mr. Holland was the CEO of North Fulton Hospital ("North

Fulton"); co-defendant William Moore was CEO of Atlanta Medical Center ("AMC);

and Ed Cota was President and CEO of Clinica.  *Id*.

In an effort to "streamline" its case, the Government sent the defense a letter

listing 55 alleged unindicted co-conspirators that included ████████████████████

██████████████████████████████████████████████████████████████ whose

curated statements it intended to offer into evidence at trial.  (Doc. 195, Ex. A; Doc.

485-1).  The Government's ostensible plan was that by designating as criminal co-

conspirators ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████  the Government could present their prior statements to the jury — through

its case agent — as Fed. R. Evid. 801(d)(2)(E) non-hearsay.  (Doc. 477-93-94).  A

collateral consequence of this arrangement was that, by characterizing these individuals

as co-conspirators under a cloud of potential criminal prosecution, these individuals

lawyered up and Mr. Holland was unable to contact and secure them as defense

witnesses, thereby placing their potentially exculpatory testimony beyond his reach.

(Doc. 195-13–15; Doc. 472-19–23; Doc. 477-23–25, 40).

4

In response, Mr. Holland filed a motion for a *James*[4] hearing to determine which statements the Government intended to offer and to challenge the admissibility of those statements. (Doc. 195). The Government strongly objected to the trial court holding a *James* hearing, arguing that a hearing was neither required nor necessary and that instead the district court should "allow the United States to 'connect up' any statements that it seeks to introduce at trial and determine admissibility of those statements at the close of the United States' case-in-chief." (Doc. 277-36–43).

By way of compromise, the district court directed the Government to disclose the statements it intended to introduce under Rule 801(d)(2)(E), and Mr. Holland to respond. (Doc. 446-68–69). This time, the Government narrowed its list to 11 declarants whose statements (mostly contained in emails) it intended to present to the jury, (Doc. 472, Ex. A), while maintaining that the previous designation of 55 co-conspirators remained unchanged, (Doc. 477-14–15, 55–56). Mr. Holland then filed a motion to exclude the co-conspirator statements and find that the 55 listed individuals and entities were not co-conspirators or, in the alternative, that the court hold a *James* hearing. (Doc. 472). In its response, the Government again strongly objected to the request for a *James* hearing, saying it would "waste time [and] resources," (Doc. 485-1), and called the defense effort

---

[4] *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc).

to have the 55 individuals declared not to be co-conspirators a "fixation" and "red herring, (*id*. at 8).

The district court held a status conference on the issue, at which the Government acknowledged that the statute of limitations for prosecuting the 55 alleged co-conspirators had passed, yet maintained they were criminal conspirators.  (Doc. 477, pp. 14–15, 55–56).  Thereafter, the district court once again found the Government's submissions to be insufficient and gave the Government yet another chance to shore up its position.  (Doc. 497-1–8).  In view of the Government's opposition to the court holding a *James* hearing, as another compromise the court decided to hold a *James* hearing "on paper" and ordered the Government to file a motion to admit the statements.  (*Id*. at 7–9).

In its motion, the Government argued that select witness statements it had culled from various documents and emails were admissible as co-conspirator statements under Rule 801(d)(2)(E) because the declarants were all members of an overarching criminal conspiracy to violate the AKS.  (Doc. 507-10–11).  According to the Government, complicity in an AKS conspiracy could be shown by proof that the declarants — ███ ██████████████████████████████████ — discussed patient volume with each other and ████████████████████████████████████ ████████████████.  (*Id*. at 18–23, 30–37, 40–67; Doc. 520-2 n.2).  As the

Government saw it, discussions of patient volume proved that the Clinica contracts were "pretextual contracts between the Tenet Hospitals and Clinica [that] disguised the bribes for patients as payments for services, including management services, translations services, Medicaid eligibility paperwork services, and community outreach." (Doc. 507-3). The Government also argued with respect to the "one-purpose rule" that an affirmative defense of falling within 42 C.F.R. § 1001.952(d)'s safe harbor would "fail – and the AKS conspiracy [would be] proved – where the United States demonstrates that any purpose of a payment for services was to induce, or was in exchange for, patient referrals, even if services were rendered." (*Id*. at 7).

In his response, Mr. Holland countered that the Government had failed to carry its burden of proving that a conspiracy to violate the AKS existed that the declarants joined. (Doc. 520). He argued that the Government submitted no evidence to support its allegation that the Clinica contracts were sham arrangements or that the declarants believed they were; instead, as shown in additional statements, interviews and emails the Government omitted from its motion, the declarants acknowledged that the Clinica contracts were for services actually provided, and none believed they were pretextual or shams. (*Id*. at 2, 11, 33–72). Mr. Holland also pointed out that, although the declarants are now being labeled by the Government as criminal co-conspirators for purposes of using their testimony at trial, none were informed prior to their grand jury

7

testimony that they were considered targets[5] of the investigation nor were they given the required supplemental warnings.[6] (Doc. 472, pp. 6–7 & n. 4). In fact, one declarant was assured by federal agents before being interviewed that he was "not a subject or target" and was "not in trouble." (Doc. 520, HEx. 33, p. 1).

Mr. Holland also demonstrated that, contrary to the Government's claim, discussions of patient volume do not establish an AKS violation, and instead are normal and necessary conversations between ████████████████████████ that they engage in as part of their jobs. (*Id*. at 2–3, 7–8). As Mr. Holland explained, for compensation to "take[] into account the volume or value of any referrals" under the safe harbor provision of 42 C.F.R. § 1001.952(d)(5), the compensation would need to be in excess of fair market value, which here it was not. (*Id*. at 3–7). He also explained that the one-purpose rule does not trump the safe harbor provision; if, as here, the provisions of the safe harbor are met, the arrangement does not fall within the reach of the AKS. (*Id*. at 8-10). Finally, Mr. Holland demonstrated that, although the ex-wife of co-defendant Ed Cota, Tracey Cota, had entered a guilty plea to an information

---

[5] A "target" is "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." (Dep't of Justice, Criminal Justice Manual, § 9-11.151, (https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151)).

[6] *Id*. ("**Additional Advice to be Given to Targets**: If the witness is a target, the above advice should also contain a supplemental warning that the witness's conduct is being investigated for possible violation of federal criminal law.").

charging her with conspiring to violate the AKS, the Government failed to establish that she knowingly and willfully entered an AKS conspiracy with Mr. Holland. (*Id*. at 16). To the contrary, the totality of the evidence showed that from the outset of Tracey's relationship with North Fulton she made every effort to ensure that Clinica's contract with North Fulton was legal, and that she never intended to violate the law. (*Id*. at 15-33).

The district court denied the Government's Rule 801(d)(2)(E) motion. (Doc. 596). The court first rejected the Government's proposition that it need only present "'slight'" evidence to connect a particular individual to a conspiracy, concluding instead that the Government must establish all elements of a conspiracy by a preponderance of evidence. (*Id*. at 5). The court also rejected the idea that the "willfulness" element of an AKS violation could be imputed based on a showing that one purpose of an arrangement was to induce referrals; rather, the Government must show that the individuals in question must have known they were breaking the law. (*Id*. at 21).

The court found that the Government had presented "scant" evidence of willfulness, noting that it did not even mention the word in its motion. (*Id*. at 28 & n. 14). According to the court, the mere fact that Tenet provided training on the AKS did not establish what was said during the training. (*Id*. at 28-30). And discussing patient volume in emails does not demonstrate the declarants willfully violated the AKS "because there are many legitimate reasons for ███████████████ to have an

interest in volume and referrals." (*Id*. at 30–31).  Similarly, because ███████

███████████ have ample, legal reasons to monitor patient volume, . . . the discussions,

standing alone, do not establish that payments under the agreements were for something

more than the value of the services provided." (*Id*. at 31).  Rejecting the Government's

characterization of the Clinica contracts as pretextual, the court instead found that "there

is ample evidence showing that Clinica provided valuable services under the contracts

and no evidence that the contracts were a sham." (*Id*. at 33).  The court also concluded

that advice-of-counsel and safe harbor defenses were relevant to the court's inquiry, and

as to these defenses the Government (1) failed to establish that full disclosure was not

made to the lawyers when the Clinica contracts were vetted, and (2) "failed to dispute,

or even respond to, Defendants' contention that the contracts qualified under the §

1001.952(d) safe harbor." (*Id*. at 33, 36–38).  The court ultimately concluded that, in

the absence of evidence of willfulness, the Government failed to establish by a

preponderance of the evidence the existence of a conspiracy to violate the AKS, and

thus denied the Government's motion to admit these statements under Rule

801(d)(2)(E).  (*Id*. at 38–39).

The Government filed this interlocutory appeal of the order.  (Doc. 619).

10

3.    Standard of Review

While evidentiary rulings often require an exercise of discretion that calls for [an abuse of discretion] standard of review, they may also require legal and factual determinations that call for different standards.  Specifically, "[t]he factual findings underlying [evidentiary] rulings are reviewed for clear error."  *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012).  And questions of law underlying evidentiary rulings are reviewed de novo.  *See United States v. Westry*, 524 F.3d 1198, 1215 (11th Cir. 2008).  *Lamonica v. Safe Hurricane Shutters, Inc*., 711 F.3d 1299, 1317 (11th Cir. 2013).

11

SUMMARY OF THE ARGUMENT

The district court did not misunderstand the "willfulness" element of the Anti-Kickback Statute ("AKS"), 42 U.S.C. §§1320a-7b(b), in denying the Government's motion to admit into evidence at trial excerpts from emails as non-hearsay co-conspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The court simply found that the Government failed to carry its burden of establishing by a preponderance of evidence that the defendants, joined by the declarant ████████ ██████████████████████, conspired to violate the AKS.

Contrary to the Government's argument, the district court did not impose a "heightened" standard of willfulness; instead, it correctly relied on controlling case law from this circuit. Nor did the court have a misapprehension about the one-purpose rule that caused it to reshape the willfulness standard. The court's view of the one-purpose rule's relationship to the willfulness standard was correct: proof that one purpose of a personal services contract was to induce referrals does not itself establish that the parties willfully violated the AKS.

The district court also did not clearly err in finding that the Government's evidence failed to establish willfulness. The record is devoid of any evidence that Mr. Holland and the declarants intended to violate the AKS when he entered the personal services contract with Clinica. The evidence established the opposite: that the contract was carefully vetted by Clinica's attorney, as well as by in-house and outside counsel

12

for Tenet, after full and complete disclosure was made to all the lawyers. The Government's argument that discussions concerning the referral of patients proved willfulness is flawed. These types of conversations are typical, and even necessary, for ██████████████████████████ to engage in, and do not establish a willful intent to violate the statute.

In any event, the evidence established that the Clinica contracts qualified for safe harbor protection under 42 C.F.R. § 1001.952(d), effectively "immunizing" them under the AKS and further undermining a finding of willful intent to join a conspiracy.

ARGUMENT AND CITATIONS OF AUTHORITY

**I.    THE DISTRICT COURT DID NOT ERR AS A MATTER OF LAW IN CONSIDERING THE ELEMENT OF "WILLFULNESS" UNDER THE AKS.**

The Government filed a pretrial motion to admit into evidence at Mr. Holland's trial the hearsay statements of ████████████████████████████ and one unknown person whom the Government had designated as "co-conspirators." (Doc. 507). The Government's theory was that these 10 declarants conspired with Mr. Holland and his co-defendants to violate the AKS by paying remuneration to Clinica in exchange for referring patients to Tenet hospitals in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b)(2). In the Government's view, the declarants' statements, contained in extracts from emails, were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence as non-hearsay co-conspirator statements; the Government's plan was to present their statements to the jury through the testimony of the Government's case agent without subjecting the declarants to cross-examination by the defendants. (Doc. 477-94–95). The Government pursued this plan despite knowing that each of the identified declarants had disavowed any knowledge of or involvement in the alleged conspiracy or any other criminal conduct. (Doc. 520-33–72).

To have succeeded in establishing that the statements were non-hearsay admissible against Mr. Holland under Rule 801(d)(2)(E), the Government bore the burden of proving by a preponderance of the evidence that: (1) a conspiracy to violate

the AKS existed; (2) the conspiracy included the declarants and Mr. Holland; and (3) the statements were made during the course and in furtherance of the conspiracy. *See United States v. Reeves*, 742 F.3d 487, 503 (11th Cir. 2004); *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989) ("In order to qualify as a coconspirator statement, there must have existed a conspiracy involving the declarant and the defendant, and the statement must have been made during the course and in furtherance of the conspiracy."). The AKS makes it a crime to:

> (2) . . . knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . ..

42 U.S.C. § 1320a-7b(b)(2)(A). Read together, as the district court explained, to admit co-conspirator statements the Government had to prove by a preponderance of evidence, "(1) that a conspiracy that included Defendants existed, (2) that the alleged co-conspirator knowingly agreed to enter into that conspiracy with Defendants, (3) that the agreement was to pay or receive remuneration in exchange for patient referrals, (4) that the alleged co-conspirator knew that the remuneration-for-referrals arrangement was illegal, and (5) that the statement was made during the course and in furtherance of the conspiracy." (Doc. 596-8).

15

Here, the district court correctly ruled that the Government failed to establish that the proffered statements were admissible under Rule 801(d)(2)(E) because it failed to prove the "willfulness" element of an AKS violation. (Doc. 596-27–38). Specifically, the judge determined that the element of "willfulness" cannot be imputed "based on the appearance that one purpose of an arrangement was to induce referrals"; instead, to prove willfulness the "Government must show that the individuals in question must have known they were breaking the law beyond knowing that one purpose of the deal was to induce referrals." (*Id*. at 21). In the absence of evidence of willfulness, the district court found that the Government failed to establish by a preponderance of the evidence that the defendants and the declarants conspired to violate the AKS, and therefore the proffered statements were not admissible as co-conspirator statements under Rule 801(d)(2)(E). (*Id*. at 38–39). The district court's finding was correct.

### A. The District Court's Understanding of the One-Purpose Rule and the Standard for Proving "Willfulness" Were Correct.

On appeal, the Government argues that the district court's observations regarding the one-purpose rule — that it "seems to be at odds" with a "plain reading" of the AKS safe harbors and that the interplay between the two is "unsettled" and "unclear" — caused the court "to impose a heightened standard of willfulness that discounted the probative value of patient referral evidence and required proof of nefarious conduct." (Gov't brief at 33, 35, 43). The Government is wrong on all scores.

16

As a threshold matter, the Government's argument is merely a legal smoke screen designed to distract this Court from what the district court actually found, which is that the Government failed to prove that either the defendants or the declarants acted willfully with a belief that they were breaking the law.  (Doc. 596-21).[7]  While the Government raises the one-purpose rule in its first issue, this Court should understand that the district court's findings on the one-purpose rule did not drive its decision on "willfulness."  Rather, the district court determined that the Government failed to carry its burden of proving by a preponderance of the evidence that the defendants and the declarants willfully joined in a conspiracy to violate the AKS.  Consequently, this Court need not resolve the one-purpose rule's thorny issues to decide this appeal.

On the merits, the judge was correct that the interplay between the one-purpose rule and the AKS is confusing, as evidenced by both case law and commentary cited at length in her order.  (Doc. 596-9–19).  Indeed, it is so confusing that even the Government misunderstands it.  The Government argued in its motion to admit co-conspirator statements that Mr. Holland could not meet his burden of proving protection under 42 C.F.R. § 1001.952(d)'s personal-services safe harbor — which would have

---

[7] As the district court observed, the Government neglected to argue or even mention "willfulness" in its motion to admit co-conspirator statements.  (Doc. 596-28 n. 14).  To the extent the Government raises new issues not presented to the district court, they should be considered forfeited for purposes of appeal.  *See United States v. Jones*, 565 U.S. 400, 413 (2012) (refusing to consider argument Government neglected to raise in the district court).

17

provided him an affirmative defense to the AKS charges — if any one purpose of a payment to Clinica was to induce referrals. (Doc. 507-6–7). This argument, which the court did not accept, reflects a fundamental misunderstanding of the interplay between the one-purpose rule and the safe-harbor. Now, the Government seems to be arguing on appeal that the one-purpose rule is relevant to the issue of "willfulness." To the extent this is a new argument that was not raised below, it is forfeited for purposes of appeal.[8] In any event, it is wrong.

### 1. The One-Purpose Rule

To establish a violation of the AKS, the Government must prove that the defendant (1) knowingly and willfully offered or paid remuneration (2) to induce a person to refer a patient (3) for the furnishing of a service paid by Medicaid or Medicare. *See* 42 U.S.C. § 1320a-7b(b)(2); *United States v. Starks*, 157 F.3d 833, 837 (11th Cir. 1998). The judicially-created "one-purpose rule" is relevant to the second element of the statute, the "inducement" element.[9] It provides that to prove inducement, the Government need only establish that *one* purpose of a payment of remuneration was to induce referrals; it need not prove that inducement of referrals was the *sole* or even *primary* purpose of the payment. *See United States v. McClatchey*, 217 F.3d 823, 835

---

[8] *See supra n. 7.*

[9] Mr. Holland does not concede that the one-purpose rule is a valid concept, and has challenged it below.

(10th Cir. 2000) (holding that "a person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals"; rejecting "primary purpose" argument). So, the one-purpose rule speaks to the quantum of proof necessary to establish the "inducement" element of an AKS offense. In other words, the one-purpose rule is relevant only to proving a violation of the statute. It has nothing to do with the safe harbor.

### 2. Safe Harbor of § 1001.952(d)

The personal-services safe harbor, on the other hand, is a regulation that provides an affirmative defense to an AKS violation. *See* 42 C.F.R. § 1001.952(d). Under this safe harbor for personal services contracts, a payment is not considered to be "remuneration" for purposes of the AKS if certain conditions are met. *See id.* at § 1001.952(d)(1) ("As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following standards are met . . ..")). Stated another way, if the requirements necessary to qualify for safe harbor protection are satisfied, the AKS is not violated because a payment under the personal services contract is not considered to be "remuneration." Immunizing conduct that might otherwise violate the AKS is the very essence and purpose of the "safe harbor" provision. *See United States v. Aids Healthcare Found., Inc.*, 262 F. Supp. 3d 1353, 1367 (S.D. Fla. 2017), ("The exceptions

19

set forth in the Anti–Kickback Statute and accompanying regulations provide immunity from prosecution for behavior that might have violated the Anti–Kickback Statute.") (internal quotations and citations omitted), *aff'd sub nom. Carrel v. AIDS Healthcare Found., Inc*., 898 F.3d 1267 (11th Cir. 2018).

A correct understanding of the one-purpose rule and the safe harbor regulation highlights the flaw in the Government's argument that Mr. Holland could not meet his burden of proving protection under § 1001.952(d)'s personal-services safe harbor if any one purpose of a payment to Clinica was to induce referrals. The Government has it backwards. If Mr. Holland can meet his burden of establishing that he qualifies for safe harbor protection under 42 C.F.R. § 1001.952(d)(1), then any payments made by North Fulton to Clinica under the contact are not "remuneration." If the payments are not "remuneration," Mr. Holland cannot be guilty of violating the AKS. This is true regardless of whether some, part or *all* of his motivation to make the payments was to induce patient referrals. When the safe harbor is met, proof of guilt under the statute, the elements of the statute and the one-purpose rule are simply irrelevant. Because Mr. Holland qualified for safe-harbor protection, he cannot be guilty of violating the AKS or of participating in a conspiracy to violate the AKS.

Although the Government suggests that "the Clinica-Tenet Hospital arrangements did not qualify for safe-harbor protection because they took into account the volume of patient referrals," (Gov't brief at 40), nowhere does the Government explain *how* the

contracts took into account the volume or value of referrals. Perhaps that is because they did not.

One of the conditions that must be met to qualify for safe harbor protection for a personal services contract is that:

> [t]he aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is *not determined in a manner that takes into account the volume or value of any referrals* or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952(d)(1)(iv) (emphasis added). For "aggregate compensation" to "take into account" the volume of referrals, it would need to be based, at least in part, on the amount of referrals. *See U.S. ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 692 (W.D. Ky. 2008) (holding that compensation would only "take into account the volume or value of any referrals or other business generated" if it "varied proportionally with increases or decreases in such referrals or other business generated, either during the term of the compensation arrangement or from one compensation arrangement to the next"). In other words, the number of referrals would be a variable that either increases or decreases the compensation amount.

This definition of "take[s] into account the volume or value of referrals" has been adopted by the regulations related to the Stark Act, 42 U.S.C. § 1395nn(a)(1). According to its definition of "compensation to a physician":

21

> Compensation from an entity furnishing designated health services to a physician . . . takes into account the volume or value of referrals only if the formula used to calculate the physician's . . . compensation includes the physician's referrals to the entity as a ***variable,*** resulting in an increase or decrease in the physician's . . . compensation that positively correlates with the number or value of the physician's referrals to the entity.

42 C.F.R. § 411.354(d)(5)(i) (emphasis added).  Likewise, according to the Centers for Medicare and Medicaid Services ("CMS") interpretation of the regulations, a fair market value fixed payment compensation arrangement that does not vary over the term of the arrangement will not be considered to take into account the volume or value of referrals. *See Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 66 FR 856, 859 (interpreting "'volume or value' standard for purposes of section 1877 of the Act as permitting unit of service or unit of time-based payments, so long as the unit of service or unit of time-based payment is fair market value and does not vary over time"); *id*. at 877 ("Simply stated, section 1877 of the Act establishes a straightforward test that compensation arrangements should be at fair market value for the work or service performed or the equipment or space leased—not inflated to compensate for the physician's ability to generate other revenues.").  In short, for compensation to "take into account the volume or value of referrals," the number of referrals must be a variable in the formula for determining compensation.

In the case of the North Fulton/Clinica contracts — as with the other Tenet contracts — the number of referrals was not a variable in determining compensation paid to Clinica for the services it provided. Instead, the payments were based on the fair market value of the services. For example, under its first contract with Clinica, the hourly rate for translation services was $16.50 per hour. (Doc. 507, App. B, Ex. 47 at App. 524). This hourly rate for translation services was the "going rate," i.e., the fair market value for translation services. It did not vary with the number of referrals from Clinica to North Fulton. Further, because the safe harbor rules required that the contract be "for not less than one year" and that the "aggregate compensation" be "set in advance," North Fulton was forced to project the number of translators it would need in the next 12 months, which it estimated to be six. (*Id*.). This projection also did not vary with the number of referrals from Clinica; it was instead a rough estimate of the number of all patients — including non-Clinica patients — who would be serviced under the contract. Because the number of referrals from Clinica was not a variable in determining compensation under North Fulton's contract with Clinica, the contract fell within § 1001.952(d)(5)'s safe harbor protection.

Moreover, as the district court observed: "The Government has [] failed to dispute, or even respond to, Defendants' contention that the contracts qualified under the § 1001.952(d) safe harbor." (Doc. 596-33). This finding provides a separate, independent basis for affirming the district court's order under this Court's right-for-

any-reason rule. *See Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

### 3.    The District Court Did Not Impose a Heightened Standard for Establishing "Willfulness."

To the extent the Government takes aim at the district court's finding that "willfulness" cannot be established by proof that one purpose of a payment is to induce referrals — and suggests that this finding "heightened" the standard it had to meet to prove willfulness — its argument conflates the "willfulness" element and the "inducement" element of the AKS.  Again, to establish a violation of the AKS, the Government must prove that the defendant (1) knowingly and willfully offered or paid remuneration (2) to induce a person to refer a patient (3) for the furnishing of a service paid by Medicaid or Medicare. *See* 42 U.S.C. § 1320a-7b(b)(2); *Starks,* 157 F.3d at 837. The first element often is referred to as the "willfulness" element; the second as the "inducement" element.  As for the first element, "willfulness," this term "means the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *See Starks,* 157 F.3d at 837–38.  As for the second element, "inducement," the judicially-created one-purpose rule provides that, to prove inducement, the Government need only

24

establish that *one* purpose of a payment was to induce referrals; it need not prove that inducement of referrals was the *sole* or even *primary* purpose of the payment. *See McClatchey,* 217 F.3d at 835 (holding that "a person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals"; rejecting "primary purpose" argument).

The "willfulness" element of the AKS relates to the defendant's intent to violate the law, whereas the "inducement" element of the AKS relates to the defendant's motive in paying the remuneration. These elements are entirely distinct. Again, the one-purpose rule bears on proof of inducement. If any one purpose of a payment of remuneration is to induce referrals, the "inducement" element of the AKS is satisfied. Because the one-purpose rule is relevant to the "inducement" element and not the "willfulness" element, the district court was correct in ruling that it "cannot automatically impute willfulness simply based on the appearance that one purpose of an arrangement was to induce referrals." (Doc. 596-21).

The catalyst for the Government's misinterpretation of the one-purpose rule might have been a misreading of the holding in *United States v. Greber*, 760 F.2d 68, 69 (3d Cir. 1985) — repeated in other cases[10]— that "if one purpose of the payment was to

---

[10] *McClatchey*, 217 F.3d at 835 ("This court agrees with the sound reasoning in *Greber* and thus holds that a person who offers or pays remuneration to another

induce future referrals, the Medicare statute has been violated." The Government seems

to have read this to mean that it can prove an AKS violation simply by proving that one

purpose of a health care provider's payment of remuneration for services is to induce

the referral of patients. But that interpretation is wrong because it reads the "willfulness"

element out of the statute.

As explained above, "willfulness" is a stand-alone element of an AKS violation;

proof of willfulness requires evidence of a specific intent to do something the law

forbids. *See Starks,* 157 F.3d at 837–38. Proof of "inducement," on the other hand,

speaks to the defendant's motive in paying the remuneration, *i.e.,* to obtain referrals. As

the Eleventh Circuit observed in comparing the AKS's *payee* crime [§ 1320a-7b(b)(1)]

with its *payor* crime [§ 1320a-7b(b)(2)], the language in § 1320a-7b(b)(2) "to induce

such person . . . to refer" requires proof of the defendant's motivation for accepting the

payment." *See United States v. Shah*, 981 F.3d 920, 925–26 (11th Cir. 2020) ("So

motive matters for the payor crime even though it does not for the payee crime.").

In sum, to the extent the Government is challenging the district court's finding

that it could not impute willfulness from evidence that one purpose of an arrangement

was to induce patient referrals, the district court was right. Any contrary argument is

---

person violates the Act so long as one purpose of the offer or payment is to induce
Medicare or Medicaid patient referrals."); *United States v. Kats*, 871 F.2d 105, 108 (9th
Cir. 1989) (quoting *Greber* with approval).

based on a misunderstanding of the interplay between the one-purpose rule and the elements of the AKS.

In a similar vein, the Government argues that the district court held it to a heightened standard of "willfulness" when it found the Government failed to establish that Mr. Holland's conduct was "nefarious."  But this argument ignores what it takes to prove "willfulness."  As the Supreme Court has explained, in order to prove that a criminal defendant acted "willfully," "[t]he jury must find that the defendant acted with an ***evil-meaning mind***, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 193 (1998) (emphasis added).  *See also Stark*, 157 F.3d at 838 ("According to the *Bryan* Court, a jury may find a defendant guilty of violating a statute employing the word 'willfully' if it believes 'that the defendant acted with an ***evil-meaning mind,*** that is to say, that he acted with knowledge that his conduct was unlawful.'") (quoting *Bryan*, 524 U.S. at 193) (emphasis added).  "Nefarious" is defined as "flagrantly wicked or impious: ***EVIL***."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/nefarious (emphasis added).  Because proof of "willfulness" requires proving that Mr. Holland acted with an "evil-meaning mind," and "nefarious" means "wicked," "impious" or "evil," the district judge correctly determined that the Government's failure to establish that Mr. Holland's conduct was nefarious hampered her ability to find that he acted willfully, with specific intent to violate the law.  (Doc. 596-38).

Moreover, each of the indicia that courts have found to impute willfulness —
including a lack of need for the services, substandard services, or payments exceeding
fair market value — the district court found missing in this case. Such indicia bear on
whether a defendant acts with knowledge that his conduct was unlawful. Indeed, these
and similar indicia have been found to form the basis for proving a willful violation of
the AKS in other cases. *See, e.g., United States v. Nerey*, 877 F.3d 956, 968 (11th Cir.
2017) (evidence of patient referrals in exchange for kickbacks masked as therapy and
other professional services, where Medicare billed for "services that were technically
unnecessary or were never performed," was sufficient to support conviction for
conspiracy to violate the AKS).[11]

The district court did not unduly minimize the probative value of patient-referral
evidence in its willfulness analysis "contrary to circuit precedent," as the Government
contends. (Gov't brief at 43). Rather, the "circuit precedent" the Government cites
involved blatant kickbacks and bribes in exchange for referrals, neither of which
occurred here. For example, *Starks* involved bribes to state employees who were paid
"$250 for each patient referred: $125 when a referred woman began inpatient drug
treatment with [the clinic] and $125 after each woman had stayed in [the clinic's]
program for two weeks." *Starks*, 157 F.3d at 836. The bribes were initially paid by

---

[11] Although the Government argues that the AKS does not require proving
"corrupt intent," (Gov't brief at 45), the district court never said that it did.

checks with false coding for "aftercare, counseling, and marketing expenses," and later in cash where payments were made in restrooms or parking lots to keep them secret. *Id*. at 836–37. Likewise, in *United States v. Vernon*, 723 F.3d 1234, 1241, 1256 (11th Cir. 2013), payments were made "solely in exchange for referrals," and the contract at issue specifically provided for "finder's fees." *Id.* at 1241, 1268. And the defendants made those payments despite "an attorney specializing in health care regulation" warning that the payments violated the AKS. *Id*. at 1258–59.

Indeed, every case cited by the Government has a fact pattern that includes indicia of willfulness or payments made per referral, both of which are absent here because the contracts at issue were fair market value, fixed-price, fixed-term contracts for services actually performed. *Compare Greber*, 760 F.2d at 70 (forwarding "a portion" of Medicare payments per patient and paying "'interpretation fees' even though the defendant had actually" interpreted the data); *United States v. Mallory*, 988 F.3d 730, 735–37 (4th Cir. 2021) (paying physicians "a 'process and handling fee'" per blood test ordered, despite multiple warnings from in-house and outside counsel that the arrangement violated the AKS); *McClatchey*, 217 F.3d at 830 (paying physicians under services contract, even though defendant knew that the physicians "had not performed substantial services required," and employees "were not even interested in having the [physicians] perform some of these services"); *United States v. Davis*, 132 F.3d 1092, 1095 (5th Cir. 1998) (paying cash for referrals and "offer[ing] referring physicians the

29

use of condominiums"); *United States v. Borrasi*, 639 F.3d 774, 776–77 (7th Cir. 2011) (placing physicians on the hospital payroll under "false titles and faux job descriptions, and ask[ing] [them] to submit false time sheets," and paying lease payments for physicians); *Kats*, 871 F.2d at 106–07 (paying clinic 50% of Medicare payments it received for referrals); *Shah*, 981 F.3d at 923 (paying physician "a flat monthly payment of $5,000" for being a "medical director," but the physician "performed none of his duties under the contract"); *United States v. Bay St. Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 23–24, 31 (1989) (before the enactment of the safe harbor, employee of a city-owned hospital who was responsible for awarding ambulance contracts was secretly working and paid as a consultant for an ambulance company to whom he awarded contracts).

In sum, the standard relied on by the district court for proving "willfulness" was correct and did not heighten the Government's burden of proof or persuasion.

## II. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT THE GOVERNMENT FAILED TO ESTABLISH "WILLFULNESS."

The Government presents numerous factual findings it argues are clearly erroneous, which it apparently contends either separately or together would have established "willfulness."  Mr. Holland will attempt to address each challenge that relates to him.

### A.    The District Court Did Not Clearly Err in Finding that Payments to Clinica Were Not Conditioned on Referrals.

The Government argues that the district court "clearly erred in finding that Tenet's payments to Clinica were not conditioned on patient referrals," (Gov't brief at 46).  But the Government misstates the court's finding.  The court actually found that it "cannot automatically impute willfulness simply based on the appearance that one purpose of an arrangement was to induce referrals," and instead "the Government must show that the individuals in question must have known they were breaking the law beyond knowing that one purpose of the deal was to induce referrals."  (Doc. 596-21).  As shown above, this finding was correct.  *See supra* pp. 24–27.[12]

As a factual matter, the Government's proof fell short of establishing that North Fulton's payments to Clinica were conditioned on patient referrals.  The Government asserts that Tracey Cota — the former wife of co-defendant Ed Cota and co-owner of Clinica — "affirmed under oath that she and her co-conspirators had 'agreed' that Clinica would be compensated for 'referring' Clinica patients to Tenet Hospitals, that the contracts and payments 'were conditioned on and in exchange for Clinica referring its patients to the hospitals,' and that the Tenet Hospitals would not have contracted with and paid Clinica for services unless Clinica referred patients to them."  (Gov't brief at

---

[12] In any event, because Mr. Holland's actions met the safe harbor's protections, any discussion of referrals did not establish criminal conduct because the payments to Clinica were not "remuneration" under the AKS.  *See supra* p. 24.

46–47) (quoting Doc. 507-App.B at App-204, 216–18, 223). However, the actual quotes from Tracey's plea hearing do not support the Government's broad interpretation. The record reflects the following factual basis was made on the cited pages of the plea hearing transcript:

> [T]he understanding between Tracey Cota, certain ████████, and others was that the hospitals' contracts with and payments to Clinica under these contracts were conditioned on and in exchange for Clinica referring its patients to the hospitals through physicians with admitting privileges at the hospital. . . . Tracey Cota admits that these hospitals would not have contracted with and paid Clinica unless Clinica referred its patients to the hospitals.

(*Id*. at App-217-18). The Government does not name who these "certain ████████" or "others" were, so this transcript does not establish any involvement by Mr. Holland. Nor does the Government give a time-frame for when payments conditioned on referrals were made, so the references could have been to payments made after Mr. Holland left North Fulton in 2006[13]. And although the Government asserts that Tracey "admits" that the contracts with Clinica would not have been entered absent the referral of Clinica patients to the hospitals, there is no proffer that Tracey had knowledge of the hospital's intentions or that her "admission" was anything more than Tracey's own speculation and assumptions. In short, a comparison of the actual factual basis the Government gave

---

[13] Tracey Cota had no contact with Mr. Holland after he left North Fulton in 2006 and assumed a regional management role at Tenet. (Doc.507, App. B at App-025).

during Tracey's plea colloquy does not support the Government's assertion on appeal that "Tracey affirmed under oath that she and her co-conspirators had 'agreed' that Clinica would be compensated for 'referring' Clinica patients to Tenet Hospitals." (Gov't brief at 46–47). Simply put, the factual basis was inadequate to establish that the defendants and the declarants willfully joined a conspiracy to violate the AKS, and the district court did not clearly err so finding.

The Government also points to FBI 302s summarizing conversations Ms. Cota recalled having with various individuals. (Gov't brief at 47–48). The only conversation involving Mr. Holland allegedly occurred during negotiations for the first Clinica contract with North Fulton. *Id*. The Government alleges in its brief that Mr. Holland made a "***demand*** for assurances of patient referrals." *Id*. (emphasis added). The referenced 302, however, reflects that Tracey told the FBI that Mr. Holland "***wanted*** at least 50 deliveries per month." (Doc. 507-App.B:21). There would have been nothing wrong — or illegal — with Mr. Holland desiring that Clinica refer at least 50 patients per month to North Fulton. *See McClatchey,* 217 F.3d at 834 ("[A] hospital or individual may lawfully enter into a business relationship with a doctor and even hope for or expect referrals from that doctor, so long as the hospital is motivated to enter into the relationship for legal reasons entirely distinct from its collateral hope for referrals."). North Fulton needed data on anticipated deliveries by Spanish-speaking mothers as part of its calculations regarding business need for, and fair market value of, translation,

education, EMA eligibility and birth certificate services. So discussions of the number of referrals that Clinica anticipated sending to North Fulton was necessary to their business relationship. Indeed, to qualify for safe harbor protection, it was incumbent upon North Fulton to ensure that the contract was for at least a year's term, with compensation set in advance and at fair market value, and with aggregate services not exceeding what was reasonably necessary to accomplish a commercially reasonable business purpose. *See* 42 C.F.R. § 1001.952(d)[14]. Those conditions could only be met if due consideration were given to potential referrals from Clinica.

---

[14] The relevant version of 42 C.F.R. § 1001.952(d) (2000)` provided:

   (d) Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met—

   (1)    The agency agreement is set out in writing and signed by the parties.
   (2)    The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
   (3)    If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
   (4)    The term of the agreement is for not less than one year.
   (5)    The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise

Although the Government contends on appeal that email correspondence indicated that North Fulton "manipulated compensation amounts under the Clinica contracts," (Gov't brief at 49), the referenced emails do not support this assertion. The email from Tracey Cota suggesting adding a management fee for translation services, reducing the education services hours, and deleting marketing services altogether did not "manipulate compensation amounts"; the amount paid under the contract continued to be at fair market value for the services provided. And it is unclear how a conversation concerning postponing competency testing of Clinica interpreters had any bearing on compensation amount. In any event, any "manipulation" of compensation by persons other than Mr. Holland would have no bearing on whether Mr. Holland willfully violated the AKS.

Throughout its brief, the Government asserts that North Fulton was "buying" or "paying for" referrals, and relies in support on alleged statements of Tracey Cota contained in FBI 302s. (Gov't brief at 47–49). What the Government omits are the

---

generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6)      The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7)      The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

contradictory statements she made to the FBI agents — also contained in FBI 302s, some

of which were made even after she entered a guilty plea — that she believed the Clinica

contracts were legal and that payments under the contracts were for the services

provided.[15]   When Tracey was interviewed by the FBI along with her step-daughter

Lindsey Cota (who began working at Clinica in 2001), both told federal agents that none

of the Tenet hospitals paid Clinica for referrals:

> When asked if any of the hospitals paid or gave incentives for
> CDML clinics to direct CDML clients to a specific hospital, both
> COTA and LINDSEY COTA said "no."

(Doc. 520-Hex. 1, p.3).  When asked about her ex-husband Ed Cota's role at Clinica,

Tracey described Ed as "not an administrator," "handl[ing] more of the marketing

function," who let Tracey "handle[] the 'nuts and bolts'" and "run everything." (*Id*. at p.

5). The gist of these statements is that Clinica was not paid for patient referrals to the

hospitals, and that she would have known if it had been because she was running the

business.

Tracey also advised during an interview with the FBI and three federal

prosecutors that she did not believe the Clinica contract with North Fulton was illegal at

---

[15] Notably, the Government attempted to meet its burden under Rule 801(d)(2)(E) by offering statements of Tracey Cota that themselves were often contradictory.  Had the Government offered her as a witness, instead of objecting to the district court holding a *James* hearing, (Doc. 485-11–14; Doc. 530-1–2, 8; Doc. 477–52), her testimony likely would have had more clarity.

the time she entered it with John Holland in 2001 because she had cleared it with her

lawyer, Bill Tinsley:

> COTA advised at this time, she was not concerned about the
> legality of the relationship. COTA felt that if it was not legal,
> then the attorneys would tell them.

(Doc. 520, HEx. 2, p. 2); *see also* (Doc. 507, App.B at App-104) ("COTA said that she

wanted to be sure that she was not breaking any laws.").  Mr. Tinsley, whose advice she

sought before entering the North Fulton contract, is a well-respected lawyer who for

more than 40 years has practiced as a health law attorney.  *See*

https://www.tbtlaw.com/attorneys/william-c-tinsley-ii/.  During this interview, Tracey

showed the prosecutors the numerous memos and emails between her and attorney

Tinsley concerning Clinica's entering a services contract with North Fulton to provide

services including prenatal and breast-feeding classes, education, translation and

community outreach.  (Doc. 520, HEx. 2, pp. 2–5).  These memos and emails were

consistent with a previous FBI interview during which Tracey explained that her earliest

discussions with Mr. Holland concerned entering a services contract with Clinica in

which North Fulton would pay for Clinica to provide services such as translation and

community outreach.  (Doc. 507, App. B at App-019).  According to Tracey, the

translators were necessary to prevent situations like the "bad experiences at the other

hospitals because of the language barrier," including where "[o]ne patient at Northside

died because of an accident that might have been avoided."  (*Id.*).

Tracey also explained to the prosecutors and federal agents that when she sought the advice of attorney Tinsley as to the legality of the proposed contract with North Fulton, she made it clear to him that Clinica would be the source of patient referrals:

> COTA advised that TINSLEY knew that the arrangement included referrals to NFRH because she told them that they were doing just that; referring patients.

(Doc. 520, HEx. 2. p. 3).  Despite knowing that Clinica would be a source of patient referrals to North Fulton, attorney Tinsley nevertheless advised that the proposed contract would be legal under the AKS because it fit into the safe harbor.  In an email to Mr. Holland on which Tracey was copied, attorney Tinsley advised with respect to Clinica's proposed services contract with North Fulton:

> I believe that as worded it complies with the applicable federal AKS Safe Harbor.

(Doc. 526, Ex. 8).  Rather than turn a blind eye to the perils of the AKS, attorney Tinsley specifically warned Tracey about the AKS, and that "they had to be very, very careful because the law was very broad, meaning that it was easy to break the law without knowing it." (*Id*. at HEx. 2, p. 4).  For example, although Tracey suggested Clinica could provide free transportation to the patients as their clinics previously had done as a courtesy, attorney Tinsley advised her that Clinica could not provide transportation to its clients because it could be seen as an inducement.  (*Id*. at p. 3).  And when Tracey questioned whether it would violate the AKS for Clinica to take a percentage of

collections for billing Medicaid patients, attorney Tinsley advised her that the AKS did not allow this. (*Id.*).

Each of these statements directly and indirectly contradict any allegation that North Fulton paid Clinica for referrals, or that Tracey intended to violate the AKS and conspired to do so with Mr. Holland. All of these statements were before the district court when it considered whether the Government had met its burden to show that the declarants and the defendants were engaged in a conspiracy. The fact that Tracey Cota sought and obtained a legal opinion that the arrangement was legal after full disclosure of all relevant facts defeats any finding of willful intent to join a criminal conspiracy with Mr. Holland. *See Vernon,* 723 F.3d at 1269 ("Good faith reliance on counsel's advice can 'negate[] the mens rea element of willfulness.'") (quoting *United States v. Petrie*, 302 F.3d 1280, 1287 n.6 (11th Cir. 2002)).

Perhaps the best evidence that North Fulton was not paying Clinica for referrals was the fact that the hospital paid fair market value for the services for which it contracted. The Government has never argued — much less established — that the payments made to Clinica for services rendered *weren't* fair market value. This concession alone undercuts any claim that North Fulton's payments to Clinica actually were for referrals. Likewise, the Government overlooks that the payments for services were fixed in advance and did not vary based on patient referrals.

The Government also argues that discussions among  concerning patient volume establish that the Clinica contracts were for referrals and not services. (Gov't brief at 49–53). As the district court correctly observed, however:

> discussions of patient volume do not demonstrate a willful violation of the AKS. It is common sense that a ▮▮▮▮ ▮▮▮▮ would want to know how many patients are likely to show up at a hospital on a given day (or over a given period) for numerous reasons that have nothing to do with violating the AKS. For example, ▮▮▮▮ likely needed to know how many Spanish-speaking women delivered at a hospital so that they could verify that the payments made to Clinica for translation services were accurate and not above fair market value.

(Doc. 596-30). The district court is right. Discussions of patient volume are part of a hospital's business model and part of the essential duties of ▮▮▮▮ ▮▮▮▮. That Tenet employees would discuss patient volume does not prove that they were criminal conspirators; instead, it proves that they were doing their jobs. And it certainly does not prove that compensation paid under the Clinica contracts was for patient referrals rather than for services rendered by Clinica. As the district court correctly concluded, "[t]hat a party or Tenet employee later made a comment about referrals or volume does not suddenly render the contractual relationship illegal." (*Id*. at 37-38). The fact that these employees were not involved in the creation of the Clinica contracts informed the court's analysis of whether they were involved in a conspiracy,

(Doc. 596-21), and they weren't. The Government's evidence simply did not place the Tenet employees whose statements the Government seeks to offer under Rule 801(d)(2)(E) in a criminal conspiracy.

The Government suggests that there was some sort of "shadow agreement" that was not contained in North Fulton's contract with Clinica that transformed the contract from one for services to one for referrals. There simply is no evidence to support this claim. The payments made under all of the North Fulton/Clinica contracts were consistent with the amounts agreed to under the contract, and the services contracted for were provided. This is not a case like those cited to by the Government, such as *United States v. Clough*, 978 F.3d 810 (1st Cir. 2020), where a drug company devised a non-existent speaker program designed to incentivize health care providers to prescribe opioids through payment of speaker fees, or *United States v. Nagelvoort,* 856 F.3d 1117 (7th Cir. 2017), where a hospital paid doctors for services they never performed but instead required only that they refer patients to the hospital, or *United States v. Hagen*, 60 F.4th 932 (5th Cir. 2023), where a supplier of orthopedic braces purchased customers from a call center but disguised the contract as one for marketing services. Each of those cases involved sham contracts, whereas Clinica actually provided to North Fulton the agreed-upon services.

For all of these reasons, the district court would not have clearly erred had it found that Tenet's payments to Clinica were not conditioned on patient referrals.

###### B.    The District Court Did Not Clearly Err in Finding Scant Evidence of Willfulness.

The Government next argues that the district court clearly erred in its finding that "the Government has presented scant evidence of Defendants' willfulness." (Doc. 596-28). Again, the court was correct.

The Government first points to training on the AKS that Tenet gave its employees as proof that Mr. Holland and the declarants "knew their conduct was illegal." (Gov't brief at 54). But as the district court observed, the PowerPoint slides proffered by the Government do not explain what the content of the training was concerning any of the topics mentioned. (Doc. 596-29). In truth, there is no way to know if the Tenet employees were correctly or incorrectly advised on legal issues concerning the AKS and its safe harbors. For all we know, Mr. Holland raised his hand during each training session he attended, asked whether the Clinica contracts were legal, and was assured that they were. That notion is not farfetched as it would be consistent with the undisputed fact that the initial North Fulton/Clinica contract was approved by both Tenant's in-house and outside counsel, and their legality was never questioned when they were renewed while Mr. Holland was CEO of North Fulton or after he left to assume a regional position at Tenet. As the Fifth Circuit reasoned in *United States v. Nora*, 988 F.3d 823 (5th Cir. 2021):

> A juror would have to make a speculative leap about the content of these trainings and meetings—that they somehow alerted Nora to the unlawfulness of Abide's practices and the actions he took to support them. A rational juror would need more to conclude that Nora acted "willfully".

*Id.* at 831. Here, the Government's proffer that Mr. Holland and the declarants received training on the AKS does not undermine the district court's willfulness finding — especially given that the training was performed by the same Tenet compliance officers and lawyers who had approved the Clinica contracts. (Doc. 520, HEx. 28, p. 77; HEx. 29, pp. 15, 18–19).

Likewise, evidence that the first Clinica contract Mr. Holland signed "represented that it was 'not conditioned, nor the compensation valued, on the basis of the Physician's referrals to [North Fulton],'" (Govt brief at 56–57), also does not move the needle for the Government. The contract *wasn't* conditioned on referrals; the contract would have been in effect — and North Fulton would have been committed to make payments to Clinica — regardless of whether Clinica referred any patients to it. Admittedly, the hope and expectation was that Clinica would refer its patients, but it was not a condition of the contract. And, as demonstrated above, compensation under the contract was not valued based on Clinica referrals: compensation was based on fair market value; the number of referrals was not a variable in determining compensation amount. *See supra* pp. 21-24.

The district court considered this evidence presented by the Government, and correctly determined that it did not establish willfulness to violate the AKS. In sum, the Government failed to carry its burden of showing that Mr. Holland willfully conspired to violate the AKS by entering the North Fulton/Clinica contracts, or that the ██████ ████████████████████ whose emails the Government offered as Rule 801(d)(2)(E) non-hearsay joined a conspiracy with him.

### C. The District Court Did Not Clearly Err in Finding that Mr. Holland Relied in Good Faith on Advice of Counsel.

The Government argues that the district court clearly erred in finding that "when the contracts were executed, [Mr. Holland] had a reasonable basis to believe that the contractual arrangements under the terms of the contract were legal," because "attorneys for both Tenet and Clinica vetted the contracts to ensure that they would not violate the law." (Gov't brief at 57). The record fully supported this finding.

Again, good faith reliance on counsel's advice can negate the mens rea element of willfulness. *See Petrie, supra*, 302 F.3d at 1287 n. 6. The elements of this affirmative defense are that the defendant: (1) fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) relied in good faith on the advice given by his attorney. *See Vernon,* 723 F.3d at 1269.

As shown above, *see supra* pp. 37–39, before the first contract was entered with North Fulton in 2001, Tracey Cota vetted it with her lawyer, Bill Tinsley. The two

44

exchanged numerous memos and emails concerning the terms of the proposed contract and the services to be provided.  Tracey made it clear to attorney Tinsley that Clinica would be the source of patient referrals.  Knowing that Clinica was a referral source, attorney Tinsley nevertheless advised that the proposed contract would be legal under the AKS because it fit into a safe harbor.  In fact, in an email to Mr. Holland on which Tracey was copied, attorney Tinsley advised "I believe that as worded it complies with the applicable federal AKS Safe Harbor."  (Doc. 526, Ex. 8).

Once attorney Tinsley gave the go-ahead, Mr. Holland vetted the Clinica contract with Tenet's internal and outside counsel.  In-house lawyers included Jacinta Titialii and Barbara Zurzolo.  (Doc. 520, HEx. 4, p. 1; Doc. 526, Ex. 8, p. 1).  In addition, outside counsel Jane Boubelik, Eric Gordon and Christina Slawson, attorneys with McDermott Will & Emery, all reviewed the contract.  (Doc. 520, HEx. 4, at p. 1, 11; Doc. 526, Ex. 8, pp. 1-2, 4).  Ultimately, ███████████████████████████, gave her approval after reviewing the contract under the criteria applicable to agreements with potential referral sources.  (Doc. 507, Ex. 51, p. 3).

In support of its argument that Mr. Holland failed to make full disclosure to the lawyers, the Government points to ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████  Contrary to the

45

Government's claim, this document — created by Tenet during the Clinica contract vetting process — actually *contradicts* the Government's non-disclosure argument. The very existence of the proforma establishes that Tenet was made aware of the potential referrals from Clinica. In fact, the anticipation of Clinica referrals was the very reason Tenet's lawyers were able to determine that the "aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services" for purposes of determining safe harbor compliance. *See* 42 C.F.R. § 1001.952(d)(7). The revelation to Tenet of anticipated Clinica referrals defeats the Government's non-disclosure argument.



*see also* (Doc. 526, Ex. 8, pp. 3) (outside lawyer's statement in FBI 302 that Tenet lawyer vetting the North Fulton/Clinica contract "was going to view Clinica as a referral source" and that he, in

turn, "viewed Clinica as a referral source for purposes of providing advice on the deal"). The emails add nothing to the calculus.

The district court was correct that "the fact that Tenet employees may have made statements after the contracts were executed that caused concern by a healthcare attorney falls significantly short of establishing that the employees failed to make a full and complete good faith report of all material facts to an attorney." (Doc. 596-37). Discussions in those emails of "flat volumes of Clinica patients" in 2008 and possibly replacing Clinica with another vendor in 2009, ███████████████████████ ████████████████████████████████████████████████████ ████ have no bearing on whether Mr. Holland willfully violated the AKS when he signed off the on Clinica/North Fulton contracts. Further, none of ██████████████ indicated that Mr. Holland made less than full disclosure of all pertinent information concerning Clinica as a referral source when the contracts were vetted. In sum, ████ ██████████████████████████████████ in no way undermined her approval of the contracts.

As for Eric Gordon, Tenet's outside counsel, any statement that he "did not know that referrals were the purpose of the Clinica contracts" does not support the Government's non-disclosure argument because (1) Mr. Gordon knew that Tenet lawyers were reviewing it as a referral source contract, (Doc. 526, Ex. 8, p. 3); (2) Gordon's only involvement was to evaluate fair market value and commercial

47

reasonableness of the North Fulton/Clinica contract, not to vet its legality, (*Id*. at p. 2); and (3) the Government's evidence does not establish that referrals *were* the purpose of the contract. Moreover, while under the AKS "quid pro quo kickbacks and overpayment-for-services arrangements are illegal if they induce referrals," *see United States ex rel. Hockaday v. Athens Orthopedic Clinic, P.A.,* No. 3:15-CV-122 (CDL), 2022 WL 2820103, at *4, n.3 (M.D. Ga. July 19, 2022), the Government has neither alleged nor established that payments made by North Fulton to Clinica included kickbacks or overpayments. Mr. Gordon's statements do not advance the Government's position.

Finally, the Government's claim that the district court neglected to make a finding that Mr. Holland fully disclosed to counsel all material facts should be given short shrift. It ignores the judge's finding that "the fact that Tenet employees may have made statements after the contracts were executed that caused concern by a healthcare attorney falls significantly short of establishing that the employees failed to make a full and complete good faith report of all material facts to an attorney." (Doc. 596-37). The judge did not "skip" this step.

For all of the reasons given, the district court did not clearly err in finding that the Government failed to carry its burden of establishing that the defendants or, in turn, the alleged co-conspirator declarants, willfully violated the AKS.

CONCLUSION

For the above and foregoing reasons, Mr. Holland respectfully requests that the district court's order be affirmed.

Respectfully submitted,

/s/ Amy Levin Weil
Amy Levin Weil
THE WEIL FIRM, LLC
511 East Paces Ferry Road, N.E.
Atlanta, GA 30305
404/581-0000

Richard H. Deane, Jr.
JONES DAY
1221 Peachtree St. NE, Suite 400
Atlanta, GA 30361
404-581-8502

Henry W. Asbill
ORRICK HERRINGTON & SUTCLIFFE, LLP
2001 M St., NW, Suite 500
Washington, D.C. 20036
202-349-8007

Counsel for Appellee John Holland

49

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect word processing software in 14-point Times New Roman.

This brief complies with the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software, it contains 11,576 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


*/s/ Amy Levin Weil*
Amy Levin Weil

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2023, a true and correct copy of the foregoing Corrected Sealed Brief for Appellee was served via electronic mail to all counsel of record including counsel for the government-appellant and each defendant-appellee's counsel, who all previously consented to service via electronic mail. Paper copies have also been sent via express mail to the Clerk of the Court pursuant to the Local Rules

I also hereby certify that on April 24, 2023, a true and correct copy of the Corrected Redacted Brief for Appellee was electronically filed via the Court's CM/ECF system and served upon all counsel of record in this case.

This 24th day of April, 2023.


*/s/ Amy Levin Weil*
Amy Levin Weil